# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GARY WILLISCH, ET AL. | : | CIVIL ACTION |
| | : | |
| v. | : | NO.: 09-5276 |
| | : | |
| NATIONWIDE INSURANCE COMPANY | : | |
| OF AMERICA | : | |

| | | |
|---|---|---|
| DEBORAH KOLESAR, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | NO.: 09-5510 |
| | : | |
| ENCOMPASS INDEMNITY COMPANY | : | |

| | | |
|---|---|---|
| NICOLE MECADON | : | CIVIL ACTION |
| | : | |
| v. | : | NO.: 09-5511 |
| | : | |
| ALLSTATE INDEMNITY COMPANY | : | |

| | | |
|---|---|---|
| RONALD BUCARI, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | NO.: 09-5512 |
| | : | |
| ALLSTATE PROPERTY AND CASUALTY | : | |
| INSURANCE COMPANY | : | |

| | | |
|---|---|---|
| ROBERT BESECKER, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | NO.: 09-5513 |
| | : | |
| PEERLESS INDEMNITY INSURANCE | : | |
| COMPANY | : | |

| | | |
|---|---|---|
| ALBERT BALDONI | : | CIVIL ACTION |
| | : | |
| v. | : | NO.: 09-5514 |
| | : | |
| STATE FARM MUTUAL AUTOMOBILE | : | |
| INSURANCE COMPANY | : | |

| | | |
|---|---|---|
| PAMELA LOWE-FENICK & | : | CIVIL ACTION |
| JAMES BOYLE, SR. | : | |
| | : | NO: 09-5515 |
| v. | : | |
| | : | |
| PROGRESSIVE SPECIALTY | : | |
| INSURANCE COMPANY | : | |

| | | |
|---|---|---|
| ANN WARRICK | : | CIVIL ACTION |
| | : | |
| v. | : | NO.: 09-6077 |
| | : | |
| ALLSTATE INSURANCE COMPANY | | |

**DEFENDANTS' JOINT STATEMENT OF DISPUTED FACTS IN OPPOSITION
TO PLAINTIFFS' CORRECTED STATEMENT OF UNCONTESTED
MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# INTRODUCTORY STATEMENT

Defendants submit this Joint Statement of Disputed Facts in Opposition to Plaintiffs' Corrected Statement of Uncontested Material Facts In Support of Plaintiffs' Motion for Summary Judgment and Plaintiffs' Motion for Class Certification. Plaintiffs have also filed separate Corrected Statements of Additional Uncontested Material Facts with respect to each individual Defendant, to which the individual Defendants are responding separately. Additional facts which preclude summary judgment for Plaintiffs are set forth in Defendants' Joint Statement of Undisputed Facts and each Defendant's individual Statement of Undisputed Facts, which Defendants incorporate here.

Defendants' Joint Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment summarizes the provisions of the Court's Amended Scheduling Order, dated May 13, 2010, and the problems with Plaintiffs' initial filings on June 30, 2010. On July 8, 2010 Plaintiffs filed their Corrected Statement of Uncontested Material Facts as well as Corrected Statements of Additional Uncontested Facts with respect to individual Defendants. The "corrected" statements, however, continue to have significant defects, both procedural and substantive. Accordingly, Defendants are providing the following Introductory Statement to summarize the defects and explain the form in which Defendants have put their responses. This Introductory Statement applies both to Defendants' Joint Statement of Undisputed Facts and to the individual Statements of Undisputed Facts being filed by Defendants separately.

a.      In many instances in Plaintiffs' supposedly "corrected" filing, Plaintiffs' allegations are not properly supported, contrary to this Court's instructions. Amended Scheduling Order (May 13, 2010) at ¶ 5(d). The errors include references to multi-page documents without citing the specific page; citation to specific pages of documents or

depositions where the specific pages cited appear to be unrelated to the allegation; and statements of fact without any supporting citations. In these instances, Defendants' response typically states "Unsupported allegation." Where possible, Defendants have attempted to locate and reference the correct record citations in responding to the allegation, even though Defendants have no obligation to fix the errors in Plaintiffs' citations. With respect to facts that are not in dispute, Defendants have at times responded "Not disputed" even though Plaintiffs have not cited the correct record page.

b. Many of Plaintiffs' numbered paragraphs include multiple allegations, present facts out of context, or include characterizations and argument, making it difficult to provide a simple response. Defendants have attempted to respond to every allegation of fact, have admitted facts which are not in dispute, and, where applicable, have admitted that Plaintiffs accurately quote language from a document even if the quote is taken out of context or has been used to support an unwarranted inference. However, Defendants have pointed out unsupported inferences, facts or statements taken out of context, and mischaracterizations of the record. In addition, many of Defendants' responses include a statement of additional facts directly relevant to the fact asserted by Plaintiffs, with supporting citations to record evidence.

c. Plaintiffs' citations to their Appendix generally contain two numbers, which appear to be an exhibit number and then a Bates page number (e.g., App. 130 at 2727). Defendants received Plaintiffs' Appendix on a computer disk which did not include an exhibit list or any exhibit numbers. Accordingly, Defendants' references to Plaintiffs' Appendix include only the Bates number of the relevant document page. (E.g., a reference to Appendix at 2727 refers to the Bates number in the lower right corner of the document).

## II.   DEFENDANTS' RESPONSES TO PLAINTIFFS' STATEMENT OF FACTS

Below are Defendants' joint responses to each of Plaintiffs' factual allegations, in accordance with Federal Rule of Civil Procedure 56, the Local Rules of this District, and this Court's own policies and procedures.

Common Facts

1.    Not disputed.

2.    Not disputed.

In further response, Section 1791.1(c) provides:

§ 1791.1. Disclosure of premium charges and tort options

(c) Notice of premium discounts. – Except where the commissioner has determined that an insurer may omit a discount because the discount is duplicative of other discounts or is specifically reflected in the insurer's experience, at the time of application for original coverage and every renewal thereafter, an insurer must provide to an insured a notice stating that discounts are available for drivers who meet the requirements of sections 1799 (relating to restraint system), 1799.1 (relating to antitheft devices) and 1799.2 (relating to driver improvement course discount.

3.    Disputed on the basis that the Defendants' responses to individual allegations of Plaintiffs' complaints must be read in the context of their answers as a whole. In their Answers to the Complaints, Defendants Peerless Indemnity Insurance Company, Allstate and Encompass admitted generally that "where a statute or law pertains to a given area of contract, courts may imply the statutory provisions into the contract." Peerless, Allstate, and Encompass went on to state that "[s]uch application, however, depends on a case-by-case basis analysis and interpretation which *has not* yet been undertaken in this particular case." Similarly, in their Answers, Progressive and Nationwide admitted that, "as a general matter," insurance contracts must be read with reference to applicable statutes, and incorporated other paragraphs of their answers, including statements that the statutory requirements must be read as a whole, that

Plaintiffs' characterizations of the statutory requirements were denied, and that Defendants denied that they violated any requirements of the relevant statutes. *See* Appendix pages referenced in Plaintiffs' ¶ 3. Plaintiffs' statement that "the Statute is applicable to the insurance contracts in all of the Related Actions" is a legal conclusion and not a statement of fact.

4.    Not disputed.

5.    Not disputed.

6.    Not disputed.

7.    Not disputed.

### VEHICLES EQUIPPED WITH FACTORY INSTALLED STANDARD EQUIPMENT PASSIVE ANTITHEFT DEVICES ARE WIDESPREAD[1]

8.    Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. Under HLDI's definition, a device is "passive" if it is automatically armed by the vehicle's doors being locked. *See* Defendants' Joint Statement of Undisputed Facts at 12, ¶58 (citing Hazelbaker Dep. at 29: 16 – 22, 65: 25 – 67: 8). Mr. Hazelbaker explicitly stated that his statement that "passive" devices have been widely available since the mid-1990s was based on HLDI's definition of a "passive device." The following exchange from Mr. Hazelbaker's deposition clarifies Plaintiffs' mischaracterization:

Q:    Would an insurer by looking at a HLDI 04 be able to determine if that vehicle has a device that is activated simply by turning the key to the off position?
A:    No, because we don't use that definition.

Q:    You stated earlier that these devices became widely available in the mid-nineties. Was that statement based on your definition of passive?
A:    Absolutely.

---

[1] Defendants deny Plaintiffs' unsupported allegation that "passive antitheft devices are widespread." Defendants dispute Plaintiffs' use of the general term "passive" which makes no reference to the Pennsylvania statute. Plaintiffs also fail to narrow their statement to any particular time period. Defendants' incorporate their responses to ¶¶ 8–211.

Q:      And by you I mean HLDI's definition of passive?
A:      Correct.

Q:      You also said that virtually everything today at this point has an immobilizer.
Was that based on HLDI's definition?
A:      Yes.

Q:      Which requires an additional step aside from turning the key to the off position?
A:      Yes.

*See* Plaintiffs' Appendix at 5617 (citing Hazelbaker Dep. at 66: 15 – 67: 8). In response to the

statement in footnote 6, Defendants do not dispute that HLDI is a non-profit research institution

supported by automobile insurers, including Defendants.

9.      Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to

draw an unsupported inference. *See* Defendants' Response to ¶ 8. HLDI's responses regarding

the prevalence of active and passive devices are based on HLDI's definition of "passive" and

"active." Furthermore, the definition of what constitutes a "passive" device differs from source

to source. *See* Defendants' Joint Statement of Undisputed Facts at 12, ¶ 58, 13, ¶ 70, 15, ¶ 83

(listing different definitions of "passive" used by various third-party vendors).

10.     Not disputed that Honda stated that since 2003, all Honda and Acura automobiles

manufactured for distribution and sale in the United States have been equipped with antitheft

immobilizer devices as standard equipment. In further response, Honda did not provide any

information on vehicles manufactured before 2003 because "it would be burdensome to parse

out" which vehicles before 2003 came equipped with an antitheft device." *See* Defendants' Joint

Statement of Undisputed Facts at 19, ¶ 111 (citing Brady Aff. at Bates No. Pl. 003353).

11.     Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to

draw an unsupported inference. The allegation in paragraph 11 uses the general terms "active"

and "passive" without reference to the Pennsylvania statute. Plaintiffs' support for the allegation

in paragraph 11 comes from Robert Mangine, who has explicitly stated that none of the devices installed on named plaintiffs' vehicles activate automatically by turning the key to the off position. *See* Defendants' Joint Statement of Undisputed Facts at 7–9, ¶¶ 29–39 (citing Mangine Report).

### Factory Installed Standard Engine Immobilizers

12.     Not disputed.

13.     Not disputed.

14.     Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. *See* Defendants' Responses to ¶¶ 8, 9, and 11.  The allegation in paragraph 14 uses the general term "passive" without reference to the Pennsylvania statute. Plaintiffs' support for the allegation in paragraph 14 comes from Robert Mangine, who has explicitly stated that engine immobilizer systems are commonly "referred to as 'passive anti-theft devices' in the automotive industry, but do not activate when the key is turned to the off position." *See* Defendants' Joint Statement of Undisputed Facts at 7–9, ¶¶ 29–39 (citing Mangine Report at 1).   In further response, Mr. Mangine explicitly stated that none of the devices installed on named plaintiffs' vehicles activate automatically by turning the key to the off position. *See* Defendants' Joint Statement of Undisputed Facts at 7–9, ¶¶ 29–39 (citing Mangine Report at 8-9).

15.     Not disputed.

16.     Not disputed.

### GM's PassKey Systems (PassKey I and PassKey II)

17.     Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference.  *See* Defendants' Response to ¶¶ 8, 9, 11, and 14.    The

allegation in paragraph 17 uses the general term "passive" without reference to the Pennsylvania statute. Furthermore, the owner's manual for the 1997 Cadillac El Dorado Touring Coupe provides no definition of the term "passive," and makes no mention of the Pennsylvania statute. In further response, Robert Mangine, whom Plaintiffs selectively cite to for certain propositions but not others (see paragraphs 10–16, 18–19, 26), explicitly states that the 1997 Cadillac El Dorado Touring Coupe does not have a device that activates automatically when the ignition key is turned to the off position. *See* Defendants' Joint Statement of Undisputed Facts at 9, ¶ 39 (citing Mangine Report at 8–9). In further response, HLDI (which Plaintiffs cite for numerous other propositions) states that the PASSKey system is engaged by the *"normal locking of the vehicle." See* Plaintiffs' Appendix at 3985 (emphasis added).

18.     Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. *See* Defendants' Responses to ¶¶ 8, 9, 11, 14, and 17. The allegation in paragraph 18 uses the general term "passive" without reference to the Pennsylvania statute. Robert Mangine, the source of Plaintiffs' allegation in paragraph 18, states that the PassKey theft deterrent system does not activate automatically when the key is turned to the off position. *See* Mangine Report at 1–2, 8–9. In further response, HLDI (which Plaintiffs cite for numerous other propositions) states that the PASSKey system is engaged by the *"normal locking of the vehicle." See* Plaintiffs' Appendix at 3985 (emphasis added).

19.     Not disputed that Plaintiffs have accurately cited a portion of Mr. Mangine's book. In further response, Plaintiffs fail to cite to the entire paragraph from which their citation was obtained which includes Mr. Mangine's description that the immobilizer system energizes upon rotation of the key. This is the precise aspect of Mr. Mangine's opinion number four in his report – that electronic immobilizers function when the key is turned on, not off – which

Plaintiffs wish to preclude. *See* Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Motion In Limine To Preclude the Expert Report and Testimony of Robert Mangine at 5, n.4.

20.　　Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. *See* Defendants' Responses to ¶¶ 8, 9, 11, 14, 17, and 18. The allegation in paragraph 20 uses the general term "passive" without reference to the Pennsylvania statute. Furthermore, the NHTSA document cited by Plaintiffs in paragraph 20 is dated 1993 – three years after the relevant provisions of the MVFRL were drafted. Additionally, defendants dispute that NHTSA made any actual findings regarding the definition of the PASSKey II device. There is nothing in the cited document, which is simply a notice that NHTSA has granted an exemption from the Vehicle Theft Prevention Standard, to suggest that NHTSA has done anything more than rely on statements made by GM. *See* Plaintiffs' Appendix at 5105-09. Furthermore, Robert Mangine's expert report states that the PASSKey theft deterrent system does not activate automatically when the key is turned to the off position. *See* Mangine Report at 1–2, 8–9. In further response, HLDI (which Plaintiffs cites for numerous other propositions) states that the PASS-Key system is engaged by the *"normal locking of the vehicle." See* Plaintiffs' Appendix at 3985 (emphasis added).

21.　　Not disputed.

## GM's PassLock Theft Deterrent System

22.　　Disputed. The PassLock system does not activate automatically when the ignition key is turned to the off position. *See* Defendants' Joint Statement of Undisputed Facts at 8, ¶ 38 (citing Mangine Report at 7). Robert Mangine, whom Plaintiffs selectively cite to for certain propositions but not others (see paragraphs 10–16, 18–19, 26), explicitly states that the 1998

Chevy Cavalier R/S does not have a device that activates automatically when the ignition key is turned to the off position. *See* Defendants' Joint Statement of Undisputed Facts at 9, ¶ 39 (citing Mangine Report at 8–9). In further response, Plaintiffs offer no support for the allegation in paragraph 22. The page of the 1998 Chevy Cavalier's owner's manual they cite to describes the vehicle's power door locks – not the PassLock system.

23. Not disputed.

24. Defendants dispute that NHTSA made any actual findings regarding the definition of the PassLock device. There is nothing in the cited document, which is simply a notice that NHTSA has granted an exemption from the Vehicle Theft Prevention Standard, to suggest that NHTSA has done anything more than rely on statements made by GM. *See* Plaintiffs' Appendix at 5089-92.

### Transponder-Based Immobilizers

25. Disputed. *See* Defendants' Responses to ¶¶ 8, 9, 11, 14, 17, and 20. The allegation in paragraph 25 uses the general term "passive" without reference to the Pennsylvania statute. In further response, Robert Mangine's expert report states that transponder-based immobilizers do not activate automatically when the key is turned to the off position. *See* Mangine Report at 1–2, 8–9.

26. Not disputed that Plaintiffs have accurately cited a portion of Mr. Mangine's book. In further response, Plaintiffs fail to cite to the entire paragraph from which their citation was obtained which includes Mr. Mangine's description which explains that the device is energized when the key is turned on. This is the precise aspect of Mr. Mangine's opinion number four in his report – that electronic immobilizers function when the key is turned on, not off – which Plaintiffs wish to preclude. *See* Defendants' Joint Memorandum of Law in

9

Opposition to Plaintiffs' Motion In Limine To Preclude the Expert Report and Testimony of

Robert Mangine at 5, n.4.

## Chrysler's Sentry Key Immobilizer System

27.     Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to

draw an unsupported inference. *See* Defendants' Responses to ¶¶ 8, 9, 11, 14, 17, 18, 20, and 25

The allegation in paragraph 27 uses the general term "passive" without reference to the

Pennsylvania statute. Furthermore, the NHTSA document cited by Plaintiffs in paragraph 27 is

dated 2005 – fifteen years after the relevant provisions of the MVFRL were drafted.

Additionally, defendants dispute that NHTSA made any actual findings regarding the definition

of the Sentry Key Immobilizer System. There is nothing in the cited document, which is simply

a notice that NHTSA has granted an exemption from the Vehicle Theft Prevention Standard, to

suggest that NHTSA has done anything more than rely on statements made by Chrysler. *See*

Plaintiffs' Appendix at 5060-62. In further response, Robert Mangine's expert report states that

the SentryKey theft deterrent system does not activate automatically when the key is turned to

the off position. *See* Mangine Report at 1–2, 8–9.

28.     Disputed. Sentry Key Systems are not "passive" systems as defined by the

Pennsylvania statute and are not activated upon removal of the key. *See* Mangine Report at 1-2.

Robert Mangine, whom Plaintiffs selectively cite to for certain propositions but not others (see

paragraphs 10–16, 18–19, 26), explicitly states that the 2005 Jeep Liberty Renegade does not

have a device that activates automatically when the ignition key is turned to the off position. *See*

Defendants' Joint Statement of Undisputed Facts at 9, ¶ 39 (citing Mangine Report at 8–9). In

further response, Plaintiffs offer no support for the allegation in paragraph 28 as the owner's

manual page referenced does not state that the Sentry Key System is "activated upon removal of the key."

## GM's PassKey III/PassKey+ Theft Deterrent Systems

29.    Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. *See* Defendants' Responses to ¶¶ 8, 9, 11, 14, 17, 18, 20, 25, and 27. The allegation in paragraph 29 uses the general term "passive" without reference to the Pennsylvania statute. Furthermore, the NHTSA document cited by Plaintiffs in paragraph 29 is dated 2009 – nineteen years after the relevant provisions of the MVFRL were drafted. Additionally, Defendants dispute that NHTSA made any actual findings regarding the definition of the PASS-Key III device. There is nothing in the cited document, which is simply a notice that NHTSA has granted an exemption from the Vehicle Theft Prevention Standard, to suggest that NHTSA has done anything more than rely on statements made by GM. *See* Plaintiffs' Appendix at 5048-51. In further response, Robert Mangine's expert report states that the PassKey III theft deterrent system does not activate automatically when the key is turned to the off position. *See* Mangine Report at 1–2, 8–9.

30.    Disputed. PassKey III Systems are not "passive" systems as defined by the Pennsylvania statute and are not activated upon removal of the key. *See* Mangine Report at 7. The owner's manual section quoted in paragraph 30 states that the system "works when you insert *or* remove the key from the ignition." (emphasis added). Robert Mangine, whom Plaintiffs selectively cite to for certain propositions but not others (see paragraphs 10–16, 18–19, 26), explicitly states that the 2002 Buick Rendezvous CX/CXL does not have a device that activates automatically when the ignition key is turned to the off position. *See* Defendants' Joint Statement of Undisputed Facts at 9, ¶ 39 (citing Mangine Report at 8–9).

31.     Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. *See* Defendants' Responses to ¶¶ 8, 9, 11, 14, 17, 18, 20, 25, 27, and 29. The allegation in paragraph 31 uses the general term "passive" without reference to the Pennsylvania statute. The owner's manual section quoted in paragraph 31 states that the system "is designed to be active at all times without direct intervention by the vehicle operator." Furthermore, the NHTSA document cited by Plaintiffs in paragraph 31 is dated 2009 – nineteen years after the relevant provisions of the MVFRL were drafted. Additionally, Defendants dispute that NHTSA made any actual findings regarding the definition of the PassKey III+ device. There is nothing in the cited document, which is simply a notice that NHTSA has granted an exemption from the Vehicle Theft Prevention Standard, to suggest that NHTSA has done anything more than rely on statements made by GM. *See* Plaintiffs' Appendix at 5048-51.

### Ford's Securilock Anti-Theft Immobilizer System

32.     Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. *See* Defendants' Responses to ¶¶ 8, 9, 11, 14, 17, 18, 20, 25, 27, 29, and 31. The allegation in paragraph 32 uses the general term "passive" without reference to the Pennsylvania statute. Furthermore, the NHTSA document cited by Plaintiffs in paragraph 32 is dated 1999 – nine years after the relevant provisions of the MVFRL were drafted. Additionally, Defendants dispute that NHTSA made any actual findings regarding the definition of the SecuriLock device. There is nothing in the cited document, which is simply a notice that NHTSA has granted an exemption from the Vehicle Theft Prevention Standard, to suggest that NHTSA has done anything more than rely on statements made by Ford. *See* Plaintiffs' Appendix at 5094-97. In further response, Robert Mangine's expert report states that engine

immobilizer systems like the SecuriLock do not activate automatically when the key is turned to the off position. *See* Mangine Report at 1–2, 8–9.

33. Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. *See* Defendants' Responses to ¶¶ 8, 9, 11, 14, 17, 18, 20, 25, 27, 29, and 32. The allegation in paragraph 33 uses the general term "passive" without reference to the Pennsylvania statute. In further response, Robert Mangine's expert report states that engine immobilizer systems like the SecuriLock do not activate automatically when the key is turned to the off position. *See* Mangine Report at 1–2, 8–9.

34. Disputed in part. Defendants do not dispute that Plaintiffs have accurately cited to the owner's manual for a 2001 Ford Taurus LX. Defendants dispute, however, that the 2001 Ford Taurus has a passive antitheft device within the meaning of the Pennsylvania statute. Robert Mangine, whom Plaintiffs selectively cite to for certain propositions but not others (see paragraphs 10–16, 18–19, 26), explicitly states that the 2001 Ford Taurus does not have a device that activates automatically when the ignition key is turned to the off position. *See* Defendants' Joint Statement of Undisputed Facts at 9, ¶ 39 (citing Mangine Report at 8–9).

### The Mercedes Immobilizer System

35. Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. *See* Defendants' Responses to ¶¶ 8, 9, 11, 14, 17, 18, 20, 25, 27, 29, 32, and 33. The allegation in paragraph 35 uses the general term "passive" without reference to the Pennsylvania statute. Furthermore, the NHTSA document cited by Plaintiffs in paragraph 35 is dated 2006 – sixteen years after the relevant provisions of the MVFRL were drafted. Additionally, Defendants dispute that NHTSA made any actual findings regarding the definition of MBUSA's immobilizer device. There is nothing in the cited document, which is simply a

notice that NHTSA has granted an exemption from the Vehicle Theft Prevention Standard, to

suggest that NHTSA has done anything more than rely on statements made by MBUSA. *See*

Plaintiffs' Appendix at 5058. In further response, Robert Mangine's expert report states that

engine immobilizer systems such as the one described in paragraph 35 do not activate

automatically when the key is turned to the off position. *See* Mangine Report at 1–2, 8–9.

36. Disputed. The Mercedes Immobilizer Systems are not "passive" devices as

defined by the Pennsylvania statute and are not activated upon removal of the key. *See* Mangine

Report at 1-2, 8-9. Robert Mangine, whom Plaintiffs selectively cite to for certain propositions

but not others (see paragraphs 10–16, 18–19, 26), explicitly states that the 2006 Mercedes CLK

350 and the 2007 Mercedes GL 450 do not have a device that activates automatically when the

ignition key is turned to the off position. *See* Defendants' Joint Statement of Undisputed Facts at

9, ¶ 39 (citing Mangine Report at 8–9). In further response, the owner's manuals for the 2006

Mercedes CLK 350 and 2007 Mercedes GL 450 state that the purchaser of either vehicle may opt

for "Keyless-Go." With Keyless-Go, the operator of the vehicle must turn the engine off by

means of a start/stop button *and* open the driver-side door for the immobilizer to activate. *See*

Ex. 8 to State Farm's Statement of Undisputed Facts (citing 2006 Mercedes CLK 350 Owner's

Manual at PL–001877); Ex. 9 to State Farm's Statement of Undisputed Facts (citing 2007

Mercedes GL 450 Owner's Manual at PL–001302).

## Other Immobilizer Systems

37. Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to

draw an unsupported inference. *See* Defendants' Responses to ¶¶ 8, 9, 11, 14, 17, 18, 20, 25, 27,

29, 32, 33, and 35. The allegation in paragraph 37 uses the general term "passive" without

reference to the Pennsylvania statute. Furthermore, the NHTSA document cited by Plaintiffs in

paragraph 37 is dated 2009 – nineteen years after the relevant provisions of the MVFRL were drafted. Plaintiffs further mischaracterize the evidence cited in paragraph 37 by arbitrarily inserting and quoting the term "passive" where the manufacturers themselves have not used the term. For example, Plaintiffs refer to Volkswagen's "*passive*, transponder-based electronic immobilizer" and Porsche's "*passively activated*" transponder-based engine immobilizer despite the fact that neither of those sources uses the terms "passive" or "passively activated." (emphasis added). Additionally, Defendants dispute that NHTSA made any actual findings regarding the definition of the devices mentioned. There is nothing in the cited documents, which are simply notices that NHTSA has granted an exemption from the Vehicle Theft Prevention Standard, to suggest that NHTSA has done anything more than rely on statements made by the automobile manufacturers. *See* Plaintiffs' Appendix at 5049, 5060, 5078, 5039, 5065, 5042, 5037, 5033, 5052, 5045, 5029, 5099. Further, the citations contain hearsay statements from NHTSA that "[Manufacturer] said . . . ", and many of the NHTSA documents cited pertain to vehicles that have not been released on the market. *E.g.* Plaintiffs' Appendix at 5030 ("Volkswagen stated . . ."); Pls. App. 246 at 5029 ("The exemption granted by this notice is effective beginning with the 2012 model year").

38.     Disputed on the basis that the Mangine chapter cited (Plaintiffs' Appendix at 4986) states only that the "concept" of transponder systems is the same among different types. Mangine says nothing about the "function" of the transponder system. The functions of various transponder systems undisputedly vary greatly. *See* Chart, "Definitions for Engine Immobilizer vs. Statutory Definition," Ex. A to Defendants' Joint Memorandum in Opposition to Plaintiffs' Motions for Summary Judgment.

39.     Not disputed.

40.    Defendants do not dispute that Plaintiffs have accurately cited to the portion of Robert Mangine's book describing electronic key and keyless entry systems. For the sake of completeness, Defendants note that the electronic key and keyless entry systems described in paragraph 40 were first introduced in 1998 – eight years after the relevant portions of the MVFRL were drafted. *See* Plaintiffs' Appendix at 4994. Defendants also note that Plaintiffs have failed to include Robert Mangine's descriptions of alarms, which appears on the same page that Plaintiffs cite for the description of keyless entry systems in paragraph 40 and states that "[alarm] systems are armed by the locking of the doors by the driver." *See* Plaintiffs' Appendix at 4994–4995.

41.    Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. Plaintiffs use the term "passive alarm systems" although none of the sources they cite to in paragraph 41 refer to alarm systems as "passive." Alarm systems, including those available in the 1980s and those available today, are activated by locking a vehicle's doors. *See* Defendants' Joint Statement of Undisputed Facts at 8, ¶ 31 (citing Mangine Report at 5, 9); *see also*, Robert Mangine, *Forensic Investigation Of Stolen-Recovered And Other Crime Related Vehicles*, Chapter 8, *Antitheft Systems* at Plaintiffs' Appendix 04995 (stating that "[alarm] systems are armed by the locking of the doors by the driver"). Defendants do not dispute that ignition interlocks are not engine immobilizers or alarms.

**Industry Standard for What Constitutes A "Passive" ATD**

42.    Defendants dispute the statement that "key removal and door locking do not render an immobilizer 'active,'" as that statement conflicts with the definition in the Pennsylvania statute. Not disputed that some of the definitions of passive systems that are

16

generally accepted in the automobile industry are different from the Pennsylvania statute and include devices that activate automatically once the keys are removed *or the doors are locked.*

43.     Not disputed that Polk defines a "passive" device as one where "*the system is activated automatically when the ignition key is turned on or off.*" Defendants dispute any allegation that Polk provides information on factory-installed "passive antitheft devices" as specifically defined by the Pennsylvania statute. Defendants incorporate their responses to ¶¶ 42 and 171.

44.     Not disputed that HLDI defines a device as "passive" if it is "automatically armed by the vehicle's doors being locked normally." Defendants dispute any allegation that HLDI provides information on factory-installed "passive antitheft devices" as specifically defined by the Pennsylvania statute. Defendants incorporate their responses to ¶¶ 42, 94-95 and 132.

45.     Not disputed that ISO has a times defined a device as "passive" if the operator must lock the vehicle door in order for the device to be activated, and at other times, defined a "passive disabling device" as "any fuel, ignition or starting system cutoff that is automatically activated (does not require manual intervention)." Defendants dispute any allegation that ISO provides information on factory-installed "passive antitheft devices" as specifically defined by the Pennsylvania statute. Defendants incorporate their responses to ¶¶ 42 and 142.

46.     Not disputed that NHTSA provides exemptions for devices that are activated automatically by removing the key and locking the doors. Defendants dispute any allegation that the devices for which NHTSA provides an exemption fit within the specific definition of "passive" set forth in the Pennsylvania statute. Defendants incorporate their responses to ¶ 42.

47.     Disputed. Plaintiffs provide no support for their claim that immobilizers do not require the locking of a vehicle's doors to be activated. Instead, Plaintiffs cite to the owner's

manual for a 2006 Hyundai Sonata describing the Sonata's alarm system which is armed by the locking of the vehicle's doors. *See* Plaintiffs' Appendix at 7187-88. Neither the Sonata owner's manual or any other third-party source lists the 2006 Sonata as having an engine immobilizer. In further response, Kim Hazelbaker, the Senior Vice President of HLDI, testified that locking the doors is required. *See* Defendants' Response to ¶ 51. Defendants further dispute that "turning the vehicle off and removing the key" is the relevant focus for determining the "passivity" of an immobilizer, for the reasons set forth in Defendants' responses to ¶¶ 14, 17–41.

48.    Unsupported allegation. Plaintiffs' allegation in paragraph 42 states that the automobile industry defines passive systems to include those that activate automatically once the keys are removed or the doors are locked. As stated in their response to paragraph 42, Defendants do not dispute that allegation. Plaintiffs now allege that the industry standard for passive immobilizers depends upon the immobilizer activating upon removal of the key. Defendants dispute that allegation as unsupported and contrary to the evidence in the record. *See* allegation and response to ¶ 42. In further response, Robert Mangine's expert report states that engine immobilizers do not activate automatically when the key is turned to the off position. *See* Mangine Report at 1–2, 8–9. Defendants incorporate their responses to ¶¶ 17-18, 20-22, 27-37, 48, 50-51, 55-60.

49.    Defendants dispute the allegation in paragraph 49 as vague. According to Polk, a device is "passive" if it is activated automatically when the ignition key is turned on or off. *See* Defendants' Joint Statement of Undisputed Facts at 15, ¶ 83 (citing Polk VIS Manual at Bates No. PL 003188). Defendants do not dispute that Polk does not provide any information on alarm systems. Defendants dispute Plaintiffs' use of the term "passive alarms" for the reasons set forth in paragraphs 41 and 47.

50. Defendants dispute the allegation in paragraph 50 on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. *See* Defendants' Responses to ¶¶ 8, 9, 11, 14, 17, 18, 20, 25, 27, 29, 32, 33, 35, and 37. Defendants do not dispute that ISO includes an electronic immobilizer system as an example of a passive disabling device. Defendants dispute any inference that ISO's definition of "passive disabling device" comports with the definition of "passive antitheft device" set forth in the Pennsylvania statute. In further response, ISO has never published antitheft information that is limited to or otherwise specifically addresses the Pennsylvania statute, nor has ISO evaluated what equipment would meet the legal definition of passive antitheft device set forth in 75 Pa. C.S. § 1799.1(a). *See* Defendants' Joint Statement of Undisputed Facts at 14, ¶¶ 77–78.

51. Disputed. Plaintiffs' counsel asked Kim Hazelbaker, Senior Vice President of HLDI, about the activation of the Ford SecuriLock during his deposition to which Mr. Hazelbaker responded that the locking of the doors is required. The following exchange occurred between Mr. Hazelbaker and Plaintiffs' counsel:

> Q: Explain your confusion about the Pennsylvania definition for me, please.
> A: I don't know of any device – we didn't do a good job of writing this obviously because the secure lock (sic) you have to lock the vehicle as well.

Plaintiffs' Appendix at 5624 (citing Hazelbaker Dep. at 95: 9 – 13) (responding to HLDI Theft Loss Bulletin, Vol. 15, No. 1 which Plaintiffs cite in paragraph 51). In further response, Mr. Hazelbaker testified that based on HLDI's definition of "passive" and how HLDI tracks immobilizers and alarms, no insurer can rely on HLDI's data to determine if a particular vehicle has an antitheft device that activates simply by turning the key to the off position (i.e., meets the statutory definition under the MVFRL). *See* Defendants' Joint Statement of Undisputed Facts at 12, ¶ 59 (citing Hazelbaker Dep. at 66: 19–19). In further response, a HLDI Theft Bulletin

which Plaintiffs cite to support their allegation in paragraph 66 states that the PASSKey system is engaged by the *"normal locking of the vehicle."* *See* Plaintiffs' Appendix at 3985 (emphasis added). In paragraphs 17 – 21, Plaintiffs allege that the PASSKey system is an engine immobilizer.

52. Disputed. Plaintiffs' allegation in paragraph 52 is nonsensical and unsupported by the evidence in the record. Under HLDI's definition, a device is "passive" if it is automatically armed by the vehicle's doors being locked. *See* Defendants' Joint Statement of Undisputed Facts at 12, ¶58 (citing Hazelbaker Dep. at 29: 16 – 22, 65: 25 – 67: 8). Based on HLDI's definition of "passive" and how HLDI tracks immobilizers and alarms, no insurer can rely on HLDI's data to determine if a particular vehicle has an antitheft device that activates simply by turning the key to the off position (i.e., meets the statutory definition under the MVFRL). *See* Defendants' Joint Statement of Undisputed Facts at 12, ¶ 59 (citing Hazelbaker Dep. at 66: 15–19). Defendants do not understand what Plaintiffs mean in paragraph 52, but the following excerpt from the exact page of Mr. Hazelbaker's deposition transcript which Plaintiffs cite in support of paragraph 52 states the following:

Q: So I'm asking Mr. Hazelbaker whether a HLDI 04 passive fuel ignition electrical system immobilizers includes devices that require an additional step aside from simply turning the key to the off positions?
A: Yes, locking the doors.

Q: Would an insurer by looking at a HLDI 04 be able to determine if that vehicle has a device that is activated simply by turning the key to the off position?
A: No, because we don't use that definition.

*See* Plaintiffs' Appendix at 5617 (citing Hazelbaker Dep. at 66: 8-19).

53. Disputed on the basis that Defendants do not understand Plaintiffs' allegation in paragraph 53. *See* Defendants' Response to ¶ 52.

54. Disputed on the basis that Defendants do not understand Plaintiffs' allegation in paragraph 54. *See* Defendants' Response to ¶ 52.

55. Unsupported allegation. The cited exhibits pertain to federal parts marking requirements. Plaintiffs provide a partial description of requirements of federal law, which consists of legal conclusions, not statements of fact.

56. Plaintiffs provide a partial description of requirements of federal law, which consists of legal conclusions, not statements of fact.

57. Not disputed that NHTSA issues Federal Notices granting, or rejecting, petitions for Exemption from the parts-marking requirement. Defendants also do not dispute that NHTSA's notices include descriptions of certain antitheft devices as provided by manufacturers. Defendants dispute any allegation that the devices for which NHTSA provides an exemption fit within the specific definition of "passive" set forth in the Pennsylvania statute. Defendants incorporate their responses to ¶¶ 20–21, 24, 27, 29, 32, 35, and 37.

58. Disputed in part. Defendants dispute Plaintiffs' mischaracterization of the NHTSA documents cited in support of the allegation in paragraph 58, which make no mention of the relevance of "door locking" to a passive immobilizer. Defendants do not dispute that the sources described in paragraph 58 are quoted accurately.

59. Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. Plaintiffs' allegation in paragraph 42 states that the automobile industry defines passive systems to include those that activate automatically once the keys are removed or the doors are locked. As stated in their response to paragraph 42, Defendants do not dispute that allegation. Plaintiffs now allege that the industry standard for passive immobilizers depends upon the immobilizer activating upon removal of the key. Defendants dispute that

allegation as unsupported and contrary to the evidence in the record. *See* allegation and response to paragraph 42. In further response, Defendants dispute the citation to the 2002 Buick Rendezvous Owner's Manual as the quotation provided by Plaintiffs does not appear anywhere in that document. Defendants do not dispute the accuracy of the remaining citations in paragraph 59.

60. Unsupported allegation; disputed. Defendants incorporate their responses to ¶¶ 61-63.

61. Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. Plaintiffs attempt to utilize the information on Progressive's website to support their bare allegation in paragraph 60. The language cited on Progressive's website and quoted in paragraph 61 makes no mention of the Pennsylvania statute or of whether a particular device would fit the specific statutory definition. In further response, the language cited by Plaintiffs in paragraph 61 makes no mention of "locking the doors." Thus, any allegation that door locking does not constitute an active or additional step is unsupported and denied by Defendants.

62. Disputed on the basis that Plaintiffs misquote Allstate's filed rule. The rule states as follows: "This rule applies to all private passenger motor vehicles and pick-up trucks rated as private passenger automobiles. For the insured automobile equipped with a passive anti-theft device or system which is activated automatically when the driver turns the ignition key to the off position, and the key is removed, apply the factors shown in the Automobile Rating Section. If two or more qualifying systems are installed, only one discount shall be applied." *See* Plaintiffs' Appendix at 508.

63.     The allegations in Paragraph 63 are not disputed to the extent they purport to describe a portion of the language in the particular document referenced therein.  The allegations are disputed, however, to the extent they purport to refer to such language as the "definition" of a passive antitheft device that State Farm uses in determining whether the passive antitheft device discount applies in Pennsylvania.  It is undisputed that the rule set forth in State Farm's filed rate manual defines a passive antitheft device as "any item or system installed in an automobile which is activated automatically when the operator turns the ignition key to the off position." (Defendant State Farm Mutual Automobile Insurance Company's Statement of Undisputed Facts in Support of Motion for Summary Judgment at ¶ 3.)

### Passive Engine Immobilizers Are Well Known In The Insurance Industry As An Effective Theft Deterrent And Result In Lower Theft Claims And Losses[2]

64.     Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference.  *See* Defendants' Responses to ¶¶ 8, 9, 11, 14, 17, 18, 20, 25, 27, 29, 32, 33, 35 and 50.  The allegation in paragraph 64 uses the general term "passive" without reference to the Pennsylvania statute.  In further response, HLDI defines a device as "passive" if it is automatically armed by the vehicle's doors being locked.  *See* Defendants' Joint Statement of Undisputed Facts at 12, ¶58 (citing Hazelbaker Dep. at 29: 16 – 22, 65: 25 – 67: 8).  Mr. Hazelbaker explicitly stated that his statements regarding "passive" devices are based on HLDI's definition of what constitutes a "passive device."  *See* Defendants' Responses to ¶¶ 8, 47, 51, and 52.  Further, Mr. Hazelbaker's general statements of opinion do not support Plaintiffs'

---

[2] Defendants deny Plaintiffs' unsupported allegation that "passive antitheft devices are well known in the insurance industry as an effective theft deterrent and result in lower theft claims and losses."  Defendants Dispute Plaintiffs' use the term "passive" which makes no reference to the Pennsylvania statute.  Defendants incorporate their responses to paragraphs 64–77.

generalizations about the knowledge and views of the "insurance industry" or "[a]utomobile insurers."

65.     Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. *See* Defendants' Responses to ¶¶ 8, 9, 11, 14, 17, 18, 20, 25, 27, 29, 32, 33, 35, 50, and 64. Defendants dispute Plaintiffs' use of the term "passive" which does not reference the Pennsylvania statute and is based on HLDI's own definition of a passive device which includes devices that are activated by the locking of a vehicle's doors. *See* Defendants' Joint Statement of Undisputed Facts at 12, ¶ 58 (citing Hazelbaker Dep. at 29: 16 – 22, 65: 25 – 67: 8). Defendants do not dispute the allegations concerning the HLDI organization or its monitoring of the effectiveness of antitheft devices.

66.     Disputed on the basis that Plaintiffs' allegation in paragraph 66 is vague. Plaintiffs do not list a date range regarding the theft loss data collected in the "February Bulletin." Defendants do not dispute that the document Plaintiffs cite in support of paragraph 66 states that loss data was provided by 14 insurers, including Allstate, Liberty Mutual (Peerless), Nationwide, and State Farm. In further response, the page cited by Plaintiffs to support their allegation in paragraph 66 also states the following regarding the "PASSKey II system:" "*Normal locking of the vehicle engages the system*." *See* Plaintiffs' Appendix at 3985 (emphasis added). Plaintiffs fail to cite this information in ¶¶ 17, 18, 20, and 21, where they allege that the PASSKey II is an engine immobilizer which requires no action other than removing the key from the ignition.

67.     Not disputed.

68.     Not disputed.

69.     Not disputed.

24

70. Not disputed.

71. Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. *See* Defendants' Responses to ¶¶ 8, 9, 11, 14, 17, 18, 20, 25, 27, 29, 32, 33, 35, 50, 64, and 65. The allegation in paragraph 71 uses the general term "passive" without reference to the Pennsylvania statute. Furthermore, the NHTSA document cited by Plaintiffs in paragraph 20 is dated 1998 – eight years after the relevant provisions of the MVFRL were drafted. While Defendants do not dispute that Plaintiffs have quoted the language of the NHTSA document cited in support of paragraph 71, Defendants dispute any allegation that the Ford SecuriLock fits the specific definition of passive antitheft device as set forth in the Pennsylvania statute. Robert Mangine's expert report states that engine immobilizer systems like the SecuriLock do not activate automatically when the key is turned to the off position. *See* Mangine Report at 1–2, 8–9.

72. Not disputed.

73. Not disputed.

74. Not disputed.

75. Not disputed.

76. Not disputed.

77. Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. Plaintiffs provide no support for any allegation that any Defendant insurer, with the exception of Progressive, considers the existence or nonexistence of an immobilizer when investigating theft claims. Defendants incorporate their responses to paragraphs 204–207. In further response, the allegation in paragraph 77 uses the term "passive antitheft device" without reference to the Pennsylvania statute, and there is no evidence that the

devices referenced in that paragraph actually meet the definition set forth in the relevant provisions of the MVFRL. *See* Defendants' Responses to ¶¶ 8, 9, 11, 14, 17, 18, 20, 25, 27, 29, 32, 33, 35, 50, 64, 65, and 71. Not disputed that Progressive considers the existence of an immobilizer as one factor when investigating a theft claim.

**Multiple Sources Of Information Relating To Passive**
**Antitheft Devices Are And Have Been Available To The Defendants**[3]

78. Disputed. While Defendants do not dispute that there exist various sources that purport to list whether a particular vehicle has an antitheft device, there currently exists no single definitive source of information showing which vehicle models come equipped with a passive antitheft device as standard equipment. *See* Defendants' Joint Statement of Undisputed Facts at 9, ¶ 42 (citing various sources). Furthermore, the sources Plaintiffs allege that Defendants should rely upon in granting the discount provide incomplete information and data that is inconsistent from source to source. *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶ 43 (citing various sources). For example, the antitheft device information available on named Plaintiffs' vehicles is inconsistent between and among many of the sources Plaintiffs list in paragraph 78, which include vendors (e.g., ISO, HLDI, Polk, and JATO) and Internet websites. *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶ 46 (citing Antitheft Spreadsheet showing inconsistencies between sources). In further response, data from the manufacturers themselves is equally unreliable. Plaintiffs subpoenaed seven major automobile manufacturers

---

[3] Defendants dispute Plaintiffs' mischaracterization that multiple sources of information relating to passive antitheft devices are and have been available to Defendants. The undisputed evidence establishes that there currently exists no single definitive source of information showing which vehicle models come equipped with a passive antitheft device as standard equipment and that the information currently available from sources that purport to list which vehicles come standard with an antitheft device is often incomplete, inaccurate, and inconsistent between sources. *See* Defendants' Joint Statement of Undisputed Facts at 9–10, ¶ 42–43 (citing various sources). Defendants incorporate their responses to paragraphs 78–211.

requesting "[d]ocuments sufficient to show the make, model, year, and body type of vehicles manufactured ... for sale in the United States that contain an engine immobilizer or other passive antitheft device as standard manufacturers' equipment." *See* Defendants' Joint Statement of Undisputed Facts at 18, ¶¶ 103-04 (citing subpoenas). Not one manufacturer provided Plaintiffs with information on vehicles manufactured before 1996, or with an explanation describing the data provided. Instead, manufacturers provided disclaimers regarding the information provided and data that was inconsistent with other sources that Plaintiffs allege that Defendants should rely upon. *See* Defendants Joint Statement of Undisputed Facts at 18–20, ¶¶ 103-13 (discussing information received from automobile manufacturers).[4] In further response, Plaintiffs focus on the availability of the information "throughout the proposed class period," yet Plaintiffs have not identified a single source that provided this information in 1990 at the time that the relevant provisions of the MVFRL were drafted.

### Information From Third Party Database Providers

### The Highway Loss Data Institute ("HLDI")

79.    Not disputed that the allegation in paragraph 79 is an accurate description of HLDI based on Mr. Hazelbaker's testimony and an undated HLDI VINDICATOR Brochure.

---

[4] Defendants' Joint Statement of Undisputed Facts states that Plaintiffs received formal responses from only three of the seven manufacturers subpoenaed. *See* Defendants' Joint Statement of Facts at 18, ¶ 106. This statement was based on responses to subpoenas that Plaintiffs actually provided to Defendants. The parties in this case had an agreement where they would share information received pursuant to subpoena. Plaintiffs acknowledge that they never furnished to Defendants documents received from Chrysler, Mercedes-Benz, Ford, or General Motors. *See* Ex. A, email from Plaintiffs to Defendants discussing oversight in failure to provide subpoena responses. Defendants no longer contend that Plaintiffs received formal responses from only three of the seven manufacturers subpoenaed. Defendants, however, dispute any allegation that the information received from automobile manufacturers is accurate, consistent with information from other sources, or tailored to the specific definition of passive antitheft device set forth in the Pennsylvania statute. Defendants discuss the numerous problems with the information Plaintiffs received from Ford, GM, Chrysler, and Mercedes in their responses to paragraphs 184–203.

80. Not disputed that the allegation in paragraph 80 is an accurate description of the information provided on http://www.iihs.org.

81. Not disputed that the allegation in paragraph 81 is an accurate description of the relationship between HLDI and IIHS based on Mr. Hazelbaker's testimony.

82. Not disputed that the allegation in paragraph 82 is an accurate statement regarding HLDI and IIHS based on Mr. Hazelbaker's testimony.

83. Not disputed that the allegation in paragraph 83 is an accurate description of the relationship between HLDI and IIHS based on Mr. Hazelbaker's testimony.

84. Plaintiffs' allegation that "all Defendants in the Related Actions" currently make up HLDI's Board of Directors is unsupported. Plaintiffs cite to a document that lists representatives from each of the Defendants in the Related actions as board members in 2003. *See* Plaintiffs' Appendix at 3992. Plaintiffs, however, have no support for an allegation that the Defendants in the Related Actions were members of HLDI's Board either before or after 2003. Furthermore, Mr. Hazelbaker testified that there are "a couple of companies that don't have membership even though they could." *See* Plaintiffs' Appendix at 5603 (citing Hazelbaker Dep. at 10: 12-14). In further response, Mr. Hazelbaker did not identify any of the Defendants in the Related Actions as current board members.

85. Not disputed that the allegation in paragraph 85 is an accurate statement regarding HLDI based on Mr. Hazelbaker's testimony.

86. Not disputed that the allegation in paragraph 86 is an accurate statement regarding HLDI based on Mr. Hazelbaker's testimony.

87.     Not disputed.  In further response, Plaintiffs cite to the wrong page of Mr. Hazelbaker's Deposition Transcript to support the allegation in paragraph 87.  The correct citation is Plaintiffs' Appendix at 5602.

88.     Not disputed.

89.     Not disputed that the allegation in paragraph 89 is an accurate description of VINDICATOR based on Mr. Hazelbaker's testimony.

90.     Not disputed that the allegation in paragraph 90 is an accurate description of VINDICATOR based on an undated HLDI brochure.

91.     Not disputed that the allegation in paragraph 91 is an accurate description of the undated VINDICATOR brochure based on Mr. Hazelbaker's testimony.

92.     Not disputed.  In further response, HLDI did not begin supplying antitheft information until 1992.  *See* Defendants' Joint Statement of Undisputed Facts at 12, ¶ 57 (citing Hazelbaker Dep. at 21: 21–23).

93.     Not disputed that the allegation in paragraph 93 is an accurate description of how HLDI describes its VINDICATOR database as of today.

94.     Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference.  *See* Defendants' Responses to ¶¶ 8, 9, 11, 14, 17, 18, 20, 25, 27, 29, 32, 33, 35, 50, 64, 65, 71, and 77.  Defendants dispute the allegation that the VINDICATOR database "identifies" which vehicles have "passive engine immobilizers."  Although HLDI purports to provide information about passive immobilizers as HLDI defines them, Defendants do not concede that HLDI's data is accurate or consistent with data from other sources.  *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶ 46 (citing Antitheft Spreadsheet showing inconsistencies between sources).  In further response, Defendants dispute Plaintiffs'

use of the term "passive" which does not reference the Pennsylvania statute and is based on HLDI's own definition of a passive device which includes devices that are activated by the locking of a vehicle's doors. *See* Defendants' Joint Statement of Undisputed Facts at 12, ¶ 58 (citing Hazelbaker Dep. at 29: 16 – 22, 65: 25 – 67: 8).

95. Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. *See* Defendants' Responses to ¶¶ 8, 9, 11, 14, 17, 18, 20, 25, 27, 29, 32, 33, 35, 50, 64, 65, 71, 77, and 94. Defendants dispute the allegation that the VINDICATOR database "identifies" which vehicles have "passive engine immobilizers." Although HLDI purports to provide information about passive immobilizers as HLDI defines them, Defendants do not concede that HLDI's data is accurate or consistent with data from other sources. *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶ 46 (citing Antitheft Spreadsheet showing inconsistencies between sources). In further response, Defendants dispute Plaintiffs' use of the term "passive" which does not reference the Pennsylvania statute and is based on HLDI's own definition of a passive device which includes devices that are activated by the locking of a vehicle's doors. *See* Defendants' Joint Statement of Undisputed Facts at 12, ¶58 (citing Hazelbaker Dep. at 29: 16 – 22, 65: 25 – 67: 8). In further response, alarm systems, including those available in the 1980s and those available today, are activated by locking a vehicle's doors. *See* Defendants' Joint Statement of Undisputed Facts at 8, ¶ 31 (citing Mangine Report at 5, 9); *see also*, Robert Mangine, *Forensic Investigation Of Stolen-Recovered And Other Crime Related Vehicles*, Chapter 8, *Antitheft Systems* at Plaintiffs' Appendix 04995 (stating that "[alarm] systems are armed by the locking of the doors by the driver").

96. Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. *See* Defendants' Responses to ¶¶ 8, 9, 11, 14, 17, 18, 20, 25, 27,

29, 32, 33, 35, 50, 64, 65, 71, 77, 94, and 95. Defendants dispute Plaintiffs' use of the term "passive" which does not reference the Pennsylvania statute and is based on HLDI's own definition of a passive device which includes devices that are activated by the locking of a vehicle's doors. *See* Defendants' Joint Statement of Undisputed Facts at 12, ¶58 (citing Hazelbaker Dep. at 29: 16 – 22, 65: 25 – 67: 8). Defendants do not dispute that Plaintiffs have accurately quoted language that appears in the VINDICATOR brochure.

97.     Not disputed that VINDICATOR only provides data on factory-installed equipment, and that HLDI does not provide information on aftermarket antitheft devices.

98.     Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. Defendants dispute the allegation that the VINDICATOR database "identifies" which vehicles have certain antitheft devices. Although HLDI purports to provide information about antitheft devices as HLDI defines them, Defendants do not concede that HLDI's data is accurate or consistent with data from other sources. *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶ 46 (citing Antitheft Spreadsheet showing inconsistencies between sources). Defendants further dispute this allegation to the extent Plaintiffs are suggesting that all of the devices that Plaintiffs have described as "immobilizers" were in existence in 1992. *See* Defendants' Joint Statement of Undisputed Facts at 7, ¶¶ 29-39 (describing the history of antitheft devices). In further response, Defendants dispute Plaintiffs' use of the term "passive" which does not reference the Pennsylvania statute and is based on HLDI's own definition of a passive device which includes devices that are activated by the locking of a vehicle's doors. *See* Defendants' Joint Statement of Undisputed Facts at 12, ¶ 58 (citing Hazelbaker Dep. at 29: 16 – 22, 65: 25 – 67: 8).

99.     Not disputed.  In further response, Plaintiffs cite to the wrong page of Mr. Hazelbaker's deposition transcript.  The correct citation is to Plaintiffs' Appendix at 5606.

100.    Not disputed.  In further response, the HLDI Manual Plaintiffs cite to is dated 2005, fifteen years after the relevant provisions of the MVFRL were drafted.

101.    Defendants dispute the allegation that the VINDICATOR database "identifies" which vehicles have certain antitheft devices.  Although HLDI purports to provide information about antitheft devices as HLDI defines them, Defendants do not concede that HLDI's data is accurate or consistent with data from other sources.  *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶ 46 (citing Antitheft Spreadsheet showing inconsistencies between sources).  Defendants do not dispute that Plaintiffs have accurately quoted the codes that appear in the 2005 HLDI VINDICATOR Manual.

102.    Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference.  Defendants do not dispute that HLDI considers a device passive "if it is automatically armed by the vehicle's doors being locked normally."  Defendants do not understand Plaintiffs' allegation that HLDI does not consider removing an engine immobilizer key from the car's ignition in its definition of passive.  Plaintiffs questioned Mr. Hazelbaker on this specific point and he was as confused as Defendants regarding this issue.  HLDI does not consider the removal of the key in its definition of "passive" which includes devices that are activated by the normal locking of the doors.  The following exchange from Mr. Hazelbaker's deposition exemplifies his own confusion with Plaintiffs' questioning regarding the allegation in paragraph 102.

Q:      The fact that you have to remove a key from the ignition doesn't make a device active, right?
A:      I'm not sure what you are asking.

Q:     Have you ever referred to a passive immobilizer as one that is activated upon
removal of the key?
A:     Our definition says, the normal locking of the vehicle is what makes a difference
between passive and active.  If you normally lock the vehicle and the device becomes on then
that's a passive device.  If you have to do something in addition to the normal locking of the
vehicle it's an active device.

Q:     You don't consider removing the key an additional step?
A:     We don't consider removal of the key whatsoever.

Q:     Right.  So that wouldn't render something under your definition of active?
A:     No.

*See* Plaintiffs' Appendix at 5623-24 (citing Hazelbaker Dep. at 92: 10 – 93: 8).

103.    Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to

draw an unsupported inference.  Mr. Hazelbaker had no knowledge as to whether Allstate used

VINDICATOR to obtain antitheft information.  Mr. Hazelbaker stated that he is aware that

Allstate uses VINDICATOR at some locations but does not know the specific purpose for which

Allstate uses it.  The following is an exchange from Mr. Hazelbaker's deposition:

Q:     Do you know whether the Allstate Companies use Vindicator?
A:     I know they do at some locations.  I'm not privy to how exactly they use them.

Q:     You don't know what purposes the use it for?
A:     I do not.

*See* Plaintiffs' Appendix at 5607 (citing Hazelbaker Dep. at 25: 12-20).

104.    Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to

draw an unsupported inference.  The evidence Plaintiffs cite in support of the allegation in

paragraph 104 is a single HLDI VINDICATOR report on a 1998 Chevy Cavalier which was

produced by Allstate and is dated July 28, 1999.  *See* Plaintiffs' Appendix at 773.  Plaintiffs also

point to Mr. Hazelbaker's deposition testimony.  His testimony indicates only that he is aware

that Allstate has used VINDICATOR at some locations but does not know the specific purpose

for which Allstate used it.  *See* Defendants' Response to ¶ 103.  Plaintiffs provide no support for

any allegation that Allstate has actually "used" HLDI antitheft data in 1999 or any time thereafter.

105.　Not disputed.　In further response, the HLDI code 04 indicates "passive fuel/ignition/electrical system immobilizer" which is automatically armed by the vehicle's doors being locked. *See* Plaintiffs' Appendix at 2429.

106.　Not disputed that Mr. Hazelbaker testified that HLDI has "a lot of interaction" with its insurer members.

107.　Not disputed that the allegation in paragraph 107 is an accurate description of Mr. Hazelbaker's testimony.

108.　Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference.　Defendants do not dispute that Amy Chapman contacted Matt Moore with a question regarding HLDI's classification of antitheft data.　Defendants, however, dispute Plaintiffs' characterization that Ms. Chapman contacted Mr. Moore seeking "clarification on the distinction between active and passive."　Ms. Chapman contacted Mr. Moore with a specific question regarding HLDI's specific definition of active and passive systems.　Mr. Moore responded to Ms. Chapman's inquiry by stating that, according to HLDI's definition, "[p]assive systems, both alarms and immobilizers, are turned on by the normal locking of the vehicle." *See* Plaintiffs' Appendix at 2090.

109.　Not disputed that Plaintiffs have accurately cited the language of the undated VINDICATOR brochure.　It is also undisputed that Mr. Hazelbaker testified that the statement in the VINDICATOR brochure remains accurate other than the portion regarding the National Association of Insurance Commissioners.　In further response, regarding the accuracy of HLDI's data, there exists no single definitive source of information (including HLDI) showing which

vehicle models come equipped with a passive antitheft device as standard equipment. *See* Defendants' Joint Statement of Undisputed Facts at 9, ¶ 42 (citing various sources including Mr. Hazelbaker's Dep. at 74: 20–24). Furthermore, the information currently available from HLDI is inconsistent with other sources that Plaintiffs allege Defendants should rely upon in granting the discount. *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶¶ 43, 46 (citing various sources and Antitheft Spreadsheet showing inconsistencies between sources, including HLDI).

110. The documents that Plaintiffs cite in support of the allegation in paragraph 110 are dated 1996, 1997, and 2001. Defendants do not dispute that HLDI monitored the effectiveness of antitheft devices at those times. Any allegation that HLDI monitored the effectiveness of antitheft devices a times other than 1996, 1997, and 2001 is unsupported.

111. Not disputed that the allegation in paragraph 111 is an accurate description of HLDI based on Mr. Hazelbaker's testimony.

112. Defendants do not dispute that HLDI received information from the sources identified in paragraph 111 in 2003. In further response, Mr. Hazelbaker stated that HLDI was not using the Internet as much in 2003 as it does today because "there's been more information made available on websites that we use and it's easier to gather today than it used to be." *See* Plaintiffs' Appendix at 5609 (citing Hazelbaker Dep. at 35: 8-10).

113. Not disputed that HLDI states that it uses a "Rule of Three" in populating its VINDICATOR database. In further response, HLDI uses the "Rule of Three" because of the incomplete information it receives from manufacturers and because of the inconsistency of antitheft data from source to source. The following exchange from Mr. Hazelbaker's deposition exemplifies the reasons for HLDI's approach to information gathering:

Q: You also said that you use third-party websites and you have to supplement the data because some of the manufacturer data isn't complete, is that correct?

35

A:     That's correct.

Q:     When you go to multiple sources – and I'm referring solely to antitheft data here – is the data always consistent between sources, and I mean from source to source?

A:     No.  We actually have a rule of three.  We try and triangulate on any particular data source that we're not getting directly from the manufacturer.  We'd like to find it in three places and all of them saying the same thing.  So if it's the presence of an anti-theft device we would like to find three third-party sites that tells us it either does nor does not tell that.

*See* Plaintiffs' Appendix at 5619 (citing Hazelbaker Dep. at 74: 3-19).  In further response,

Defendants dispute Plaintiffs' use of the term "passive antitheft device" which does not reference

the Pennsylvania statute and is based on HLDI's own definition of a passive device which

includes devices that are activated by the locking of a vehicle's doors.  *See* Defendants' Joint

Statement of Undisputed Facts at 12, ¶58 (citing Hazelbaker Dep. at 29: 16 – 22, 65: 25 – 67: 8).

114.    Not disputed that Mr. Hazelbaker testified that he has been communicating with

automobile manufacturers since he joined HLDI and that HLDI has "always had an open

dialogue with manufacturers."

115.    Not disputed that HLDI contacts automobile manufacturers on an ongoing basis

to determine whether a make and model of a vehicle has an antitheft device.  In further response,

Defendants dispute Plaintiffs' use of the term "passive antitheft device" which does not reference

the Pennsylvania statute and is based on HLDI's own definition of a passive device which

includes devices that are activated by the locking of a vehicle's doors.  *See* Defendants' Joint

Statement of Undisputed Facts at 12, ¶ 58 (citing Hazelbaker Dep. at 29: 16 – 22, 65: 25 – 67: 8).

116.    Not disputed that Mr. Hazelbaker testified that he has been talking to vehicle

manufacturers about their devices since the very early 1990s.

117.    Not disputed that the allegation in paragraph 117 is an accurate description of

HLDI based on Mr. Hazelbaker's testimony.

118.    Not disputed that the allegation in paragraph 118 is an accurate description of HLDI based on Mr. Hazelbaker's testimony.

119.    Not disputed that the allegation in paragraph 119 is an accurate description of HLDI based on Mr. Hazelbaker's testimony.

120.    Not disputed. *See* Defendants' Response to Paragraph 113.

121.    Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. Defendants do not dispute that Mr. Hazelbaker stated that antitheft information is available on the Internet. Mr. Hazelbaker also stated, however, that the data that HLDI receives from Internet websites is not always consistent from source to source. *See* Defendants' Joint Statement of Undisputed Facts at 12, ¶ 61 (citing Hazelbaker Dep. at 74: 8–24); *see also* Defendants' Response to Paragraph 113 (quoting Mr. Hazelbaker's testimony regarding information available via the Internet). Furthermore, while HLDI did not provide a specific length of time for how long it has been relying on information available on the Internet, Mr. Hazelbaker did state that HLDI was not using the Internet as much in 2003 as it does today because "there's been more information made available on websites that we use and it's easier to gather today than it used to be." *See* Plaintiffs' Appendix at 5609 (citing Hazelbaker Dep. at 35: 8-10).

122.    Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. Mr. Hazelbaker testified that he had no knowledge regarding member insurers' integrated systems and did not know whether the VINDICATOR product could be integrated within those systems. *See* Plaintiffs' Appendix at 5611 (citing Hazelbaker Dep. at 41: 12-17). Mr. Hazelbaker also testified that he had no knowledge "one way or the other" of whether "a member insurer could use the product in a freestanding manner to obtain

anti-theft data." *See* Plaintiffs' Appendix at 5611 (citing Hazelbaker Dep. at 41: 4-7).

Defendants do not dispute that VINDICATOR allows for single or multiple ("batch") VIN searches. While Defendants also do not dispute that VINDICATOR purports to provide information as to whether a particular vehicle has an antitheft device, Defendants dispute any allegation that the VINDICATOR database "identifies" which vehicles have certain antitheft devices and do not concede that HLDI's data is accurate or consistent with data from other sources. *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶ 46 (citing Antitheft Spreadsheet showing inconsistencies between sources). In further response, Defendants dispute Plaintiffs' use of the term "passive antitheft devices" which does not reference the Pennsylvania statute and is based on HLDI's own definition of a passive device which includes devices that are activated by the locking of a vehicle's doors. *See* Defendants' Joint Statement of Undisputed Facts at 12, ¶ 58 (citing Hazelbaker Dep. at 29: 16 – 22, 65: 25 – 67: 8).

123. Disputed. *See* Defendants' Response to ¶ 122.

124. Not disputed that Mr. Hazelbaker testified that VINDICATOR provides users with a complete set of data and that users have the option of selecting what information to utilize.

125. Not disputed that Mr. Hazelbaker testified that all versions of VINDICATOR provide antitheft data. In further response, HLDI first began supplying antitheft information in 1992. *See* Defendants' Joint Statement of Undisputed Facts at 12, ¶ 57 (citing Hazelbaker Dep. at 21: 21–23).

126. Not disputed that HLDI updates its VINDICATOR database on a monthly schedule or that HLDI would send email reminders in 2005 regarding updates to its system. Defendants also do not dispute that Mr. Hazelbaker stated that a member insured that uses VINDICATOR may choose to download the information from an FTP site. Defendants,

however, dispute Plaintiffs' allegation that "the member insurers and other VINDICATOR users know the update release schedule." Plaintiffs provide no support for the allegation that the member insurers are aware of HLDI's release schedule, and Defendants deny that claim.

127. Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. Defendants do not dispute that the Plaintiffs have accurately quoted the information from the VINDICATOR brochure. Defendants, however, dispute any allegation or inference that antitheft information is released at the same time that new models are released. To the contrary, the undisputed evidence, including Mr. Hazelbaker's testimony, establishes that there is a time lag between when new vehicles are released for sale or lease and when antitheft data on those vehicles becomes available to HLDI. *See* Defendants' Joint Statement of Undisputed Facts at 13, ¶ 63 (citing Hazelbaker Dep. at 83: 18–25).

128. Not disputed that Mr. Hazelbaker testified that "it is his understanding" that member insurers use VINDICATOR to assist in applying premium discounts. *See* Plaintiffs' Appendix at 5612 (citing Hazelbaker Dep. at 46: 6-10). Defendants dispute any allegation or unsupported inference that any insurer uses the VINDICATOR database to provide the passive antitheft device discount.

129. Not disputed.

130. Not disputed. In further response, the undisputed evidence establishes that there is a time lag between when new vehicles are released for sale or lease and when antitheft data on those vehicles becomes available to HLDI. *See* Defendants' Joint Statement of Undisputed Facts at 13, ¶ 63 (citing Hazelbaker Dep. at 83: 18–25).

131. Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. HLDI considers a device passive "if it is automatically armed

by the vehicle's doors being locked normally." *See* Defendants' Joint Statement of Undisputed

Facts at 12, ¶ 58 (citing Hazelbaker Dep. at 29: 16 – 22, 65: 25 – 67: 8). Defendants do not

understand Plaintiffs' allegation that HLDI does not consider removing an engine immobilizer

key from the car's ignition in its definition of passive. Plaintiffs questioned Mr. Hazelbaker on

this specific point and he was as confused as Defendants regarding this issue. HLDI does not

consider the removal of the key in its definition of "passive" which includes devices that are

activated by the normal locking of the doors. The following exchange from Mr. Hazelbaker's

deposition exemplifies his own confusion with Plaintiffs' questioning regarding the allegation in

¶ 102.

> Q:     The fact that you have to remove a key from the ignition doesn't make a device active, right?
> A:     I'm not sure what you are asking.

> Q:     Have you ever referred to a passive immobilizer as one that is activated upon removal of the key?
> A:     Our definition says, the normal locking of the vehicle is what makes a difference between passive and active. If you normally lock the vehicle and the device becomes (sic) on then that's a passive device. If you have to do something in addition to the normal locking of the vehicle it's an active device.

> Q:     You don't consider removing the key an additional step?
> A:     We don't consider removal of the key whatsoever.

> Q:     Right. So what wouldn't render something under your definition of active?
> A:     No.

*See* Plaintiffs' Appendix at 5623-24 (citing Hazelbaker Dep. at 92: 10 – 93: 8); *see also*

Defendants' Response to Paragraph 102. Finally, Defendants accept Plaintiffs' forthright

admission "that an immobilizer would not work as an antitheft device if the key were left in the

ignition."

132.     Not disputed that Plaintiffs accurately quote the HLDI Theft Loss Bulletin for September 1997, but by way of clarification, Plaintiffs asked Kim Hazelbaker, Senior Vice President of HLDI, about the activation of the Ford SecuriLock during his deposition to which Mr. Hazelbaker responded that the locking of the doors is required.  The following exchange occurred during Mr. Hazelbaker and Plaintiffs' Counsel:

Q:     Explain your confusion about the Pennsylvania definition for me, please.
A:     I don't know of any device – we didn't do a good job of writing this obviously because the secure lock (sic) you have to lock the vehicle as well.

Plaintiffs' Appendix at 5624 (citing Hazelbaker Dep. at 95: 9 – 13 (responding to HLDI Theft Loss Bulletin, Vol. 15, No. 1 which Plaintiffs cite in paragraph 51).  In further response, Mr. Hazelbaker testified that based on HLDI's definition of "passive" and how HLDI tracks immobilizers and alarms, no insurer can rely on HLDI's data to determine if a particular vehicle has an antitheft device that activates simply by turning the key to the off position (i.e., meets the statutory definition under the MVFRL).  *See* Defendants' Joint Statement of Undisputed Facts at 12, ¶ 59 (citing Hazelbaker Dep. at 66: 15–19).  *See* Defendants' Response to ¶ 51.

133.     Disputed.  *See* Defendants' Response to ¶ 132.

134.     Not disputed that Plaintiffs have accurately quoted the April 1996 Theft Loss Bulletin.  In further response, Defendants dispute any allegation or unsupported inference regarding the information in the April 1996 Theft Loss Bulletin and how HLDI defines a passive antitheft device or how it tracks information on passive antitheft devices.  HLDI considers a device passive "if it is automatically armed by the vehicle's doors being locked normally."  *See* Defendants' Joint Statement of Undisputed Facts at 12, ¶ 58 (citing Hazelbaker Dep. at 29: 16 – 22, 65: 25 – 67: 8).  In further response, Mr. Hazelbaker testified that based on HLDI's definition of "passive" and how HLDI tracks immobilizers and alarms, no insurer can rely on HLDI's data

to determine if a particular vehicle has an antitheft device that activates simply by turning the key to the off position (i.e., meets the statutory definition under the MVFRL). *See* Defendants' Joint Statement of Undisputed Facts at 12, ¶ 59 (citing Hazelbaker Dep. at 66: 15–19).

135.    Not disputed.  In further response, it is an undisputed fact that no information about a vehicle's antitheft system can be obtained directly from the vehicle's VIN.  *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶ 45 (citing various sources).

## Insurance Services Office ("ISO") Databases And Circulars

136.    Not disputed that the allegation in paragraph 136 is an accurate description of ISO's services based on statements from the cited press release.  In further response, no record evidence exists to suggest whether the statements are accurate or not, and the web pages, in and of themselves, are not adequate support for a purported undisputed fact – particularly in the instant matter, where Plaintiffs refused the opportunity to take an ISO deposition.

137.    Not disputed that the allegation in paragraph 137 is an accurate description of ISO's services based on statements from the cited press release.  In further response, no record evidence exists to suggest whether the statements are accurate or not, and the web pages, in and of themselves, are not adequate support for a purported undisputed fact – particularly in the instant matter, where Plaintiffs refused the opportunity to take an ISO deposition.

138.    Not disputed that the allegation in paragraph 138 is an accurate description of ISO's services based on statements from the cited press release.  In further response, no record evidence exists to suggest whether the statements are accurate or not, and the web pages, in and of themselves, are not adequate support for a purported undisputed fact – particularly in the instant matter, where Plaintiffs refused the opportunity to take an ISO deposition.

139.    Not disputed that the allegation in paragraph 139 is an accurate description of ISO's services based on statements from the website ISOClaimsSearch.Com. In further response, no record evidence exists to suggest whether the statements are accurate or not, and the web pages, in and of themselves, are not adequate support for a purported undisputed fact – particularly in the instant matter, where Plaintiffs refused the opportunity to take an ISO deposition.

140.    Not disputed that the allegation in paragraph 140 is an accurate description of ISO's services based on statements from ISO's website. In further response, no record evidence exists to suggest whether the statements are accurate or not, and the web pages, in and of themselves, are not adequate support for a purported undisputed fact – particularly in the instant matter, where Plaintiffs refused the opportunity to take an ISO deposition.

141.    Not disputed that the allegation in paragraph 141 are an accurate description of ISO's services based on statements from ISO's website. In further response, no record evidence exists to suggest whether the statements are accurate or not, and the web pages, in and of themselves, are not adequate support for a purported undisputed fact – particularly in the instant matter, where Plaintiffs refused the opportunity to take an ISO deposition.

142.    Not disputed that the allegation in paragraph 142 is an accurate description of ISO based on an ISO document entitled "Symbol and Identification Procedures." Defendants dispute any allegation that ISO identifies which vehicles have "passive" antitheft devices as defined by the Pennsylvania statute. The undisputed evidence establishes that ISO has never published antitheft information that is limited to or otherwise specifically addresses the Pennsylvania statute, nor has ISO evaluated what equipment would meet the legal definition of passive antitheft device set forth in 75 Pa. C.S. § 1799.1(a). *See* Defendants' Joint Statement of

Undisputed Facts at 14, ¶¶ 77–78. In further response, there currently exists no single definitive source of information showing which vehicle models come equipped with a passive antitheft device as standard equipment and that the information currently available from sources that purport to list which vehicles come standard with an antitheft device is often incomplete, inaccurate, and inconsistent between sources. *See* Defendants' Joint Statement of Undisputed Facts at 9–10, ¶ 42–43 (citing various sources).

143. Not disputed that the allegation in paragraph 143 is an accurate description of ISO based on an ISO document entitled "Symbol and Identification Procedures," with the exception of the omission of the word "Installation" from "Security System Installation Information." Defendants dispute any allegation that ISO identifies which vehicles have "passive" antitheft devices as defined by the Pennsylvania statute. Defendants incorporate their response to ¶ 142.

144. Not disputed that the document entitled "Symbol and Identification Procedures" provides that ISO contacts manufacturers regarding "Security System Installation" information and that ISO compiles that information for "participating insurers." Defendants dispute Plaintiffs' unsupported allegation that the referenced citation mentions "antitheft devices." Defendants also dispute any allegation that ISO identifies which vehicles have "passive" antitheft devices as defined by the Pennsylvania statute. Defendants incorporate their response to ¶ 142.

145. Not disputed that the allegation in paragraph 145 is an accurate quotation from ISO's "Safety And Identification Manual." Defendants dispute any allegation that ISO identifies which vehicles have "passive" antitheft devices as defined by the Pennsylvania statute. Defendants incorporate their response to ¶ 142.

146.     Not disputed that the allegation in paragraph 146 is an accurate description of ISO from ISO's "Safety And Identification Manual."   Defendants dispute any allegation that ISO identifies which vehicles have "passive" antitheft devices as defined by the Pennsylvania statute. The referenced documents do not make any mention of the Pennsylvania statute or whether a particular device is activated by turning the key to the off position.  Defendants incorporate their response to ¶ 142.

147.     Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference.  Defendants dispute Plaintiffs' argumentative characterization that "an SSI Sheet is so detailed."  Plaintiffs provide no support for that conclusory remark. While Defendants do not dispute that Plaintiffs have accurately described the information listed with the particular vehicle identified in paragraph 147, Defendants do not concede that ISO's data is accurate or consistent with data from other sources. *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶ 46 (citing Antitheft Spreadsheet showing inconsistencies between sources).  In further response, Defendants dispute Plaintiffs' use of the term "passive" which does not reference the Pennsylvania statute and is based on ISO's own definition of a passive device. *See* Plaintiffs' Statement of Uncontested Facts at ¶ 152 describing ISO's definition of "passive."

148.     Not disputed that Plaintiffs have accurately cited ISO's definition of a "passive disabling device."  Defendants dispute any allegation that ISO identifies which vehicles have "passive" antitheft devices as defined by the Pennsylvania statute.  Defendants incorporate their response to ¶ 142.

149.     Not disputed.  Defendants dispute any allegation that ISO identifies which vehicles have "passive" antitheft devices as defined by the Pennsylvania statute.  Defendants incorporate their response to ¶ 142.

150.     Unsupported allegation.  Plaintiffs' support for the allegation in paragraph 150 is an untitled and unrecognizable document which was not produced in discovery, without any supporting affidavit or other basis for supporting the document's authenticity.  Defendants cannot tell what the document is or where it came from, especially since Plaintiffs have included only one page of at least a 51 page document.  *See* Plaintiffs' Appendix at 403 (attaching unknown document numbered page 51).  "Rule 56 requires the party moving for summary judgment base its motion upon admissions and sworn testimony.  The court may not consider unverified or unauthenticated documents submitted by the moving party in deciding a motion for summary judgment."  *Walker v. Spiller*, No. CIV. A. 97-6720, 1998 WL 306540, at *4 n.6 (E.D. Pa. June 9, 1998).  *See also* 10A Fed. Prac. & Proc. Civ. § 2722 (3d ed.) (same).  In further response, Defendants dispute any allegation that ISO made antitheft data available in 1990.  The undisputed evidence establishes that ISO's VINMASTER product was first introduced in 1993.  *See* Defendants' Joint Statement of Undisputed Facts at 13, ¶ 66 (citing Baldizzi Aff. at ¶ 4).

151.     Not disputed that ISO uses a "P" to designate a vehicle with a "passive disabling" device as manufacturer's standard equipment.  Defendants dispute any allegation that ISO identifies which vehicles have "passive" antitheft devices as defined by the Pennsylvania statute.  Defendants incorporate their response to ¶ 142.

152.     Not disputed that the allegation in paragraph 152 is an accurate description of ISO's antitheft codes.  Defendants dispute any allegation that ISO identifies which vehicles have

"passive" antitheft devices as defined by the Pennsylvania statute. Defendants incorporate their response to ¶ 142.

153. Not disputed that the statement in paragraph 153 is an accurate statement based on the ISO expedited circular cited in support thereof.

154. Not disputed that Plaintiffs have accurately described the information that appears on the referenced ISO documents. Defendants dispute any allegation that ISO identifies which vehicles have "passive" antitheft devices as defined by the Pennsylvania statute. Defendants incorporate their response to ¶ 142.

155. Not disputed.

156. Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. Nationwide Insurance Company of America's Internet quote and buying system available to consumers consults the ISO VINMASTER anti-theft device codes added to the Defendant's VIN database to apply a passive anti-theft device discount to policies purchased over the Internet. If the system cannot make that determination because the data is not available the question will be posed to the applicant. *See* Plaintiffs' Appendix at 5360-5361 (citing Rau Dep. at 64: 19 – 67: 3). Internet-based business is primarily sold without the assistance of an agent. *See* NICOA Stmt. of Undisputed Facts, at ¶ 5 fn. 2 (citing Rau Aff. at ¶ 2). The Internet quote and buying system was introduced by Defendant in 2006 or 2007. *See* Plaintiffs' Appendix at 5406-5407 (citing Strevig Dep. at 56: 22 – 57: 9). Roughly one percent of Defendants' personal lines automobile insurance policy sales in Pennsylvania is obtained through the Internet quote and buying system. *See* NICOA Stmt. of Undisputed Facts, at ¶ 5 fn. 2 (citing Rau Aff. at ¶ 2). Nationwide Insurance Company of America's Agency Online Access ("AOA") system does not apply a passive anti-theft device discount based on ISO codes. *See*

Plaintiffs' Appendix at 5405 (citing Strevig Dep. at 49: 11-16). Information regarding a policyholder's eligibility for an anti-theft discount is manually entered by agents into AOA while completing the application with the policyholder as prompted by the AOA system. *See* NICOA Stmt. of Undisputed Facts, at ¶ 3, 8-11 (citing various sources). When populating the AOA system with vehicle information, the agent must indicate as a mandatory step whether or not the vehicle is equipped with a passive anti-theft device. *See* Plaintiffs' Appendix at 5405 (citing Strevig Dep. at 49: 17–50: 10).

157.    Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. Plaintiffs provide no support for their allegation that Peerless uses VINMASTER to populate within its system – make, model, year, passive restraint, and anti-lock brake information. The following excerpt from Peerless' Objections and Responses to Consolidated Discovery Requests As Agreed Between the Parties, dated May 17, 2010 clarifies Plaintiffs' mischaracterization:

> Subject to and without waiving its objections, PIIC responds to this interrogatory as clarified by counsel as follows:  PIIC does not use any database to determine whether a car contains a passive antitheft device, as that term is used in 75 Pa. C.S. § 1799.1.  PIIC uses ISO's Vinmaster product to receive some vehicle information based on the vehicle's VIN.  Though Vinmaster contains some limited information related to antitheft devices, PIIC's agents do not receive or have access to that information and, instead, are instructed to ask the applicant/insured this question.

*See* Plaintiffs' Appendix at 1959–60 (cited in support of their allegation in paragraph 157).

158.    Not disputed.

159.    Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. While the cited testimony establishes that Allstate receives antitheft data from ISO, Defendants dispute Plaintiffs' use of the term "passive" which does not

reference the Pennsylvania statute or state whether ISO identifies devices that activate by turning the key to the off position. Defendants dispute any allegation that ISO identifies which vehicles have "passive" antitheft devices as defined by the Pennsylvania statute. Defendants' incorporate their response to paragraph 142. In further response, while it is not disputed that the 30(b)(6) designee of Allstate was unaware of whether or not Allstate has conducted studies of ISO data, the conduct of such studies was not an area for which the witness was designated to testify.

160. Not disputed that the allegation in paragraph 160 is an accurate representation of Ms. Chapman's testimony. In further response, Ms. Chapman did not testify that she uses or relies on ISO data in populating the VIS Symbol Table. While Ms. Chapman did testify that she receives "hard copies" of ISO data that contains "some information on cars," she did not testify that Progressive receives any "antitheft" data from ISO. *See* Plaintiffs' Appendix at 5660 (citing Chapman Dep. at 40: 18–25). Thus, any allegation that Progressive receives antitheft data from ISO is unsupported and denied.

161. Unsupported allegation. Plaintiffs provide no support for their conclusory allegation in paragraph 161 that ISO performs "other" functions for the Defendants in the Related actions. Defendants do not dispute that the federal regulations cited in support of the allegation in paragraph 161 require insurers to furnish to NHTSA certain information regarding comprehensive insurance for motor vehicles, thefts, and recoveries of motor vehicles and information about actions taken by insurer to reduce premiums. Defendants dispute Plaintiffs' unsupported inference that ISO assists Defendants in compiling or furnishing any information to NHTSA regarding comprehensive insurance premiums or actions taken by insurers to reduce premiums. *See* Defendants' Response to ¶ 162.

162.	Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. The documents Plaintiffs cite in support of the allegation in paragraph 162 provide that the insurers themselves submitted information regarding "the rating rules used by the insurer to establish premiums for comprehensive coverage, the actions taken by the insurer to reduce premiums, and the actions taken by the insurer to reduce theft in the calendar year 2003." *See* Plaintiffs' Appendix at 4319. The documents referenced state that ISO *only* submitted "vehicle theft and recovery" information on behalf of the insurers listed. *See* Plaintiffs' Appendix at 4320–4356. Defendants dispute Plaintiffs' unsupported inference that ISO assists Defendants in compiling or furnishing any information to NHTSA regarding comprehensive insurance premiums or actions taken by insurers to reduce premiums – including any actions regarding the application of the passive antitheft discount. Defendants also dispute Plaintiffs' unsupported inference that ISO submitted any information whatsoever for Defendants except for the information referenced in the cited documents for calendar year 2003.

### R.L. Polk & Co.

163.	Not disputed that the allegation in paragraph 163 is an accurate description of Polk based on Polk's VIS Manual.

164.	Not disputed that Polk offers various products for licensing which include those listed in paragraph 164. Any allegation that any of the defendant insurers in this case (aside from Progressive), licensed any of the products listed in paragraph 164 is unsupported and therefore denied. In further response, insurers must license an optional/additional product from Polk called "VINPlus" if they wish to receive vehicle security system (i.e., antitheft device) information. *See* Defendants' Joint Statement of Facts at 15, ¶ 82 (citing Krass Dep. at 20: 12–23). Progressive did not receive the VINPlus product prior to March 1, 2010. *See* Plaintiffs'

Appendix at 2469 (citing ¶ A). While the VINPlus product purports to offer information about antitheft devices as Polk defines them, Defendants do not concede that Polk's data is accurate or consistent with data from other sources. *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶ 46 (citing Antitheft Spreadsheet showing inconsistencies between sources).

165.    Not disputed that CVINA, Polk's primary VIN decoding product, has been available since 2003. Defendants also do not dispute that VINA and VIS are no longer licensed to new customers but maintained for existing licensees. In further response, VINPlus, the product that contains vehicle security system information, has been available since 1992. *See* Defendants' Joint Statement of Undisputed Facts at 15, ¶ 82, 16, ¶ 86 (citing Krass Dep. at 20: 21–23, 53: 9–17).

166.    Not disputed that Ms. Krass testified that VINTelligence is a product delivered through the Internet. In further response, Ms. Krass also testified that VINTelligence is "not really used by the insurance carriers. It's intended for customers that's just a single one-off lookups (sic). So many pay per the VIN." *See* Plaintiffs' Appendix at 5798 (citing Krass Dep. at 15: 11-16).

167.    Not disputed that insurers must license an optional/additional product from Polk called "VINPlus" if they wish to receive vehicle security system (i.e., antitheft device) information. While the VINPlus product purports to offer information about antitheft devices as Polk defines them, Defendants do not concede that Polk's data is accurate or consistent with data from other sources. *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶ 46 (citing Antitheft Spreadsheet showing inconsistencies between sources). In further response, Defendants dispute Plaintiffs' use of the term "passive" which does not reference the Pennsylvania statute and is based on Polk's own definition of a passive device which includes

devices that are activated when the ignition key is turned on or off. *See* Defendants' Joint Statement of Undisputed Facts at 15, ¶ 83 (citing Polk VIS Manual at Bates No. PL 003188).

168. Not disputed.

169. Not disputed that Ms. Krass testified that security system information is available through VINTelligence without the addition of VINPlus. In further response, Ms. Krass also testified that VINTelligence is "not really used by the insurance carriers" because it only allows the user to search one vehicle at a time. *See* Plaintiffs' Appendix at 5798 (citing Krass Dep. at 15: 13-14). While Ms. Krass testified that the VINTelligence product offers security system information, Defendants do not concede that Polk's data is accurate or consistent with data from other sources. *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶ 46 (citing Antitheft Spreadsheet showing inconsistencies between sources).

170. Not disputed that Polk provides a key to explain its security codes. Defendants also do not dispute that Polk purports to base its security codes "on the insurance and automobile standards of Active and Passive devices." Defendants dispute any allegation that Defendants can accurately rely on Polk data to provide the passive antitheft discount. Polk's definition of "passive" does not reference or comport with the definition of "passive" set forth in the Pennsylvania statute. Rather, it is based on Polk's own definition of a passive device which includes devices that are activated when the ignition key is *turned on* or off. *See* Defendants' Joint Statement of Undisputed Facts at 15, ¶ 83 (citing Polk VIS Manual at Bates No. PL 003188) (emphasis added). In further response, Defendants do not concede that Polk's data is accurate or consistent with data from other sources. *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶ 46 (citing Antitheft Spreadsheet showing inconsistencies between sources).

171.    Not disputed that Polk provides multiple security codes which are based on "the insurance and automobile industry standards of Active and Passive devices." Defendants dispute the allegation that Polk "identifies" which vehicles have "passive" immobilizer systems; while Polk purports to provide information about "passive" devices as Polk defines them, Defendants do not concede that Polk's data is accurate or consistent with data from other sources. *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶ 46 (citing Antitheft Spreadsheet showing inconsistencies between sources). In further response, Defendants dispute Plaintiffs' use of the term "passive" which does not reference the Pennsylvania statute and is based on Polk's own definition of a passive device which includes devices that are activated when the ignition key is *turned on* or off. *See* Defendants' Joint Statement of Undisputed Facts at 15, ¶ 83 (citing Polk VIS Manual at Bates No. PL 003188) (emphasis added).

172.    Not disputed that the allegation in paragraph 172 is an accurate description of Polk based on Ms. Krass' deposition testimony. In further response, Ms. Krass also testified that Polk does not receive antitheft information on all makes and models that are on the road today. *See* Defendants' Joint Statement of Undisputed Facts at 16, ¶ 87 (citing Krass Dep. at 54: 15–20).

173.    Unsupported allegation. Plaintiffs provide no support for the allegation that Polk provides a system called "year/make/model/series" that allows one to obtain vehicle antitheft data. The support Plaintiffs provide for the allegation in paragraph 173 is the portion of Ms. Krass' testimony discussing the product called VINTelligence. Defendants dispute that Polk provides a product called "year/make/series" which provides antitheft data. *See* Defendants' Responses to Paragraphs 166 and 169 regarding VINTelligence.

174.     Not disputed that Ms. Krass testified that Polk provides software that "will attempt to correct [a] VIN based on the logic within the software that knows what the acceptable character should be." In further response, Plaintiffs cite to the wrong portion of Ms. Krass' deposition for the allegation in paragraph 74. The correct citation is Plaintiffs' Appendix at 5803 (citing Krass Dep. at 34: 11-21).

175.     Unsupported allegation. There is no evidence in the record that Polk licenses any information to www.autos.yahoo.com. Defendants deny the unsupported allegation in paragraph 175. While Defendants do not dispute that www.autos.yahoo.com reports that each named plaintiffs' vehicle (except Ms. Lowe) has a standard engine immobilizer, Defendants dispute that the information on that site is accurate or consistent with information from other sources. The undisputed evidence establishes that there currently exists no single definitive source of information showing which vehicle models come equipped with a passive antitheft device as standard equipment and that the information currently available from sources that purport to list which vehicles come standard with an antitheft device is often incomplete, inaccurate, and inconsistent between sources. *See* Defendants' Joint Statement of Undisputed Facts at 9–10 ¶ 42–43 (citing various sources). Furthermore, the information available on each of named plaintiff's vehicles is inconsistent between the sources of information upon which Plaintiffs allege Defendants should rely in granting the discount. *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶ 46 (attaching Antitheft Spreadsheet showing inconsistencies between sources).

176.     Not disputed that Polk provides customer service support regarding its products.

177.     Defendants dispute Plaintiffs' allegation that "Polk updates its vehicle data based upon what the particular customer wants, as specified in the license agreement between Polk and

the customer." Plaintiffs' allegation is overly broad and unsupported by the evidence in the record. Defendants do not dispute that the frequency as to how often Polk updates its information is determined by the licensing agreement between the customer and Polk. Plaintiffs' Appendix at 5808 (citing Krass Dep. at 55: 7 – 56:1). Defendants do not dispute that updates are provided in the form of a "complete reinstall of the system." *See* Plaintiffs' Appendix at 5810 (citing Krass Dep. at 63: 7–8) (Plaintiffs' allegation included an incorrect citation for this proposition).

### Information from Manufacturers/Dealers

178. Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. Mr. Hazelbaker never testified that HLDI "relies extensively" on information from manufacturers to populate its VINDICATOR database. As stated in Defendants' Responses to Paragraphs 111 and 114 – 118, Defendants do not dispute that HLDI obtains antitheft information from automobile manufacturers. In further response, Mr. Hazelbaker testified that there exists no single definitive source of information (including manufacturers) showing which vehicle models come equipped with a passive antitheft device as standard equipment. *See* Defendants' Joint Statement of Undisputed Facts at 9, ¶ 42 (citing various sources including Mr. Hazelbaker's Dep. at 74: 20–24). Mr. Hazelbaker also testified that HLDI also relies on third-party websites to supplement the incomplete data that it receives from automobile manufacturers. *See* Defendants' Joint Statement of Undisputed Facts at 12, ¶ 60 (citing Hazelbaker Dep. at 74: 3–24).

179. Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. The undisputed evidence establishes that there currently exists no single definitive source of information showing which vehicle models come equipped with a

passive antitheft device as standard equipment. *See* Defendants' Joint Statement of Undisputed Facts at 9, ¶ 42 (citing various sources including Robert Mangine and Plaintiffs' own expert witness). With regard to the specific allegation in paragraph 179 regarding Mr. Mangine's testimony, Mr. Mangine testified that antitheft information can be obtained only on a one-by-one basis by calling an automobile manufacturer and providing the manufacturer with the full 17-digit VIN and the specific serial number for a vehicle. *See* Plaintiffs' Appendix at 5576 (citing Mangine Dep. at 122: 22 – 123: 6). Mr. Mangine also testified that automobile manufacturers are not receptive to such inquiries on a routine basis. *See* Plaintiffs' Appendix at 5576 (citing Mangine Dep. at 123:7-10). In further response, Plaintiffs subpoenaed seven major automobile manufacturers requesting "[d]ocuments sufficient to show the make, model, year, and body type of vehicles manufactured ... for sale in the United States that contain an engine immobilizer or other passive antitheft device as standard manufacturers' equipment." *See* Defendants' Joint Statement of Undisputed Facts at 18, ¶ 103 (citing subpoenas). Not one manufacturer provided Plaintiffs with information on vehicles manufactured before 1996, or with an explanation describing the data provided. *See* Defendants' Joint Statement of Undisputed Facts at 18–20, ¶¶ 101-13. Instead, manufacturers provided disclaimers regarding the information provided and data that was inconsistent with other sources upon which Plaintiffs allege that Defendants should rely. *See* Defendants' Joint Statement of Undisputed Facts at 18–20, ¶¶ 106-13.

180. Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. Plaintiffs have provided no support for any allegation that Progressive, State Farm, Peerless, or Nationwide has ever contacted any manufacturer to ascertain or clarify the standard features on vehicles. Plaintiffs have also not provided any support for a claim that Allstate has ever contacted an automobile manufacturer for antitheft data

aside from the one instance Plaintiffs note that took place in 1998. In further response, Defendants dispute the reference to the general term "passive" in paragraph 180 which makes no mention of the Pennsylvania statute or whether a particular device is activated by turning the key to the off position. Plaintiffs also use the term "Passive Audible Alarm" although the undisputed evidence establishes that alarms are activated by locking a vehicle's doors. *See* Defendants' Joint Statement of Undisputed Facts at 8, ¶ 31 (citing Mangine Report at 5, 9); *see also*, Robert Mangine, *Forensic Investigation Of Stolen-Recovered And Other Crime Related Vehicles*, Chapter 8, *Antitheft Systems* at Plaintiffs' Appendix 04995 (stating that "[alarm] systems are armed by the locking of the doors by the driver"). While the information provided to Allstate by Chrysler in 1998 purports to offer information on vehicles with factory- installed antitheft devices, Defendants do not concede that Chrysler's data is accurate or consistent with data from other sources. Chrysler supplied antitheft information on 32 vehicles. Plaintiffs' Appendix at 733. Of those 32 vehicles, 25 were listed as having a "passive" device as "optional," meaning that only the purchaser of the vehicle could know for certain if the car came equipped with such a device. *See* Plaintiffs' Appendix at 733. Additionally, the information that Chrysler provided is inconsistent with other sources that Plaintiffs allege Defendants should rely upon in granting the discount. For example, the information provided by Chrysler to Allstate provided no information on the 1999 Chrysler 300M, Dodge Viper, Plymouth Prowler and Plymouth Voyager whereas the NETS list states that all four vehicles have some sort of device. *Compare* Plaintiffs' Appendix at 730–772 with Plaintiffs' Appendix at 4870–4883.

181. Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. *See* Defendants' Responses to ¶¶ 8, 9, 11, 14, 17, 18, 20, 25, 27, 29, 32, 33, 35, 50, 64, 65, 71, 77, 94, 95, and 96. The allegation in paragraph 181 uses the

general term "passive" immobilizer without reference to the Pennsylvania statute. Plaintiffs'

support for the allegation in paragraph 181 comes from their expert witness Scott King, who

acknowledged that he did not look at any systems applicable or available in 1990 in forming his

opinions in this case. *See* Plaintiffs' Appendix at 5836–5837 (citing King Dep. at 45: 6 – 49:6).

While Defendants do not dispute that Mr. King's primary methodology for determining that the

named plaintiffs (except Ms. Lowe) had an engine immobilizer was to contact auto dealers by

telephone, Defendants do not concede that the information Mr. King received was accurate or

consistent with information from other sources, or that the dealers provided information on

devices tailored to the specific definition set forth in the Pennsylvania statute. According to Mr.

King, the only question he asked the dealers was "[i]f I intended to purchase a key, what kind of

key do I need, the kind with the transponder in it or without."[5]  *See* Plaintiffs' Appendix at 5841

(citing King Dep. at 65: 6–9).

182.    Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to

draw an unsupported inference. Defendants dispute that the NETS list provides information

based on vehicle sub-model. *See* NETS list attached as Exhibit 1 to Pacheco Affidavit listing

vehicles by make, model, and year (Ex. H to Defendants' Joint Statement of Undisputed Facts).

While Mr. Pacheco did state that NETS does receive antitheft information from manufacturers'

---

[5] Other than the one question, Mr. King claims the only other discussion with the dealers was
that Chrysler asked him for the specific 17-digit VIN information. That testimony was offered
only after Mr. King was made aware that Progressive named-plaintiff James Boyle's owner's
manual lists his Jeep Grand Cherokee as having an immobilizer as "optional." When asked about
the discrepancy between what the owner's manual states and what the dealers allegedly stated,
Mr. King testified that Chrysler, and only Chrysler, asked him for specific VIN information. He
had no explanation for why none of the other dealers asked for the full 17 digit VINs, or for why
he did not provide that information to any other dealer. *See* Plaintiffs' Appendix at 5846–5847
(citing King Dep. at 83:2-86:10). Interestingly, nowhere in his report does Mr. King document
either the fact that he made these calls or the results thereof. He had no credible explanation for
this omission. *See* Plaintiffs' Appendix at 5841, 5849–5850 (citing King Dep. at 63: 11 – 65: 15,
95: 17–98: 2).

websites and dealerships, he also stated that the information NETS obtains from various sources, including manufacturers' websites and dealerships, "has proved inaccurate or inconsistent." *See* Defendants' Joint Statement of Undisputed Facts at 17, ¶ 97 (citing Pacheco Aff. at ¶ 16). Mr. Pacheco also stated that "there is no single definitive source of antitheft device data." *See* Defendants' Joint Statement of Undisputed Facts at 17, ¶ 96 (citing Pacheco Aff. at ¶ 13).

183.    Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. Defendants dispute that the Herndon & Associates list provides information based on vehicle sub-model. *See* Plaintiffs' Appendix at 1859 (listing information by model). While the Herndon & Associates list purports to provide information on vehicles having either a standard or optional engine immobilizer, Defendants dispute that the information on that list is accurate or consistent with information from other sources. This is evident from the citation that Plaintiffs offer in support of their allegation in paragraph 183. The cover page of the Herndon & Associates lists states: "These charts are a **GUIDE** only, the investigator must verify that the vehicle is equipped with an immobilizer system." *See* Plaintiffs' Appendix at 1851 (emphasis in original). In further response, the Herndon & Associates list notes inconsistencies between different versions of its own list. The page cited to by Plaintiffs in support of their allegation in paragraph 183 states:

> We were originally told that Sentry Key was standard on Ram 1500 & 2500 starting in 2008 and optional on all others. Our new contact now notes that the Sentry Key Immobilizer was standard beginning 2008 model year for 2008 and 2009 1500, 2500, and 3500. Because of this discrepancy, as usual it's imperative that you obtain a copy of the dealer invoice or NICB shipping records to verify if Sentry Key was on the vehicle in question.

*See* Plaintiffs' Appendix at 1859. In further response, Plaintiffs offer no support for any allegation that the "dealer invoices" or "NCIB shipping records" provide accurate information as to whether a particular vehicle has a "passive" antitheft device, as defined

59

by the MVFRL, as standard equipment. To the contrary, the undisputed evidence establishes that there currently exists no single definitive source of information showing which vehicle models come equipped with a passive antitheft device as standard equipment. *See* Defendants' Joint Statement of Undisputed Facts at 9, ¶ 42 (citing various sources). Furthermore, Mr. Pacheco stated that NETS receives antitheft information from auto dealerships, and that the information received from dealerships "has proven inaccurate or inconsistent." *See* Plaintiffs' Appendix at 4866–4868 (citing Pacheco Aff. at ¶ 16). Finally, the Herndon information cited by Plaintiffs in support of their allegation in paragraph 183 is inconsistent with the information provided by NETS, which Plaintiffs also allege Defendants should rely upon in granting the discount. *See* Plaintiffs' Statement of Uncontested Material Facts at ¶¶ 204–205. For example, the Herndon lists provides that the Dodge Ram models 2500 and 3500 have had an immobilizer device as standard since 2008 whereas those vehicles do not appear anywhere on the NETS list. *See* Plaintiffs' Appendix at 1859, 4870–4883.

184.    Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. The allegation in paragraph 184 uses the general term "passive antitheft devices" without reference to the Pennsylvania statute. Defendants deny the unsupported allegation that manufacturers provide any antitheft information that is complete, consistent with other sources of information, or tailored to the specific definition of "passive antitheft device" as set forth in the Pennsylvania statute. Plaintiffs subpoenaed seven major automobile manufacturers requesting "[d]ocuments sufficient to show the make, model, year, and body type of vehicles manufactured … for sale in the United States that contain an engine immobilizer or other passive antitheft device as standard manufacturers' equipment." *See*

Defendants' Joint Statement of Undisputed Facts at 18, ¶¶ 103–104 (citing subpoenas). Not one manufacturer provided Plaintiffs with information on vehicles manufactured before 1996, or with an explanation describing the data provided. Instead, manufacturers provided disclaimers regarding the information provided and data that was inconsistent with other sources upon which Plaintiffs allege that Defendants should rely. *See* Defendants' Joint Statement of Undisputed Facts at 18–20, ¶¶ 101-13. As stated in footnote 4 on page 22, Defendants have recently been made aware of additional manufacturer responses to Plaintiffs' subpoenas – which Plaintiffs failed to produce during discovery. The additional documents include information from Mercedes-Benz, Chrysler, Ford, and General Motors. The information received from these manufacturers is as problematic as the information Plaintiffs received from Nissan, Honda, and Toyota, as stated in Defendants' Joint Statement of Undisputed Facts at 18–20, ¶¶ 106-13. Below is a summary of problems with the additional information with which Defendants were recently provided.

### A. Mercedes-Benz

While Plaintiffs allege that Defendants should rely upon information received from automobile manufacturers, they themselves fail to provide the court with the information they received from Mercedes-Benz. In response to Plaintiffs' subpoena requesting "[d]ocuments sufficient to show the make, model, year, and body type of vehicles manufactured … for sale in the United States that contain an engine immobilizer or other passive antitheft device as standard manufacturers' equipment," Mercedes provided "a chart of Mercedes-Benz' models and years with 'drive authorization systems'." *See* Ex. B, Mercedes' Response to Plaintiffs' Subpoena. The information provided by Mercedes makes no mention of the Pennsylvania statute, and does not discuss how the "drive authorization systems" are activated or whether they fit the specific

definition set forth in the Pennsylvania statute. *See* Ex. B, Mercedes' Response to Plaintiffs' Subpoena. Furthermore, Mercedes only provided information on vehicles manufactured from 1996 – 2002, despite the fact that Plaintiffs' subpoena was not limited in time frame. *See* Ex. B, Mercedes' Response to Plaintiffs' Subpoena. In further response, Mercedes provided no information whatsoever with regard to the 2006 CLK 350 or the 2007 GL 450, which State Farm named plaintiff Baldoni drives and Plaintiffs claim qualifies for the discount. *See* Ex. B, Mercedes' Response to Plaintiffs' Subpoena.

    B.    <u>General Motors</u>

    General Motors ("GM") provided Plaintiffs with a table of vehicles with immobilizer devices. The information provided by GM makes no mention of the Pennsylvania statute, and it does not discuss how the immobilizers are activated or whether they fit the specific definition set forth in the Pennsylvania statute. *See* Plaintiffs' Appendix at 4906–4910. The devices listed in GM's chart include the: (1) PASSKey II, (2) PASSKey III, (3) PASSKey III+, (4) Passlock II, (5) Passlock III, (6) PASSKey III+ Standard, Optional Keyless Access, (7) Holden Immobilizer[6], (8) Opel Immobilizer[7], and (9) Keyless Access. *See* Plaintiffs' Appendix at 4906–4910. GM provided Plaintiffs with no information on vehicles having either a GM PASSKey I or PASSLock I, even though Plaintiffs claim that these devices fall within the statutory definition. *See* Plaintiffs' Appendix at 4906–4910; Plaintiffs' Statement of Uncontested Material Facts at 9 – 12, ¶¶ 17-24 (discussing PASSKey I and PASSLock). Furthermore, GM did not provide Plaintiffs with any information on vehicles manufactured before 2003, despite the fact that

---

[6] Plaintiffs have not alleged that a Holden immobilizer is a qualifying device under the statutory definition.

[7] Plaintiffs have not alleged that an Opel immobilizer is a qualifying device under the statutory definition.

Plaintiffs' subpoena was not limited in time frame. *See* Plaintiffs' Appendix at 4906–4910. In further response, there were numerous discrepancies between the information provided by GM and information from other sources upon which Plaintiffs allege Defendants should rely in granting the discount. For example,

  • 2007 Buick Enclave (GM lists nothing whereas NETS states it has a device)

  • 2007-2008 Buick Ranier (GM lists nothing whereas NETS states it has a device)

  • 2007 Buick Rendezvous (GM lists the car has having a device whereas NETS does not)

  • 2008 Buick Terraza (GM lists nothing whereas NETS states it has a device)

  • 2010 Pontiac G 5 (GM lists nothing whereas NETS states it has a device)

*Compare* Plaintiffs' Appendix at 4906–4910 *with* Plaintiffs' Appendix at 4870–4883.

    C.    <u>Chrysler</u>

The information provided by Chrysler makes no mention of the Pennsylvania statute, and does not discuss how the Chrysler devices are activated or whether they fit the specific definition set forth in the Pennsylvania statute. *See* Plaintiffs' Appendix at 4886–4903. Furthermore, Chrysler did not provide Plaintiffs with any information on vehicles manufactured before 1998, despite the fact that Plaintiffs' subpoena was not limited in time frame. *See* Plaintiffs' Appendix at 4886-4903. In further response, Chrysler lumps several vehicles together under what it calls "body codes," make it impossible to determine if a particular vehicle within a specific body code has a device. *See* Plaintiffs' Appendix at 4886–4903. For example, Chrysler has a body code labeled "LH" which includes the Dodge Intrepid, Chrysler Concorde, and Chrysler 300M. The data on the tables provided by Chrysler states that 17% of vehicles with the LH code had a Sentry Key Immobilizer device in 1998. *See* Plaintiffs' Appendix at 4890–4892. Defendants fail to see how any insurer could feasibly rely on that information to determine if a particular

vehicle within the LH body type has a passive antitheft device as defined by the Pennsylvania statute. *See* Plaintiffs' Appendix at 4886–4903.

D.     Ford

Ford provided a chart listing vehicles since 1996 with a "passive antitheft device." The chart is titled "Passive Antitheft System (Securilock)". The chart consists of 12 columns, none of which is titled "passive antitheft device" or "Securilock" or "immobilizer." One of the columns is titled "starter interrupt present," but the document does not clarify whether "starter interrupt present" indicates a "passive antitheft device." Thus, it is impossible to determine whether all the vehicles listed on the Ford spreadsheet have a particular device, like the Securilock, or only those that the chart indicates as having "starter interrupt present." In further response, the information provided by Ford makes no mention of the Pennsylvania statute, and does not discuss how the Ford devices are activated or whether they fit the specific definition set forth in the Pennsylvania statute. *See* Plaintiffs' Appendix at 4904-4905. Furthermore, Ford did not provide Plaintiffs with any information on vehicles manufactured before 1998, despite the fact that Plaintiffs' subpoena was not limited in time frame. *See* Plaintiffs' Appendix at 4904-4905.

185.     Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. Plaintiffs' allegation in paragraph 185 is vague as it does not reference any document or source stating that the 1999 Jeep Grand Cherokee has a "Vehicle Theft Security System with security alarm and Sentry Key Engine Immobilizer." Plaintiffs' support for this proposition is an untitled and unrecognizable document listing certain features for the 1999 Jeep Grand Cherokee. While Defendants do not dispute that the document cited lists the 1999 Cherokee as having a security alarm and Sentry Key Immobilizer, Defendants

dispute that the 1999 Jeep Grand Cherokee has a passive antitheft device as specifically defined

under the Pennsylvania statute. The undisputed evidence establishes that there currently exists

no single definitive source of information showing which vehicle models come equipped with a

passive antitheft device as standard equipment and that the information currently available from

sources that purport to list which vehicles come standard with an antitheft device is often

incomplete, inaccurate, and inconsistent between sources. *See* Defendants' Joint Statement of

Undisputed Facts at 9–10, ¶¶ 42–43 (citing various sources). Furthermore, the owner's manual

produced by Mr. Boyle explicitly states that "his" 1999 Jeep Grand Cherokee Limited comes

with the Sentry Key Engine Immobilizer as "Optional." *See* Ex. U to Progressive's Statement of

Undisputed Facts (citing Owner's Manual for 1999 Jeep Grand Cherokee Limited at PL-

002790). Additionally, the information available on the 1999 Jeep Grand Cherokee Limited is

inconsistent between the sources of information upon which Plaintiffs allege Defendants should

rely in granting the discount. *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶ 46

(attaching Antitheft Spreadsheet showing inconsistencies between sources). In further response,

Robert Mangine explicitly stated that the 1999 Jeep Grand Cherokee Limited does not come with

an antitheft device that is activated upon turning the key to the off position. *See* Defendants'

Joint Statement of Undisputed Facts at 9, ¶ 39 (citing Mangine Report at 8–9).

    a.       Defendants do not dispute that the document titled "2001 M.Y. Ford Motor

Company Safety Features Matrix" purports to identify whether a feature is: (1) Standard on all

models in a vehicle line; (2) Available on only some models in a vehicle line; or (3) Not

available at all in a vehicle line. Defendants dispute Plaintiffs' use of the term "Passive"

Immobilizer which makes no mention of the Pennsylvania statute or whether the particular

devices listed fit the specific definition as set forth by the Pennsylvania legislature. While

Defendants do not dispute that the document cited lists the 2001 Taurus as having a "passive immobilizer," Defendants dispute any allegation that the 2001 Taurus has a passive antitheft device as specifically defined under the Pennsylvania statute. The undisputed evidence establishes that there currently exists no single definitive source of information showing which vehicle models come equipped with a passive antitheft device as standard equipment and that the information currently available from sources that purport to list which vehicles come standard with an antitheft device is often incomplete, inaccurate, and inconsistent between sources. *See* Defendants' Joint Statement of Undisputed Facts at 9–10 ¶ 42–43 (citing various sources). Furthermore, the information available on the 2001 Ford Taurus is inconsistent between the sources of information upon which Plaintiffs allege Defendants should rely in granting the discount. *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶ 46 (attaching Antitheft Spreadsheet showing inconsistencies between sources). In further response, Robert Mangine explicitly stated that the 2001 Ford Taurus does not come with an antitheft device that is activated upon turning the key to the off position. *See* Defendants' Joint Statement of Undisputed Facts at 9, ¶ 39 (citing Mangine Report at 8–9).

186.    Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. Defendants do not dispute that Plaintiffs have cited an untitled and unexplained document which purports to list which 2001 Honda vehicles come equipped with an "Immobilizer-Theft Deterrent System" or "Security System" information. Defendants dispute any allegation that 2001 Hondas have passive antitheft devices as specifically defined under the Pennsylvania statute. The undisputed evidence establishes that there currently exists no single definitive source of information showing which vehicle models come equipped with a passive antitheft device as standard equipment and that the information currently available from

sources that purport to list which vehicles come standard with an antitheft device is often incomplete, inaccurate, and inconsistent between sources. *See* Defendants' Joint Statement of Undisputed Facts at 9–10, ¶¶ 42–43 (citing various sources).

187.    Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference.   While Defendants do not dispute that the document cited purports to identify certain Toyota and Lexus vehicles that have standard or optional engine immobilizers, Defendants dispute any allegation or inference that the information listed is accurate or consistent with other sources of antitheft information.  The undisputed evidence establishes that there currently exists no single definitive source of information showing which vehicle models come equipped with a passive antitheft device as standard equipment and that the information currently available from sources that purport to list which vehicles come standard with an antitheft device is often incomplete, inaccurate, and inconsistent between sources. *See* Defendants' Joint Statement of Undisputed Facts at 9–10, ¶¶ 42–43 (citing various sources).  In further response, Plaintiffs subpoenaed seven major automobile manufacturers – including Toyota – requesting "[d]ocuments sufficient to show the make, model, year, and body type of vehicles manufactured … for sale in the United States that contain an engine immobilizer or other passive antitheft device as standard manufacturers' equipment." *See* Defendants' Joint Statement of Undisputed Facts at 18, ¶¶ 103–104 (citing subpoenas).  Not one manufacturer provided Plaintiffs with information on vehicles manufactured before 1996, or with an explanation describing the data provided.  Instead, manufacturers provided disclaimers regarding the information provided and data that was inconsistent with other sources upon which Plaintiffs allege that Defendants should rely. *See* Defendants' Joint Statement of Undisputed Facts at 18–20, ¶¶ 101-13; *see also* Defendants' Response to Paragraph 184.

188.   Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference.  Plaintiffs' allegation in paragraph 188 is vague as it does not reference any document or source listing that the 2008 Ford Expedition EL has a "SecuriLock passive anti-theft ignition system."  Plaintiffs' support for this proposition is an untitled, unexplained, and unrecognizable document listing certain features for the 2008 Ford Expedition EL.  While Defendants do not dispute that the document cited lists the 2008 Ford Expedition EL as having a "SecuriLock passive anti-theft ignition system," Defendants dispute any allegation that the 2008 Ford Expedition EL has a passive antitheft device as specifically defined under the Pennsylvania statute.  The undisputed evidence establishes that there currently exists no single definitive source of information showing which vehicle models come equipped with a passive antitheft device as standard equipment and that the information currently available from sources that purport to list which vehicles come standard with an antitheft device is often incomplete, inaccurate, and inconsistent between sources. *See* Defendants' Joint Statement of Undisputed Facts at 9–10, ¶¶ 42–43 (citing various sources).

189.   Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference.  Plaintiffs' allegation in paragraph 189 is vague as it does not reference any document or source listing that the 2008 Ford Expedition has a "SecuriLock passive anti-theft ignition system."  Plaintiffs' support for this proposition is an untitled, unexplained, and unrecognizable document listing certain features for the 2008 Ford Expedition. While Defendants do not dispute that the document cited lists the 2008 Ford Expedition as having a "SecuriLock passive anti-theft ignition system," Defendants dispute any allegation that the 2008 Ford Expedition has a passive antitheft device as specifically defined under the Pennsylvania statute.  The undisputed evidence establishes that there currently exists no single

definitive source of information showing which vehicle models come equipped with a passive antitheft device as standard equipment and that the information currently available from sources that purport to list which vehicles come standard with an antitheft device is often incomplete, inaccurate, and inconsistent between sources. *See* Defendants' Joint Statement of Undisputed Facts at 9–10, ¶¶ 42–43 (citing various sources). Furthermore, the information available on the 2008 Ford Expedition is inconsistent between the sources of information upon which Plaintiffs allege Defendants should rely in granting the discount. *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶ 46 (attaching Antitheft Spreadsheet showing inconsistencies between sources). In further response, Robert Mangine explicitly stated that the 2008 Ford Expedition does not come with an antitheft device that is activated upon turning the key to the off position. *See* Defendants' Joint Statement of Undisputed Facts at 9, ¶ 39 (citing Mangine Report at 8–9).

190. Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. The documents Plaintiffs cite in support of the allegation in paragraph 190 are "cut off," thus making it unclear whether it contains additional information conflicting with Plaintiffs' proposition. While Defendants do not dispute that the terms "Antitheft" and "Immobilizer" are visible in the document, there also appear to be words that precede "immobilizer" that have been "cut off" the page. In further response, Defendants dispute any allegation that the 2006 CLK 350 has a passive antitheft device as specifically defined under the Pennsylvania statute. The undisputed evidence establishes that there currently exists no single definitive source of information showing which vehicle models come equipped with a passive antitheft device as standard equipment and that the information currently available from sources that purport to list which vehicles come standard with an antitheft device is often incomplete, inaccurate, and inconsistent between sources. *See* Defendants' Joint Statement of Undisputed

Facts at 9–10, ¶ 42–43 (citing various sources). Furthermore, the information available on the 2006 CLK 350 is inconsistent between the sources of information upon which Plaintiffs allege Defendants should rely in granting the discount. *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶ 46 (attaching Antitheft Spreadsheet showing inconsistencies between sources). In further response, Robert Mangine explicitly stated that the 2006 CLK 350 does not come with an antitheft device that is activated upon turning the key to the off position. *See* Defendants' Joint Statement of Undisputed Facts at 9, ¶ 39 (citing Mangine Report at 8–9); *see also* Defendants' Response to Paragraph 184 (discussing information Plaintiffs Received from Mercedes).

191.    Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. While Defendants do not dispute that the untitled and unexplained document Plaintiffs cite in support of their allegation in paragraph 191 lists the 2004 Chrysler Pacifica as having a "Sentry Key Theft Deterrent System" as standard, Defendants dispute any allegation that the 2004 Chrysler Pacifica has a passive antitheft device as specifically defined under the Pennsylvania statute. The undisputed evidence establishes that there currently exists no single definitive source of information showing which vehicle models come equipped with a passive antitheft device as standard equipment and that the information currently available from sources that purport to list which vehicles come standard with an antitheft device is often incomplete, inaccurate, and inconsistent between sources. *See* Defendants' Joint Statement of Undisputed Facts at 9–10, ¶ 42–43 (citing various sources). Furthermore, the information available on the 2004 Chrysler Pacifica is inconsistent between the sources of information upon which Plaintiffs allege Defendants should rely upon in granting the discount. *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶ 46 (attaching Antitheft Spreadsheet showing inconsistencies between sources). In further response, Robert Mangine

explicitly stated that the 2004 Chrysler Pacifica does not come with an antitheft device that is activated upon turning the key to the off position. *See* Defendants' Joint Statement of Undisputed Facts at 9, ¶ 39 (citing Mangine Report at 8–9); *see also* Defendants' Response to ¶ 184 (discussing information Plaintiffs' Received from Chrysler).

192. Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. *See* Defendants' Response to ¶ 191.

193. Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. This allegation is further disputed as unsupported as the document referenced makes no mention of the 2002 Buick Rendezvous. The document cited in support of the allegation in paragraph 193 has a tiny header which states Buick Rendezvous and a small footer with the date 03/06/2001. While Defendants do not dispute that the Plaintiffs have accurately quoted the language of the document, Defendants dispute any allegation that it states that the 2002 Buick Rendezvous comes equipped with a passive antitheft device as defined by the Pennsylvania statute. The undisputed evidence establishes that there currently exists no single definitive source of information showing which vehicle models come equipped with a passive antitheft device as standard equipment and that the information currently available from sources that purport to list which vehicles come standard with an antitheft device is often incomplete, inaccurate, and inconsistent between sources. *See* Defendants' Joint Statement of Undisputed Facts at 9–10, ¶ 42–43 (citing various sources). Furthermore, the information available on the 2002 Buick Rendezvous is inconsistent between the sources of information upon which Plaintiffs allege Defendants should rely in granting the discount. *See* Defendants' Joint Statement of Undisputed Facts at 10, ¶ 46 (attaching Antitheft Spreadsheet showing inconsistencies between sources). In further response, Robert Mangine explicitly stated that the

2002 Buick Rendezvous does not come with an antitheft device that is activated upon turning the key to the off position. *See* Defendants' Joint Statement of Undisputed Facts at 9, ¶ 39 (citing Mangine Report at 8–9); *see also* Defendants' Response to ¶ 184 (discussing information Plaintiffs' Received from GM).

194.    Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. This allegation is further disputed as unsupported as the document referenced makes no mention of the 2002 Buick Rendezvous. The document cited in support of the allegation in paragraph 194 has a tiny header which states Buick Rendezvous and a small footer with the date 03/06/2001. *See* Defendants' Response to Paragraph 193.

195.    Unsupported allegation and disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference. Plaintiffs have not cited any "Dodge Standard Equipment List for the 2004 Stratus Coupe." Instead, Plaintiffs have cited to the case caption page that accompanies Mr. Pacheco's affidavit. Defendants presume that Plaintiffs meant to cite page 4886 of their appendix, which includes a document that lists the 2004 Dodge Stratus Coupe as having an "immobilizer." Defendants dispute any allegation that the information contained in that document is consistent with the specific definition of "passive antitheft device" as set forth in the Pennsylvania statute. Furthermore, the undisputed evidence establishes that there currently exists no single definitive source of information showing which vehicle models come equipped with a passive antitheft device as standard equipment and that the information currently available from sources that purport to list which vehicles come standard with an antitheft device is often incomplete, inaccurate, and inconsistent between sources. *See* Defendants' Joint Statement of Undisputed Facts at 9–10, ¶ 42–43 (citing various sources).

196.    Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference.  Defendants do not dispute that the document cited by Plaintiffs in support of the allegation in paragraph 196 states that all 2004 Dodge Stratus Sedan models with the exception of the "Stratus SE" come equipped with the Sentry Key Theft Deterrent System" as standard.  Defendants dispute, however, any allegation that the 2004 Dodge Stratus come with a passive antitheft device as specifically defined under the Pennsylvania statute.  The undisputed evidence establishes that there currently exists no single definitive source of information showing which vehicle models come equipped with a passive antitheft device as standard equipment and that the information currently available from sources that purport to list which vehicles come standard with an antitheft device is often incomplete, inaccurate, and inconsistent between sources.  *See* Defendants' Joint Statement of Undisputed Facts at 9–10 ¶ 42–43 (citing various sources).  This is further supported by the fact that the NETS list, upon which Plaintiffs allege Defendants should rely for antitheft information, states that all 2-door 2004 Dodge Stratus Sedan models come with an immobilizer as "Optional."  *See* Plaintiffs' Appendix at 4874.

197.    Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference.  While Defendants do not dispute that the document cited by Plaintiffs in support of the allegation in paragraph 197 states that the 2001 Honda Accord 4DR LX-A SSRS lists "Immobilizer Anti Theft System," Defendants dispute any allegation that the 2001 Honda Accord 4DR LX-A SSRS has a passive antitheft device as specifically defined by the Pennsylvania statute.  The undisputed evidence establishes that there currently exists no single definitive source of information showing which vehicle models come equipped with a passive antitheft device as standard equipment and that the information currently available from

sources that purport to list which vehicles come standard with an antitheft device is often incomplete, inaccurate, and inconsistent between sources. *See* Defendants' Joint Statement of Undisputed Facts at 9–10, ¶ 42–43 (citing various sources).

198.    Disputed.  Plaintiffs provide no support for their allegation that Mr. Hazelbaker gave testimony on the "relative ease with which insurers could obtain information identifying vehicles with immobilizers."  To the contrary, Mr. Hazelbaker testified that that there currently exists no single definitive source of information showing which vehicle models come equipped with a passive antitheft device as standard equipment and that the information currently available from sources that purport to list which vehicles come standard with an antitheft device is often incomplete, inaccurate, and inconsistent between sources. *See* Defendants' Joint Statement of Undisputed Facts at 9–10, ¶ 42–43 (citing Hazelbaker Dep. at 74: 3–24).  Mr. Hazelbaker also testified that no insurer can rely on HLDI's data to determine if a particular vehicle has an antitheft device that activates simply by turning the key to the off position. *See* Defendants' Joint Statement of Undisputed Facts at 12, ¶ 59 (citing Hazelbaker Dep. at 66: 15–19).  In further response, Defendants do not dispute that Plaintiffs have accurately quoted a portion of Mr. Brady's affidavit.  Mr. Brady also stated, however, that he could not provide Plaintiffs with *any* information on Honda vehicles manufactured before 2003 because "it would be burdensome to parse out" which vehicles before 2003 came equipped with an antitheft device." *See* Defendants' Joint  Statement of Undisputed Facts at 19, ¶ 111 (citing Brady Aff. at Bates No. Pl. 003353).  Defendants dispute any allegation that antitheft information can be accurately and readily obtained from automobile manufacturers. *See* Defendants' Response to Paragraph 184.

199. Disputed. No evidence suggests whether or not this document is "readily available to insurers." *See also* Defendants' Response to ¶ 184 (discussing Ford documents cited by Plaintiffs in support of their allegation in paragraph 203).

200. Not disputed that Honda stated that since 2003, all Honda and Acura automobiles manufactured for distribution and sale in the United States have been equipped with antitheft immobilizer devices as standard equipment. In further response, Honda did not provide any information on vehicles manufactured before 2003 because "it would be burdensome to parse out" which vehicles before 2003 came equipped with an antitheft device." *See* Defendants' Joint Statement of Undisputed Facts at 19, ¶ 111 (citing Brady Aff. at Bates No. Pl. 003353).

201. Disputed. No evidence suggests whether or not this document is "readily available to insurers." *See also* Defendants' Response to ¶ 184 (discussing GM documents cited by Plaintiffs in support of their allegation in paragraph 203).

202. Disputed. No evidence suggests whether or not this document is "readily available to insurers." *See also* Defendants' Response to ¶ 184 regarding information from automobile manufacturers – including Nissan.

203. Disputed. No evidence suggests whether or not this document is "readily available to insurers." *See also* Defendants' Response to ¶ 184 (discussing Chrysler documents cited by Plaintiffs in support of their allegation in paragraph 203).

**Information From Forensic Examiners**

204. Not disputed that NETS publishes a list that contains information regarding certain vehicles equipped with engine immobilizers. Defendants also do not dispute that the NETS list is designed solely as a reference for insurance examiners to utilize when investigating a theft claim. Defendants dispute, however, that the NETS list provides information based on

75

vehicle sub-model. *See* NETS list attached as Exhibit 1 to Pacheco Affidavit listing vehicles by make, model, and year (Ex. H to Defendants' Joint Statement of Undisputed Facts). Defendants also dispute any allegation that the information provided on the NETS list is accurate or consistent with data from other sources. To the contrary, the undisputed evidence establishes that the information NETS provides "has proved inaccurate or inconsistent." *See* Defendants' Joint Statement of Undisputed Facts at 17, ¶ 97 (citing Pacheco Aff. at ¶ 16). Mr. Pacheco also stated that "[t]here have been times … where [NETS has] reported a vehicle as having an 'immobilizer' device as standard, and later learned that the feature was merely an 'option' for the customer to purchase." *See* Defendants' Joint Statement of Undisputed Facts at 17, ¶ 100 (citing Pacheco Aff. at ¶ 20). In further response, "[i]t takes many months after the release of a new vehicle before information on that model is made available on [the NETS] list." *See* Defendants' Joint Statement of Undisputed Facts at 17, ¶ 98 (citing Pacheco Aff. at ¶ 23). Defendants further dispute any allegation that the devices on the NETS list fit within the definition of "passive" set forth in the Pennsylvania statute.

205.    Not disputed that NETS began compiling the information for its published list in 1999 and made the information available to insurance companies in 2000. Defendants also do not dispute that NETS obtains the information for its list from the sources listed in paragraph 205. In further response, the allegation that NETS continually supplements its information over time mischaracterizes the evidence as it is taken out of context. The complete quote from Mr. Pacheco states as follows: "Given the uncertainty of the information obtained [from the sources listed in paragraph 205], we continually supplement our information over time based on additional sources." *See* Defendants' Joint Statement of Undisputed Facts at 17, ¶ 99 (citing Pacheco Aff. at ¶ 18). *See* Defendants' Response to ¶ 204.

206.    Disputed on the basis that Plaintiffs mischaracterize the evidence and seek to draw an unsupported inference.  Plaintiffs use the general term "passive antitheft device" which makes no reference to the Pennsylvania statute.  Any allegation that NETS or Herndon & Associates provides information on passive antitheft devices as defined by the Pennsylvania statute is unsupported and denied by Defendants.  Plaintiffs' allegation that Peerless uses any list in evaluating theft claims is unsupported.  With regard to Progressive's "use" of the NETS list, "whether an insured automobile is equipped with an antitheft device is one of a number of factors a claims representative typically considers when investigating a theft claim."  *See* Plaintiffs' Appendix at 2737.  As stated by Mr. Pacheco, "[t]he list is designed solely as a reference for examiners to utilize when investigating a theft claim."  *See* Plaintiffs' Appendix at 4867 (citing Pacheco Aff. at ¶ 6).  Defendants dispute any allegation that either the NETS or Herndon and Associates lists can be used with certainty to identify whether a particular vehicle has an antitheft device.  The undisputed evidence establishes that the information NETS provides "has proved inaccurate or inconsistent."  *See* Defendants' Joint Statement of Undisputed Facts at 17, ¶ 97 (citing Pacheco Aff. at ¶ 16).  Mr. Pacheco also stated that "[t]here have been times ... where [NETS has] reported a vehicle as having an 'immobilizer' device as standard, and later learned that the feature was merely an 'option' for the customer to purchase."  *See* Defendants' Joint Statement of Undisputed Facts at 17, ¶ 100 (citing Pacheco Aff. at ¶ 20).  In further response, "[i]t takes many months after the release of a new vehicle before information on that model is made available on [the NETS] list." *See* Defendants' Joint Statement of Undisputed Facts at 17, ¶ 98 (citing Pacheco Aff. at ¶ 23).  Defendants further dispute any allegation that the devices on the NETS list fit within the definition of "passive" set forth in the Pennsylvania statute.  Additionally, the cover page of the Herndon & Associates lists states: "These charts are

77

a **GUIDE** only, the investigator must verify that the vehicle is equipped with an immobilizer system." *See* Plaintiffs' Appendix at 1851 (emphasis in original). In further response, the Herndon & Associates list notes inconsistencies between different versions of its own list. The page cited to by Plaintiffs in support of their allegation in paragraph 183 states:

> We were originally told that Sentry Key was standard on Ram 1500 & 2500 and optional on all others. Our new contact now notes that the Sentry Key Immobilizer was standard beginning 2008 model year for 2008 and 2009 1500, 2500, and 3500. Because of this discrepancy, as usual it's imperative that you obtain a copy of the dealer invoice or NICB shipping records to verify if Sentry Key was on the vehicle in question.

*See* Plaintiffs' Appendix at 1859.

207. Any allegation that Mr. Pacheco has served as an expert witness for Progressive, Nationwide, or Peerless is unsupported. Defendants do not dispute that Mr. Pacheco served as an expert witness on forensic analysis and auto theft in the two cases cited by Plaintiffs in support of their allegation in paragraph 207.

**Information from NHTSA**

208. This paragraph does not set forth any purported fact. To the extent the list of citations is deemed to constitute a purported fact, *see* Defendants' Responses to ¶¶ 20–21, 24, 27, 29, 31–32, 35, 37, 55–57, 161–162.

**VIN Numbers**

209. Not disputed that Plaintiffs have cited to the declaration pages for each Plaintiff in the Related Actions. Defendants also do not dispute that the declarations pages contain the VIN number or make, model, and year of each Plaintiffs' insured vehicle. Any allegation, however, that Plaintiffs provided Defendants with their VIN numbers or make, model, year information prior to obtaining an insurance quote or completing an auto insurance application is unsupported.

210.    Disputed.  Defendants agree that no information about a vehicle's antitheft system can be obtained directly from the vehicle's VIN.  Defendants dispute Plaintiffs' unsupported allegation that knowing the VIN allows an insurer to determine whether a vehicle has a factory-installed "passive antitheft device."  Defendants also dispute Plaintiffs' use of the general term "passive antitheft device" which makes no mention of the Pennsylvania statute.  The undisputed evidence establishes that there currently exists no single definitive source of information showing which vehicle models come equipped with a passive antitheft device as standard equipment and that the information currently available from sources that purport to list which vehicles come standard with an antitheft device is often incomplete, inaccurate, and inconsistent between sources.  *See* Defendants' Joint Statement of Undisputed Facts at 9–10, ¶ 42–43 (citing various sources); *see also* Defendants' Response to ¶¶ 79–177 regarding Plaintiffs allegations pertaining to HLDI, ISO, and Polk.

211.    Disputed.  While Defendants do not dispute that the VIN provides the means to identify the make, model, year, and sub-model, Defendants dispute the unsupported allegation that knowing such information enables an insurer to determine if a vehicle has a factory-installed passive antitheft device as that term is defined by the Pennsylvania statute.  *See* Defendants' Response to ¶ 210.

### Filings That All Defendants Are Required To Make With The National Highway Transportation Safety Administration Regarding Discounts Given For ATDs

212.    *See* Defendants' Responses to Paragraphs 161-62.

### The Position Of The Pennsylvania Department Of Insurance Regarding The Failure To Apply The Required ATD Discount

213.    Defendants do not dispute the following points:

- 75 Pa. Cons. Stat. § 1799.5 authorizes the Pennsylvania Insurance Department, among other things, to "[d]etermine that rates and premiums charged to residents are lawfully applied."

- In the referenced market conduct report, the Department of Insurance found that Esurance Insurance Company violated 40 P.S. § 1184 when it "failed to apply the anti-theft discount" on the policies noted in the report.

- Plaintiffs have quoted from portions of the Report.

In further response, the Department did not explain the basis for its finding, did not explain what actions it expected insurers to take in order to meet their obligation to provide the discount, and did not state or suggest that insurers are obligated to determine for themselves whether a particular insured's car is equipped with a passive antitheft device. The violations cited in the Report were as follows: 26 out of 3,055 policies in the category "new business without surcharges" Plaintiffs' Appendix at 4817, 4819–20; 18 out of 1,264 "new business with surcharges" Plaintiffs' Appendix at 4820, 4823–24; 28 out of 1,433 "renewals with surcharges" Plaintiffs' Appendix at 4825 – 26; and 13 out of 433 "renewals with surcharges." Plaintiffs' Appendix at 4827, 4829-30; The Department's report included a "company response" which stated that the company had identified and corrected a rating error approximately 12 months before the examination, and had given the Department a list of the affected policies. Plaintiffs' Appendix at 4848, ¶ 7. The current web site for Esurance Insurance Company directs the customer to:

> **Please select the discounts that apply to this vehicle.**
>
> **Passive alarm: Your car is equipped with either a passive alarm, or a steering restraint/non-passive alarm.**
> **Anti-theft: Your car is equipped with an approved electronic recovery system (Lojack, Teletrac, OnStar).**

https://www.esurance.com/CustomerFlow/CustomerFlowStandard/Vehicle1.aspx (last accessed July 7, 2010).

214.    Defendants do not dispute that Plaintiffs have quoted one sentence from the referenced notice.  Defendants further respond:  The quoted sentence is part of a paragraph which, in whole, reads as follows:

> Antitheft Devices.  The comprehensive premium must be discounted at least 10% for a vehicle equipped with passive antitheft devices.  Some insurers are not discounting the flat expense fee. (p. 2 of notice).

The Department did not explain what actions it expected insurers to take in order to meet their obligation to provide the discount, and did not state or suggest that insurers are obligated to determine for themselves whether a particular insured's car is equipped with a passive antitheft device.

215.    Defendants do not dispute that the referenced document is a notice of a civil complaint filed in a Chester County Magisterial District Court against Nationwide Mutual Insurance Company.  Defendants dispute the accuracy of Plaintiffs' characterization of the allegations of the complaint.  The complaint alleges a breach of contract claim on and as of the date the insured provided the company with "written notice of the anti theft device installation."  Contrary to Plaintiffs' characterization, the complaint did not mention the statute and, specifically, did not allege that the insurer had failed "to apply the antitheft premium discount under the Statute" or "to refund the excessive premiums paid due to the failure to provide ATD discount required by the Statute."  The relevant portion of the complaint alleges, in full:

Count I.  <u>Anti Theft Premium Discount</u>

> Since July 1, 1996, and continuously thereafter without interruption M. Weissman has purchased automobile insurance (Policy No. 58 37C645706) from Defendant for which protection Defendant accepted premium payments.  As of July 1, 1996, the insured vehicle was equiped [sic] with an approved anti theft device that was eligible to receive a premium discount from the Defendant.  On or about April 25, 2007, Defendant received written notice of the anti theft device installation.  As a result of such notification, Defendant accorded the insured, M. Weissman, an anti theft discount for the period commencing April 20, 2005 and at all times thereafter.

However, Defendant refused to recognize the anti theft premium discount for the period of July 1, 1996 to April 20, 2005. Defendant's refusal to provide said discount is a breach of Defendant's insurance policy which breach occurred on and as of April 25, 2007. Despite prior demand therefor, Defendant refused and continues to refuse to cure said contract breach. In the absence of this Civil Action there is no other remedy available to Plaintiff.

*See* Plaintiffs' Appendix at 1274.

216.     Defendants do not dispute that the referenced document is a letter dated September 28, 2007 from a Pennsylvania Insurance Department hearing officer. Defendants dispute Plaintiffs' description of the letter as a "response" to the above referenced complaint – it is dated before the complaint and states that it rejects an application for an administrative hearing. Plaintiffs' description of the letter is incomplete. The letter states that the dispute revolves around policy terms and premium calculations, and that the Pennsylvania Insurance Department "does not have jurisdiction to hear these types of disputes." The letter further states that the issues raised "involve contract interpretation" and that "[n]o statutory or regulatory authority exists for granting a hearing on this issue." The letter does not mention the MVFRL and does not state or suggest that any statutory violation may have occurred. *See* Plaintiffs' Appendix at 1276.

**Small Insurers In Pennsylvania Are Applying Pennsylvania's
Passive Antitheft Device Discount Automatically**[8]

217.     Plaintiffs' allegation that Donegal Insurance Group automatically applies the discount is unsupported. Defendants do not dispute that Plaintiffs have accurately quoted the Policyholder Notice Information" provision of Mr. and Mrs. Bucari's policy. Plaintiffs, however, have omitted the next and final sentence of the quote which states: "Please take an

---

[8] Defendants dispute Plaintiffs' mischaracterization that small insurers are applying Pennsylvania's passive antitheft discount automatically. Defendants incorporate their responses to paragraphs 217–219.

opportunity to review these credits. If you feel these credits may apply to your policy and these credits have not been applied please contact your agent." In further response, no record evidence demonstrates whether the hearsay statements in the cited material are accurate. No record evidence demonstrates how the Donegal Insurance Group determines whether a vehicle has a passive antitheft device as defined by the Pennsylvania statute, whether the Donegal Insurance Group applies the discount accurately, or how it gathers information (assuming it actually gathers information).

218. Defendants do not dispute that Ms. Bucari testified that The Donegal Insurance Group automatically applied the antitheft discount to her policy. *See* Defendants' Response to ¶ 217.

219. Defendants do not dispute that Ruth Thompson and Joyce Fleck stated that Mutual Benefit Insurance Company has been automatically applying the Pennsylvania antitheft discount since the 1990s. Defendants, however, dispute any allegation that Mutual Benefit Insurance, or any insurance company, was automatically applying the antitheft discount in 1990. As Plaintiffs acknowledge, Mutual Benefit relied on ISO data in the 1990s to apply the discount. The undisputed evidence establishes that ISO did not make antitheft information available until 1993 – three years after the relevant provisions of the MVFRL were enacted. *See* Defendants' Joint Statement of Undisputed Facts at 13, ¶ 66 (citing Baldizzi Aff. at ¶ 4). In further response, Ms. Thompson of Mutual Benefit also stated that "[t]here is a time lag for VINMaster updates for new models [and that] [c]urrently this lag is several months." *See* Plaintiffs' Appendix at 4769 (citing Thompson Aff. at ¶ (i)).

# CERTIFICATE OF SERVICE

I certify that a copy of the Defendants' Joint Statement of Disputed Facts in Opposition to Plaintiffs' Corrected Statement of Uncontested Material Facts in Support of Plaintiffs' Motion for Summary Judgment and Plaintiffs' Motion for Class Certification was filed electronically, and is available for viewing and downloading from the ECF system pursuant to Local Rule of Civil Procedure 5.1.2(8), on this 16th day of July, 2010. This electronic filing constitutes service on the following counsel:

Ira Neil Richards, Esquire
Trujillo, Rodriguez & Richards, LLC
1717 Arch Street
Suite 3838
Philadelphia, PA 19103

BY:  /s/ Robert N. Feltoon
Robert N. Feltoon, Esquire
PA# 58197
Deborah J. Krabbendam, Esquire
PA# 41856
CONRAD O'BRIEN P.C.
1515 Market Street, 16th Floor
Philadelphia, PA 19102
Tel: (215) 864-9600
Fax: (215) 864-9620
Attorneys for Defendant Progressive Specialty
Insurance Company

BY:  /s/ James T. Moughan
James T. Moughan, Esquire
PA# 33045
BRITT, HANKINS & MOUGHAN
Two Penn Center Plaza, Suite 515
15th Street and JFK Boulevard
Philadelphia, PA 19102
Tel: (215) 569-6936
Fax: (215) 569-3711
Attorney for Defendant State Farm Mutual
Automobile Insurance Company

BY:   /s/ Michael R. Nelson
Michael R. Nelson, Esquire
PA# 65679
G. Franklin McKnight IV, Esquire
PA# 85701
NELSON LEVINE de LUCA & HORST, LLC
518 Township Line Road
Suite 300
Blue Bell, PA 19422
Tel: (215) 358-5100
Fax: (215) 358-5101
Attorneys for Defendant Nationwide Insurance
Company of America


BY:   /s/ Mathieu J. Shapiro
Thomas A. Leonard, Esquire   PA# 14781
Mathieu J. Shapiro, Esquire   PA# 76266
OBERMAYER REBMANN MAXWELL &
HIPPEL LLP
1617 John F. Kennedy Boulevard
19th Floor, One Penn Center
Philadelphia, PA 19103-1895
Tel: (215) 665-3000
Fax: (215) 665-3165
Attorneys for Defendants Allstate Insurance
Company, Allstate Property & Casualty Insurance
Company, Allstate Indemnity Company, and
Encompass Indemnity Company


BY:   /s/ William C. Foster
William C. Foster, Esquire
PA#03511
MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN
1845 Walnut Street
Philadelphia, PA 19103
Tel: (215) 575-4551
Fax: (215) 575-0856
Attorney for Defendant Peerless Indemnity
Date: July 16, 2010          Insurance Company