**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GARY WILLISCH, *et al*.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 09-5276** |
| | : | |
| **NATIONWIDE INSURANCE COMPANY** | : | |
| **OF AMERICA** | : | |

| | | |
|---|---|---|
| **DEBORAH KOLESAR** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 09-5510** |
| | : | |
| **ENCOMPASS INDEMNITY COMPANY** | : | |

| | | |
|---|---|---|
| **NICOLE MECADON** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 09-5511** |
| | : | |
| **ALLSTATE INDEMNITY COMPANY** | : | |

| | | |
|---|---|---|
| **RONALD BUCARI, *et al*.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 09-5512** |
| | : | |
| **ALLSTATE PROPERTY AND** | : | |
| **CASUALTY INSURANCE COMPANY** | : | |

| | | |
|---|---|---|
| **ROBERT BESECKER, *et al*.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 09-5513** |
| | : | |
| **PEERLESS INDEMNITY** | : | |
| **INSURANCE COMPANY** | : | |

| | | |
|---|---|---|
| **ALBERT BALDONI** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 09-5514** |
| | : | |
| **STATE FARM MUTUAL AUTOMOBILE** | : | |
| **INSURANCE COMPANY** | : | |

| | | |
|---|---|---|
| **PAMELA LOWE-FENICK, *et al.*** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 09-5515** |
| | : | |
| **PROGRESSIVE SPECIALTY** | : | |
| **INSURANCE COMPANY** | : | |

| | | |
|---|---|---|
| **ANN WARRICK** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 09-6077** |
| | : | |
| **ALLSTATE INSURANCE COMPANY** | : | |

| | | |
|---|---|---|
| **JEFFREY D. JUSTICE, II** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 10-5469** |
| | : | |
| **NATIONWIDE AFFINITY INSURANCE** | : | |
| **COMPANY OF AMERICA** | : | |

| | | |
|---|---|---|
| **MARC WATERMAN** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 10-5016** |
| | : | |
| **USAA CASUALTY INSURANCE** | : | |

<u>**MEMORANDUM OPINION**</u>

**Savage, J.**                                                    **March 29, 2012**

In these putative class actions filed on behalf of all policyholders of the defendant automobile insurers whose cars were equipped with antitheft devices and did not receive a ten percent discount on their premium for comprehensive coverage, the plaintiffs allege that the insurers violated § 1799.1 of Pennsylvania's Motor Vehicle Financial Responsibility

2

Law ("MVFRL"),  75 Pa. Cons. Stat. Ann. §§ 1701-1799.7 (West 2011).  In addition to the statutory claim, they also contend that the insurers breached the implied terms of their insurance contracts when they failed to give the antitheft device discount as they had promised in their rate filings with the Insurance Commissioner.  Some plaintiffs assert an additional claim for breach of express contract terms.

With respect to the statutory claim, the plaintiffs contend that the insurers violated § 1799.1 of the MVFRL, the antitheft device discount statute, when they failed to apply a ten percent discount to the premiums for comprehensive coverage for cars equipped with a passive antitheft device as standard equipment.  Their breach of contract claim is based on the respective insurer's rate filing with the Pennsylvania Insurance Commissioner and the insurance contract.  Asserting that the rate filing is an implied term of each insurance contract and that the devices on the insured vehicles meet the respective insurers' rate filings' definition of a qualifying device, the insureds argue that the insurers breached the contracts by failing to give the discount.  The express breach of contract claim rests upon the language of some policies that represent that the insurers will give the insureds all discounts to which they are entitled under the rate filings and/or information in their possession.

The insurers contend that the plaintiffs' theory of liability rests upon a flawed interpretation of § 1799.1.  They argue that the statute does not require them to give the discount described in § 1799.1 unless the insured explicitly requests it.  The plaintiffs, on the other hand, contend that the insurers must give the discount for each insured's vehicle that has a qualifying device, even without the insured specifically requesting it.  Thus, the dispute over the statutory claim is whether the insurer must give the discount only if the

insured asks for it.

After examining the text, structure and purpose of the MVFRL, and applying rules of statutory construction, we hold that the passive antitheft device discount provision, 75 Pa. Cons. Stat. Ann. § 1799.1, mandates that automobile insurers give a ten percent discount on the premium for comprehensive coverage to all of its insureds whose vehicles are equipped with qualifying antitheft devices – whether or not they request it.  We also conclude that the failure to give the discount to those insureds whose vehicles contain passive antitheft devices as defined in the insurers' rate filings constitutes a breach of the implied terms of the insurance contracts.

## Procedural Background

Initially, nine separate putative class actions were filed, each case filed by one or two insureds against a different insurer.[1]  All parties have filed cross-motions for summary judgment.  The defendants filed a joint motion for summary judgment on the statutory interpretation issue, and each insurer filed its own motion for summary judgment on the breach of contract claim.  The plaintiffs have moved to certify the class in each action.[2]  The insurers also filed a joint opposition to the class certification motion.  Shortly after oral argument on the motions for summary judgment, three more putative class actions were

---

[1] *See Willisch v. Nationwide Ins. Co. of Am.*, Civ. A. No. 09-5276*; Kolesar v. Encompass Indem. Co.*, Civ. A. No. 09-5510; *Mecadon v. Allstate Indem. Co.*, Civ. A. No. 09-5511; *Bucari v. Allstate Prop. & Cas.* Co., Civ. A. No. 09-5512; *Besecker v. Peerless Indemn. Ins. Co.*, Civ. A. No. 09-5513; *Baldoni v. State Farm Mut. Auto. Ins. Co.*, Civ. A. No. 09-5514; *Lowe-Fenick v. Progressive Specialty Ins. Co.*, Civ. A. No. 09-5515; *Fassett v. Nationwide Gen. Ins. Co.*, Civ. A. No. 09-5741and *Warrick v. Allstate Ins. Co.*, Civ. A. No. 09-6077. The cases were consolidated by order of Chief Judge Bartle.

[2] Just prior to the deadline for filing summary judgment and class certification motions, the plaintiffs voluntarily dismissed the *Fassett* action.

filed by insureds against three new insurers.[3]  These later cases were consolidated with the earlier cases.

Typically, a ruling on the plaintiffs' motions for class certification would precede disposition of the motions for summary judgment.  However, the parties requested a ruling on the summary judgment motions before deciding the class certification motions.[4]  Thus, we shall decide the cross motions for summary judgment[5] and deny the motions for class certification without prejudice to the plaintiffs' right to file motions to certify classes in light

---

[3] *See Waterman v. USAA Cas.*,Civ. A. No. 5016; *Justice v. Nationwide Affinity Ins. Co. of America*, Civ. A. No. 10-5469; and *Margavage v. Nationwide Mut. Ins. Co.*, Civ. A. No. 10-4820.  The plaintiff voluntarily dismissed the *Margavage* action.

[4] *See* Joint Mot. for Scheduling Conference in first eight cases (Doc. No. 28 in Civ. A. No. 09-5276) ("[A]ll Plaintiffs and Defendants in these cases respectfully and jointly submit that the most efficient procedure would be for the court to decide summary judgment motions first, with class certification motions to be filed, if necessary, after the parties have had the benefit of the Court's decision on summary judgment."); Joint Report of Rule 26(f) Meeting and Proposed Discovery Plan in *Waterman* (Doc. No. 11 in Civ. A. No. 10-5016) ("The parties . . . jointly propose that the Court adopt a class certification, summary judgment, and *Daubert* motion briefing schedule substantially identical to th[at] . . . entered in the eight putative class actions involving antitheft device discounts filed in 2009 that are pending before the Court.").

[5] Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In examining the motion, we must draw all reasonable inferences in the nonmovant's favor.  *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159-60 (3d Cir. 2003).  The initial burden of demonstrating there are no genuine issues of material fact falls on the moving party.  Fed. R. Civ. P. 56(a).  Once the moving party has met its burden, the nonmoving party must counter with "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  The nonmovant must show more than the "mere existence of a scintilla of evidence" for elements on which they bears the burden of production.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment.  *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

Standards for resolving motions for summary judgment do not change when the parties file cross-motions.  *Benckini v. Hawk*, 654 F. Supp. 2d 310, 315 (E.D. Pa. 2009).  Although a court may consider cross-motions for summary judgment concurrently, it must resolve the motions independently.  *Williams v. Phila. Hous. Auth.*, 834 F. Supp. 794, 797 (E.D. Pa.1993).  The fact that both parties have moved for summary judgment "does not mean that the case will necessarily be resolved at summary judgment stage," *Atlantic Used Auto Parts v. City of Philadelphia*, 957 F. Supp. 622, 626 (E.D. Pa.1997), or that either party has waived its right to have the case presented to a jury.  *Facenda v. N.F.L. Films,* 542 F.3d 1007, 1023 (3d Cir. 2008).

of this memorandum opinion.[6]

## The Antitheft Device Discount

At the center of the dispute is the Pennsylvania antitheft device discount provision, 75 Pa. Cons. Stat. Ann. § 1799.1.  The question is whether the statute mandates that automobile insurers give discounts of at least ten percent on comprehensive coverage premiums to an insured whose vehicle is equipped with a "passive antitheft device" without the insured requesting the discount.  Put another way, are insurers only required to give the discount to those insureds who request it?

In resolving the dispute, we must construe the antitheft device statute by applying rules of statutory construction.  As a federal court in a diversity action, we shall apply Pennsylvania law to interpret the Pennsylvania statute.[7]  *Spence v. ESAB Group, Inc.*, 623 F.3d 212, 216 (3d Cir. 2010); *see also United States v. Atiyeh*, 402 F.3d 354, 369-70 (3d Cir. 2005) (applying Pennsylvania rule of statutory construction, 1 Pa. Cons. Stat. Ann. § 1921(b), to construe state gambling statute).

The aim of interpreting and construing a statute is to ascertain and effectuate the intention of the legislature.  *Bd. of Revision of Taxes v. City of Philadelphia*, 4 A.3d 610, 622 (Pa. 2010); *Swords v. Harleysville Ins. Cos.*, 883 A.2d 562, 567 (Pa. 2005) (citing 1

---

[6] In the original nine cases filed, plaintiffs asserted six causes of action: count I - violation of § 1799.1; count II - breach of contract; count III - breach of contract - reformation; count IV - violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"); count V - fraudulent misrepresentation; and count VI - negligent misrepresentation.  Prior to filing their motions for summary judgment, plaintiffs voluntarily dismissed, without prejudice, counts IV, V and VI.  In *Waterman* and *Justice*, plaintiffs asserted three causes of action: count I - violation of § 1799.1; count II - breach of contract; and count III - violation of the UTPCPL.  Plaintiffs voluntarily dismissed count III, the UTPCPL claim, without prejudice.

[7] Statutes are to be construed applying the Pennsylvania rules of statutory construction, 1 Pa. Cons. Stat. Ann. §§ 1901-1991, "unless the application of such rules would result in a construction inconsistent with the manifest intent of the General Assembly."  *Id.* § 1901.

Pa. Cons. Stat. Ann. § 1921(a)).  The starting point is the language of the statute.  The plain, unambiguous language of the statute is the best expression of legislative intent.  1 Pa. Cons. Stat. Ann. § 1921(b); *Bowser v. Blom*, 807 A.2d 830, 835 (Pa. 2002).  Hence, where the language is unambiguous, it is unnecessary to look beyond the statute's text.

On the other hand, where the statutory language is ambiguous or the words are "not explicit," the statutory principles established by the General Assembly for ascertaining its intent are employed.  1 Pa. Cons. Stat. Ann. § 1921(c).[8]  As we explain later, because the statutory language is unambiguous, we do not apply the factors set forth in § 1921(c).

Additionally, there are two important presumptions that guide the interpretation task.  First, it is presumed that the General Assembly did not intend an absurd or unreasonable result, or one that is impossible to execute.  *Bd. of Revision of Taxes*, 4 A.3d at 622 (citing 1 Pa. Cons. Stat. Ann. § 1922(1)-(2)).[9]  Second, the General Assembly is presumed to have intended to favor the public interest over any private interest.  1 Pa. Cons. Stat. Ann. § 1922(5).

### The Antitheft Device Discount Statute

To overhaul Pennsylvania's automobile insurance scheme, the General Assembly enacted the MVFRL, 75 Pa. Cons. Stat. Ann. §§ 1701-1798, in 1984.  The MVFRL was later amended in 1990 ("Act 6"), amending many MVFRL provisions and adding §§ 1799-

---

[8] Among the factors the legislature has directed us to consider where the statutory language is ambiguous or unclear are: (1) the occasion and necessity for the statute; (2) the circumstances under which it was enacted; (3) the mischief to be remedied;  (4) the object to be obtained; (5) the former law, if any, including other statutes upon the same or similar subject; (6) the consequences of a particular interpretation; (7) the contemporaneous legislative history; and (8) the legislative and administrative interpretations of the statute.  1 Pa. Cons. Stat. Ann. § 1921(c)(1)-(8).

[9] Thus, the court is "not permitted to ignore the language of a statute, nor . . . deem any language to be superfluous."  *Bd. of Revision of Taxes*, 4 A.3d at 622 (citing 1 Pa. Cons. Stat. Ann. § 1922(1)-(2)).

1799.7.  One of the primary purposes of the MVFRL and its amendments was to reduce insurance premiums to enable more drivers to purchase insurance.  *See State Auto Prop. & Cas. Ins. Co. v. Pro Design, P.C.*, 566 F.3d 86, 93-94 (3d Cir. 2009) ("[T]he primary purpose of the MVFRL, and especially the 1990 amendments . . . , was to control the cost of insurance such that a higher percentage of drivers would be able to afford insurance." (quoting *Everhart v. PMA Ins. Grp.*, 938 A.2d 301, 306 (Pa. 2007))).[10]  To accomplish this goal, the legislature provided various premium discounts to reduce the cost of insurance to the insureds.[11]

Among the discounts was one for vehicles equipped with antitheft devices.  The relevant section reads:

### § 1799.1.  Antitheft devices

**(a) General rule.--** All insurance companies authorized to write private passenger automobile insurance within this Commonwealth shall provide premium discounts for motor vehicles with passive antitheft devices. These discounts shall apply to the comprehensive coverage and shall be approved by the commissioner as part of the insurer's rate filing, provided that such discounts shall not be less than 10%. Some or all of the premium discounts required by this subsection

---

[10] *See also Paylor v. Hartford Ins. Co.*, 640 A.2d 1234, 1235 (Pa. 1994) (the "enactment of the MVFRL reflected a legislative concern for the spiralling consumer cost of automobile insurance and the resultant increase in the number of uninsured motorists driving on public highways."); James R. Ronca et al., *Pennsylvania Motor Vehicle Insurance: An Analysis of the Financial Responsibility Law*, § 1.2, at 12 (Wilhelm H. Mabius ed., 2d ed. 2009) (["With the passage of Act 6,] consumers were to be given the opportunity to make informed choices about which coverages they wished to purchase and mandatory coverages were kept to a minimum.").

[11] *See* James R. Ronca et al., *supra*, § 1.1(h)(ix), at 9 ("To make insurance coverage more attainable, new mandatory rate reductions were added in 1990," including a limited tort option, and premium reductions for cars with restraint systems and antitheft devices, and for drivers age 55 and older who successfully complete a driver improvement course.).  The Pennsylvania Insurance Department explains in its Statement of Policy regarding the MVFRL that "Act 6 . . . is designed to reduce the cost of providing private passenger automobile insurance in Pennsylvania, and provides mechanisms to pass those cost savings from insurance companies to insurance consumers.").  20 Pa. Bull. 2047 (Apr. 14, 1990).

may be omitted upon demonstration to the commissioner in an insurer's rate filing that the discounts are duplicative of other discounts provided by the insurer.

**(b) Definitions.--** As used in this subsection, the following words and phrases shall have the meanings given to them in this subsection unless the context clearly indicates otherwise:

**"Passive antitheft device."** Any item or system installed in an automobile which is activated automatically when the operator turns the ignition key to the off position and which is designed to prevent unauthorized use, as prescribed by regulations of the commissioner. The term does not include an ignition interlock provided as a standard antitheft device by the original automobile manufacturer.

75 Pa. Cons. Stat. Ann. § 1799.1.

To enhance awareness of the availability of the discounts, the MVFRL requires insurers to notify their insureds of their existence. The notice provision states:

### § 1791.1.  Disclosure of premium charges and tort options

*            *            *            *

**(c) Notice of premium discounts.--**Except where the commissioner has determined that an insurer may omit a discount because the discount is duplicative of other discounts or is specifically reflected in the insurer's experience, at the time of application for original coverage and every renewal thereafter, an insurer must provide to an insured a notice stating that discounts are available for drivers who meet the requirements of sections 1799 (relating to restraint system), 1799.1 (relating to antitheft devices) and 1799.2 (relating to driver improvement course discounts).

*Id.* § 1791.1.

### The Antitheft Device Discount is Mandatory

What does the statute require automobile insurance companies to do with respect to the antitheft device discount?  Although all parties assert that the statutory language is

9

plain and unambiguous,[12] they interpret the statute differently regarding the respective burden of the insurer and the insured.

The insurers contend that they need to give the discount only to those insureds who request it.  According to their interpretation, §§ 1799.1 and 1791.1(c) impose a duty to do only two things: include a passive antitheft discount in their rate filing, and *offer* the discount by notifying applicants and renewing policyholders of the availability of the discount.  The insurers argue that the legislature intended these two provisions "to work in tandem to require automobile insurers to make a mandatory offering of a Commissioner-approved passive antitheft discount, with consumers being responsible for taking advantage of its availability," and that the requirements of the § 1791.1(c) notice provision provide insurers with the means by which they are to "meet their obligation to provide passive antitheft discounts to consumers."[13]  Characterizing their obligation as limited to making a "mandatory offering of a Commissioner-approved passive antitheft discount,"[14] they contend that only after an insured requests a discount does a duty arise to provide one.[15]  They argue, in effect, that the notice provision relieves insurers of the burden to provide a discount for qualifying vehicles.  USAA additionally argues that if the insurers had the duty to conduct an independent investigation to determine whether an

---

[12] Defs.' Joint Mot. Summ. J. (Doc. No. 42-2 in *Willisch*, Civ. A. No. 09-5276) at 8-11; USAA's Mot. Summ. J. (Doc. No. 51-1) at 22; NAIC's Mot. Summ. J. (Doc. No. 33-1) at 7-8; *Willisch* Hr'g Tr. (Aug. 11, 2010) at 73, 105, 107; *Waterman* Hr'g Tr. (May 17, 2011) at 85.

[13] Defs.' Joint Mot. Summ. J. at 16-17.

[14] *Id.* at 17.

[15] *Id.* at 2, 8, 11; Defs.' Joint Resp. to Pls.' Mots. Summ. J. (Doc. No. 60-1 in *Willisch*, Civ. A. No. 09-5276) at 6; *Willisch* Hr'g Tr. at 6-7.  *See also* USAA's Mot. Summ. J. (Doc. No. 51-1) at 7-8 ("Section 1799.1 imposes a conditional obligation, requiring insurers to apply the 10% discount if their insureds inform them that they have a qualifying antitheft device."); NAIC's Mot. Summ. J. (Doc. No. 33) at 8.

insured has a qualifying device, the notice provision would be "superfluous."[16]

The plaintiffs argue that the statute requires insurers to give the discount for each vehicle that has a qualifying device, even without the insured specifically requesting it. Pointing to the language in § 1799.1(a), which states that insurers "shall provide premium discounts," they argue that the statute is "unequivocal" in requiring insurers to apply the discount to vehicles with qualifying devices because "provide" means "to give."[17]  They further contend that the statute imposes an "affirmative obligation" on insurers to apply the discount to vehicles with qualifying devices, requiring them to "do more than just sit there and hope the insured asks" for the discount.[18]

The insurers contend that the plaintiffs "isolat[e] four words – 'shall provide premium discounts' – and ignor[e] the rest of the statute."[19]  In fact, it is the insurers who disregard important language in the statute.  Ignoring the first sentence of § 1799.1(a), which states that "[a]ll insurance companies . . . shall provide premium discounts for motor vehicles with passive antitheft devices," they concentrate exclusively on the second sentence, which states that the "discounts shall be approved by the commissioner as part of the insurer's rate filing."  They disregard the imperative "shall,"[20] and barely acknowledge the meaning

---

[16] USAA's Mot. Summ. J. (Doc. No. 51-1) at 28; *Waterman* Hr'g Tr. at 89-90.

[17] *See, e.g.*, Pls.' Mot. Summ. J. (Doc. No. 58 in *Willisch*, Civ. A. No. 09-5276) at 5-6, 8-11.

[18] *Waterman* Hr'g Tr. at 23; *Willisch* Mot. Summ. J. at 5.

[19] Defs.' Joint Resp. to Pls.' Mots. Summ. J. (Doc. No. 60-1 in *Willisch*) at 2, 7.

[20] The insurers never address the term "shall" in their briefs.  The only time they mentioned it was at oral argument when, in response to the court's question, they responded that "shall" is "a clearly mandatory directive to doing something."  *Willisch* Hr'g Tr. at 24.  Yet, the only "mandatory" obligation they acknowledge they have is to give notice of the discount pursuant to § 1791.1(c)'s "mandatory notice" provision.  Defs.' Joint Mot. Summ. J. (Doc. No. 42-2 in *Willisch*, Civ. A. No. 09-5276) at 14.

of the word "provide," only once asserting that "to provide" means "to make available."[21]

Whose interpretation is correct turns on the meaning of the words "shall provide." The language of the antitheft device discount provision is clear and unambiguous. The General Assembly did not use discretionary language. It did not say that the insurer "may" provide premium discounts. Instead, it used mandatory language – "*shall* provide premium discounts." 75 Pa. Cons. Stat. Ann., § 1799.1(a) (emphasis added). In the same statute, "shall" is defined as requiring an act. *See id.* § 102 ("'Shall.' Indicates that an action is required or prohibited. 'Should.' Indicates that an action is advisable but not required.").

Pennsylvania's statutory construction rules direct that "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage . . . ." 1 Pa. Cons. Stat. Ann. § 1903(a). The common and approved usage of a word is found in the dictionary. *See Harcourt v. General Acc. Ins. Co.*, 615 A.2d 71, 77 (Pa. Super. 1992) (construing peer review provisions of MVFRL). As defined in the dictionary, "provide" means "to furnish; to supply," *Webster's Third New International Dictionary of the English Language* 1827 (1993), or "to supply or make available." *Merriam-Webster's Collegiate Dictionary* 1001 (11th ed. 2005). Synonyms are "give, deliver, hand over, hand, furnish, supply." *Merriam-Webster's Collegiate Thesaurus* 586 (1988).

Taken together, the words "shall provide" cannot be construed to mean that insurers need only offer the discount by providing insureds with the §1791.1(c) notice. The clear

---

[21] The only time the insurers address the meaning of "provide" is in their Joint Response to Plaintiffs' Motions for Summary Judgment, where they disagree with the plaintiffs' definition of "provide" as meaning "to give" and instead say that "provide" means "make available." Defs.' Joint Resp. to Pls.' Mots. Summ. J. (Doc. No. 60-1 in *Willisch*) at 5-6. In answer to the court's question at oral argument of what "shall provide" means, counsel responded: "You are directed to take some action." *Willisch* Hr'g Tr. at 54.

meaning of the words "shall provide" is that automobile insurers must give discounts to insureds whose vehicles have qualifying devices.

Contrary to the defendants' arguments, mandating the insurers to give the discount under § 1799.1 does not render the notice provision superfluous.  Rather, § 1791.1(c) provides for notice of the discount to insureds in situations where only the insured would know if a vehicle contains a passive antitheft device.  For example, if an insured selects a qualifying passive antitheft device as an option to a new vehicle in which the device is not standard equipment, or an insured installs an after-market passive antitheft device, the insurer would not know that the vehicle has a qualifying device.  In those situations, § 1791.1(c) serves to put the insureds on notice that they are eligible for the § 1799.1 discount and should request it.  Additionally, the notice alerts insureds as to how they can save money on their insurance premium, such as installing a passive antitheft device on their car.  It also provides a means for insureds to verify that the insurer actually gave them the antitheft device discount.

Reinforcing the interpretation that the General Assembly intended the discount to be mandatory is the reference to the discount in another part of the statute.  In this other part, the antitheft device discount is referred to as a "required" one.  *See Bd. of Revision of Taxes*, 4 A.3d at 622 (holding that statutes or parts of statutes that relate to the same persons or things shall be construed together, if possible, as one statute) (citing 1 Pa. Cons. Stat. Ann. § 1932).  Specifically, where the discount provision excuses the insurer from giving the antitheft device discount when it would be duplicative, it clearly refers to the discount in mandatory terms.  It refers to the premium discount as a "required" one. 75 Pa. Cons. Stat. Ann. § 1799.1(a) (stating that "[s]ome or all of the premium discounts *required*

by this subsection may be omitted upon demonstration to the commissioner in an insurer's rate filing that the discounts are duplicative of other discounts . . . ." (emphasis added)). It does not state "discounts required to be offered under this subsection" or "discounts required to be made available under this subsection."  This subsection specifies the only circumstance in which an insurer does not have to give the discount – when excused by the Insurance Commissioner.  Thus, in all other circumstances, the insurer must apply the discount.

Additionally, where one discount provision of a statute includes specific language imposing a burden on the insured, but another discount provision excludes such language, a burden should not be implied in the latter provision.  *Fletcher v. Pa. Prop. & Cas. Ins. Guar. Ass'n*, 985 A.2d 678, 684 (Pa. 2009) (where the legislature includes specific language in one section of a statute and excludes it from another, the language should not be implied where excluded) (citations omitted).  Here, the statutory provision that governs the driver improvement course discount clearly imposes a requirement on the *insured* to provide the insurer with a certificate showing that he completed an eligible course.  Section 1799.2 provides that upon successful completion of a course approved by the Department of Transportation, "each participant shall be issued, by the course's sponsoring agency, a certificate which shall be the basis of qualification for the discount on insurance."  75 Pa. Cons. Stat. Ann. § 1799.2(b).

The insurers argue that because the identical phrase "shall provide a premium discount" appears in both discount provisions, § 1799.1(a) and § 1799.2(a), both sections

put the burden on the insured to prove eligibility for the respective discount.[22]  USAA

expands this argument when it contends that the two discount provisions are similar in that

they both "set forth the bases for qualifying for the statutory discount – in the former, it is

receiving a qualifying certificate; in the latter, it is having a qualifying 'passive antitheft

device' on a vehicle."[23]

We agree with the insurers that the driver improvement provision requires the

insured to produce proof of entitlement to the *driver's education* discount.  But, we do not

agree that this discount provision supports the insurers' position that the insured bears the

burden of proving entitlement to the *antitheft* discount.  On the contrary, it demonstrates

that the legislature knew how to impose a burden on the insured to affirmatively prove

entitlement to a discount when it wanted to do so.  Section 1799.2(b) of the driver-

improvement discount provision requires the insured to produce a certificate showing that

he completed a qualifying course.  The antitheft device statute imposes no similar burden

on the insured to produce any certificate or proof that his car has a qualifying device.[24]

Hence, the General Assembly's omitting a similar burden of production on the insured in

the antitheft device discount provision reflects that it did not intend the insured to have

---

[22] *Willisch* Hr'g Tr. at 24-25, 55-56.

[23] USAA's Reply in Supp. of Mot. Summ. J. (Doc. No. 70) at 8 (comparing § 1799.2(b) with § 1799.1(b)).  *See also* USAA's Mot. Summ. J. (Doc. No. 51-1) at 27 and n. 12.

[24] *Compare* § 1799.2(b) (stating that insureds who complete approved driver improvement courses will be given certificates by the course's sponsoring agency that "shall be the basis of qualification for the discount") *with* § 1799.1(b) (stating that a passive antitheft device is "[a]ny item or system installed in an automobile which is activated automatically when the operator turns the ignition key to the off position and which is designed to prevent unauthorized use. . . .").  Another difference between the two discount provisions is that an insurer cannot learn from anyone other than the insured whether he was issued a certificate of completion of a qualifying driver improvement course, whereas there are sources, more reliable than the insured, from which an insurer can determine whether the car contains a qualifying antitheft device.

such an obligation with respect to that discount.

Even though they argue that the statute requires an insurer to give the discount only to those who request it, all insurers except Nationwide give the discount to every insured who requests it without verifying that the insured vehicle has a qualifying device. Yet, an insured who does not request the discount, but whose vehicle has a qualifying device, may not get the discount. Consequently, insureds who have the same make, year and model of vehicle with the same antitheft device are treated differently. Such disparate treatment certainly was not intended by the legislature.[25]

Interpreting the antitheft device provision as mandatory is consistent with the express purpose of the statute and accomplishes that purpose. The statute, which was an overhaul of Pennsylvania's automobile insurance law, was aimed at reducing automobile insurance premiums. *See State Auto Prop. & Cas. v. Pro Design*, 566 F.3d at 93-94. Discounts certainly reduce the cost of insurance. At the same time, they provide incentives to insureds to use devices that reduce risks of loss, decreasing the number of claims made and/or minimizing the extent of loss.[26] Thus, the MVFRL, a remedial statute, is liberally construed to accomplish its remedial goals and in favor of the public interest. *See Chisom v. Roemer*, 501 U.S. 380, 403 (1991).

The clear and unambiguous language of the passive antitheft device discount provision, § 1799.1, read in the context of the structure and the purpose of the MVFRL,

---

[25] Under the defendants' reading of the statute, the only insureds who would get the discount would be those who know and understand what a passive antitheft device is and know enough to ask for the specific antitheft device discount.

[26] Section 1791.1(c) operates in conjunction with § 1799.1 by making insureds aware of these incentives. Together, they encourage insureds to add devices to vehicles in which a passive antitheft device is not standard.

requires insurers to give the premium discount to their insureds whose vehicles are equipped with a passive antitheft device that meets the statutory definition without the insureds requesting the discount.

## Qualifying Antitheft Device

Determining that insurers are obligated to give the premium antitheft device discount to all insureds whose vehicles have qualifying antitheft devices without the insureds requesting the discount does not end the inquiry. We must now consider what is a qualifying device.

The insurers take two contradictory positions. On the one hand, they argue that the statutory definition of "passive antitheft device" is narrow, clear and unambiguous.[27] On the other hand, they contend that it is not clear how the statutory definition applies to actual devices.[28] Two insurers, USAA and NAIC, go even farther, arguing[29] that it is impossible to determine whether a given device is activated when the key is turned to the off position (the statutory definition of a "passive antitheft device") without reviewing the vehicle's

---

[27] *Willisch* Hr'g Tr. at 107 (calling the definition of antitheft device in § 1799.1(b) "clear" and "unambiguous"); Defs.' Joint Mot. Summ. J. at 3, 30 (describing the definition as "narrow" and "specific"); USAA's Mot. Summ. J. at 36 (describing the definition as "clear, precise, specific, and narrow") and 31 ("the statutory language is unambiguous"); NAIC Mot. Summ. J. at 17 (noting that the statutory definition of antitheft device is "narrow").

[28] *Willisch* Hr'g Tr. at 107 (Counsel for Nationwide Ins. Co. of Am.: "I find it very hard to understand what [it] means to say" that "something that's activated automatically when the operator turns the ignition in the off position.").

[29] Although these two insurers adopted and incorporated the filings, arguments, and evidence submitted by the *Willisch* defendants, *see* Defs.' Joint Statement of Material Facts (Doc. No. 50 in *Justice v. NAIC*) at 1, and USAA's Statement of Undisputed Material Facts (Doc. No. 50 in *Waterman v. USAA*) at 2, n.1), they make additional arguments and have submitted the additional expert report of Thomas G. Livernois.

schematics and dismantling the vehicle.[30]  They cite the opinion of Thomas G.  Livernois,

who has a doctorate in electrical engineering, that "there is a continuum of at least eight

plausible activation points, [and] it is not possible to determine how and at what point a

particular antitheft device activates based on publicly available information."[31]  He opines

that the determination cannot be done to a "reasonable degree of engineering certainty."[32]

The insurers claim they cannot identify a single device that qualifies.[33]  In support

of this position, they rely on Robert Mangine, their proffered expert, who opines that the

only systems in existence today that meet the statute's definition of "passive antitheft

devices" are mechanical interlock devices.   Because these devices are specifically

excluded from the statutory definition of "passive antitheft device," Mangine concludes that

"no systems referred to today as 'passive anti-theft devices' activate automatically when

the key is turned to the off position."[34]

_____

[30] *Waterman* Hr'g Tr. at 5-14; USAA's Mot. Summ. J. (Doc No. 51-1) at 34-35; USAA's Resp. to Pl.'s Mot. Summ. J. (Doc. No. 61) at 16 (stating that "determining how and when different antitheft devices activate – and, thus, identifying which particular devices 'activate[] automatically when the operator turns the ignition key to the off position' – is a difficult task").

[31] USAA's Resp. to Pl's MSJ (Doc. No. 61) at 16. Livernois states: "As an electrical engineer, I understand an antitheft device that utilizes an engine immobilizer becomes activated at the point in time when the vehicle parameters associated with the engine immobilizer functionality change the status of the vehicle to a state such that the vehicle is immobilized (i.e., will not start) until prescribed conditions are satisfied." Livernois Report (Doc. No. 50-1 in *Waterman*) at 3.

[32] Livernois Report at 4.

[33] *See* Defs.' Joint Statement Undisputed Facts, ¶ 39 (contending that none of the named plaintiffs' cars contain antitheft devices that "activate automatically merely when the key is turned to the off position"; *Willisch* Hr'g T at 46, 100-101 ("The Court: 'Give me a device that fits the definition.' Mr. Feltoon: 'That's a great question and I can't definitively answer it. . . . . I can't specifically say one.'  The Court: 'Is there any?' Mr. Feltoon: 'There may well be.'").

[34] Mangine Report (Doc. No. 42-5 in *Willisch*, Civ. A. No. 09-5276) at 8, 9.  Specifically, Mangine opines that engine immobilizer systems are activated when the *electronic components* of these antitheft systems are "energized," which occurs once the key is rotated to the "on" position.  *Id.* at 6, 8 (emphasis added).  He opines that prior to the point where the ignition lock core is turned on and the relevant electrical components are energized, the antitheft systems remain at rest and dormant, are not "activated" and provide

In the book, *Forensic Investigation of Stolen-Recovered and Other Crime Related Vehicles*, Mangine characterizes all three types of the popular antitheft devices – resistor-pellet, transponder-based and magnetic rotation – as passive, electronic immobilizers.[35] He distinguishes them from aftermarket systems that "require the driver to physically install or activate [ ] each time the vehicle is parked."[36]  He clearly draws the distinction, writing "most aftermarket systems require action on the part of the driver to arm the system (active system) as opposed to OEM [original equipment manufacturer] immobilizer systems, which require no action on the part of the driver (passive system)."[37]  The MVFRL definition is not any different from Mangine's description of a passive antitheft device.

The insurers correctly point out that the Commissioner could have promulgated regulations "to further specify the devices that qualify."[38]  Despite the language "as prescribed by regulations of the commissioner" in the  definition of "passive antitheft device," and the Insurance Department's obligation under the MVFRL  to "administer and enforce" insurance-related matters and to make any necessary rules and regulations, *see* 75 Pa. Cons. Stat. Ann. § 1704(b), the Commissioner has never issued any regulations that specify what devices qualify under the statute.  Nor has the Commissioner defined it

---

no antitheft protection.  *Id*. at 6.  As we explain later, equating the point at which the electronic signals are sent with the point at which the antitheft device system is activated or armed contradicts the way the manufacturers and NHTSA describe when the systems are activated.  Under the statute, "activated" must mean "armed," not when there are certain electrical charges or signals that can be measured only by doing scientific experiments.

[35] Robert F. Mangine, *Anti-Theft Systems* (Chapter 8), *in Forensic Investigation of Stolen-Recovered and Other Crime Related Vehicles* 209, Table 8-1 at 209 (Eric Stauffer & Monica Bonfanti eds., 2006).

[36] *Id*. at 209.

[37] *Id*. at 208.

[38] Defs.' Joint Mot. Summ. J. at 22.

on an industry-wide basis.[39]

USAA criticizes the Commissioner's failure to prescribe regulations, arguing that this failure leaves insureds and insurers "without guidance" in determining which devices meet the statutory definition and which vehicles contain qualifying devices.[40] It contends that the legislature delegated to the Insurance Commissioner the job of prescribing regulations regarding qualifying antitheft devices because, in an "environment in which antitheft device technology was rapidly evolving,"[41] the legislature "[r]ecogniz[ed] that applying the statutory definition to the real world of automobile technology would require expertise and guidance.[42] USAA further states that the "Legislature chose a clear, precise, specific, and narrow definition. And it allowed for the flexibility to account for technological changes and the imperfect information available in data sources by delegating to the Insurance Commissioner the job of prescribing regulations regarding 'passive antitheft devices' – a job that the Commissioner chose never to fulfill."[43]

We agree with the defendants that it is a reasonable interpretation, giving effect to the purpose of the MVFRL, that the Commissioner may approve or disapprove certain

---

[39] In interpreting a provision of the MVRFL relating to underinsured motorist benefits, § 1733, the Pennsylvania Supreme Court expressed its disapproval of the insurance commissioner's failure to take on the *initial* responsibility of determining whether the MVFRL requires the exhaustion of primary underinsured motorist benefits before secondary coverage is implicated. *See Nationwide Ins. Co. v. Schneider*, 960 A.2d 442, 450, n.8 (Pa. 2008). The Court noted that while it "ultimately maintains the final responsibility to interpret or construe statutes, this function is appropriately informed by the approach of the expert administrative agency." *Id.* But, where the agency has not issued regulations in the area, it has not gained any expertise and it is not helpful to the Court. *Id.*

[40] USAA's Mot. Summ. J. (Doc. No. 51-1) at 8; USAA's Resp. to Pl.'s Mot. Summ. J. (Doc. No. 61) at 16.

[41] USAA's Mot. Summ. J. at 8.

[42] USAA's Resp. to Pl.'s Mot. Summ. J. at 16.

[43] USAA's Mot. Summ. J. at 36.

devices depending on whether they meet the minimum statutory definition.  This interpretation allows the Commissioner to expand the qualifying category and to take into account the changing technology the insurers have noted.  It is not reasonable to conclude, as the defendants urge us to do, that the Commissioner's failure to prescribe regulations relieves the insurers of their statutory obligation to provide the discount to insureds whose vehicles contain a qualifying antitheft device.  Adopting the insurers' interpretation that it is up to the Commissioner to define a passive antitheft device would render the statutory definition meaningless or superfluous.  *See Prestol Espinal v. Attorney Gen.*, 653 F.3d 213, 224 (3d Cir. 2011) (quoting *TRW v. Andrews*, 534 U.S. 19, 31 (2001)).

Notwithstanding their argument to the contrary, each insurer had an understanding of what devices qualify under the statute.  Each explicitly defined what devices entitled its insureds to the discount when it submitted its rate filing to the Commissioner.  Some recited the statutory definition verbatim.  Others varied slightly, adopting the definition used by third party vendors supplying them information for each vehicle make and model.  All represented they would give the discount to those insureds whose vehicles had devices as defined in their respective rate filings.  None advised the Commissioner that the definition of a qualifying device was incomprehensible, or that it was impossible to determine what specific devices qualify.

Even though the defendants now argue that the definition of a qualifying device is incomprehensible, some rely on the insureds' owners' manuals to determine eligibility.  For instance, Nationwide and NAIC require their agents to verify a request for the discount by consulting the owner's manual.  These insurers must believe that the agents are capable of understanding what devices qualify for the discount.  Otherwise, how could the agents

make the determination in each case that the insured is entitled to the discount?

Contradicting their argument that they cannot comprehend how the definition *applies* to actual devices, the defendants argue that they must rely on the insureds to identify whether their vehicles are equipped with qualifying devices.  Implicit in this contention is that they do not have access to information regarding what antitheft device a given make and model has.   However, that is not the case.   The insurers can and do use manufacturers' manuals, industry compilations, government information and their own databases to learn what equipment, standard or optional, is included with each manufacturer, make and model. They also subscribe to services provided by third parties that contain the information.

When an insured applies for insurance coverage, the insurers can verify entitlement to the discount through these various sources.  If the insured does not know whether his vehicle has a qualifying device or incorrectly states that it does not have one, the insurer can easily verify if it does.  Having once determined that a given make and model has the qualifying device, either one that meets the statutory definition or one that meets its rate filing definition, or both, the insurer can process all new and renewal applications by applying the discount to the same make and model without the applicant's requesting the discount.

Citing the opinion of Eugene P. Ericksen,[44] the insurers argue that the information identifying vehicles with antitheft devices supplied by third-parties is not reliable because

---

[44] All defendants have joined in the arguments made by each other and have relied upon the experts employed by the others.

it is indefinite, incomplete and untimely.[45]  They contend that they are unable to "readily and accurately determine from third-party sources which model cars have qualifying antitheft devices as standard equipment" because the sources do not use the same definition of "passive antitheft device" as does the statute, the information is often inaccurate, and the information is regularly released months after the car model comes to market.[46]

Even if the assertion that the information comes too late is correct, it affords no excuse for the insurers failing to give the discount.  Eventually, they receive confirmation that a given make and model has a qualifying device.  Once they get it, they can issue a refund for the premium discount that was not given because they did not have the information earlier.  In addition, they can then update their databases to ensure that all new and renewal applicants for insurance covering the same make and model receive the discount.  In those instances, there is no excuse for failure to unilaterally process the discount.

Placing the burden on the insureds to identify a qualifying device, the insurers contend the insureds can check with the dealer or consult the owner's manual.  These are simple verifiable steps that the insurers themselves can take to identify that a given make and model vehicle has a qualifying device.  Once an insurer possesses the information for one insured, it can apply it to all insureds insuring the same make and model.  It can input the information into its database.  Indeed, this is the process that State Farm employs.

---

[45] Ericksen Report (Doc. No. 42-17 in *Willisch*, Civ. A. No. 09-5276) at 7.

[46] Defs.' Joint Mot. Summ. J. at 23-24.

Despite contending that the insured is in a better position than the insurer to identify whether a given vehicle has a qualifying device, USAA's own proffered expert claims he cannot.  Livernois, an electrical engineer, opines that he cannot determine what devices qualify because each one activates at a different time, making it impossible to establish that it is activated at the precise moment the ignition key is turned to the "off" position as defined in the statute.  He does not claim that the system is not activated at some time in the process.  Rather, he posits that there are at least eight different points in time, measured in seconds, at which various antitheft devices are activated.[47]  His is a hypertechnical approach that appears to have been created to excuse the insurers from providing the discount.[48]

Using Livernois's approach, no device qualifies under the statute.  This interpretation runs head on into the presumption that the legislature did not intend an absurd or unreasonable result, or one that is impossible of execution.  *See Bd. of Revision of Taxes*, 4 A.3d at 622 (citing 1 Pa. Cons. Stat. Ann. § 1922(1)-(2)).  Adopting Livernois's opinion would render the antitheft discount illusory because no device would qualify; or, at least, it would be nearly impossible to determine if a particular device qualifies.

Similarly, if we accepted the insurers' argument that they cannot determine which devices qualify and which vehicles have qualifying devices, we would have to conclude that

---

[47] For example, he distinguishes between devices that activate when the ignition key is turned to the "off" position and those that are activated 30 seconds after the ignition key is turned to the "off" position. Livernois Report at 5-7.

[48] This excerpt from his opinion demonstrates how hypertechnical it is.  He writes, "[a]s an electrical engineer, I understand anti-theft device that utilizes an engine immobilizer becomes activated at the point in time when the vehicle parameters associated with the engine immobilizer functionality change the status of the vehicle to a state such that the vehicle is immobilized (i.e., will not start) until prescribed conditions are satisfied."  Livernois Report at 3.

the insurers never intended to give the discount to anyone even though in their rate filings they represented that they would.  In other words, each insurer's promise of an antitheft device discount made in its rate filing was an empty one.

It is absurd to assume that the legislature intended the process of determining what is a qualifying device to be so complicated.  Nor can we find that the legislature intended that no device would qualify for the discount.

Having dismissed the insurers' arguments that they cannot determine which devices qualify and that there are no vehicles with qualifying devices, we consider whether the plaintiffs' vehicles were equipped with qualifying passive antitheft devices.

### Types of Engine Immobilizer Antitheft Systems

Since 1986, there have been three popular engine immobilizing antitheft devices: resistor-pellet, transponder-based, and magnetic rotation device systems.[49]

**1.  *Resistor-Pellet Technology (GM Pass-Key I and II)*:**

In 1986, General Motors introduced the vehicle antitheft system (VATS) or Pass-Key I system on the Corvette.  It has been described as "the first system to be an integrated part of the vehicle electronics and ushered in the engine immobilizer concept. . . . The system availability expanded through the various GM product lines since 1986, and by 1994, over 66% of GM domestically produced vehicles were Pass-Key equipped."[50]

In information provided to the National Highway Traffic Safety Administration

---

[49] Mangine, *supra*, *Anti-Theft Systems* (Chapter 8), at 209-16; King Report (Doc. No. 42-7 in *Willisch*, Civ. A. No. 09-5276) at 2-3; Mangine Report at 6-7.

[50] Mangine, *supra*, *Anti-Theft Systems*, at 209-10.  Pass-Key II was introduced in 1992.  NHTSA Notice, 57 Fed. Reg. 10517-18, 1992 WL 57801 (Mar. 26, 1992).

("NHTSA"), General Motors described how its Pass-Key vehicle antitheft system operates.[51]  When a properly cut ignition key is inserted into the ignition lock keyway and rotated, the resistor pellet embedded in the key shank touches the contacts located in the outer ignition lock keyway, transmitting a signal to the Pass-Key decoder module located in the instrument panel in the passenger compartment.  The signal's electrical resistance is measured by the decoder module by comparing its value to the fixed resistance value in the module.[52]  If the resistance value is correct for that specific vehicle, the starter-enable relay is energized and a discrete signal is sent to the vehicle's computer (electronic control module) to enable engine functions and allow fuel injector pulses to begin.  If an invalid key is rotated, the resistance value is read as incorrect and the decoder module will shut down for two to four minutes, preventing the engine from starting during this time interval.[53]  In other words, an invalid key fails to enable the engine functions.[54]  GM describes the Pass-Key I and II systems as "fully functional once the ignition is turned off and the key is

---

[51] Federal regulations relating to auto theft require auto manufacturers to mark various parts of certain vehicles "to reduce the incidence of motor vehicle thefts by facilitating the tracing and recovery of parts from stolen vehicles."  49 C.F.R. §§ 541.1-.5.  Each year, some manufacturers petition NHTSA for an exemption from the parts-marking requirement on the ground that the vehicle line has an antitheft device as standard equipment that is "likely to be as effective in reducing and deterring motor vehicle theft as compliance with the parts-marking requirements."  49 CFR §§ 543.2.

[52] There were only fifteen different resistor pellets available for use in GM's Pass-Key system.  Consequently, there were only fifteen different possible resistance values available.  Mangine, *supra*, *Anti-Theft Systems*, at 211.

[53] *See* NHTSA Notice, 54 Fed. Reg. 33655-56, 1989 WL 284909 (Aug. 15, 1989); NHTSA Notice, 57 Fed. Reg. 10517, 1992 WL 57801 (March 26, 1992). Each time a key is rotated in the ignition during the two-to-four minute decoder module shutdown,  the timer resets to zero and the module is shut down for another two to four minutes.  *Id.*  On Pass-Key II, although the module will not reset back to zero if there are any attempts to start the vehicle, the module ignores any attempts to start the car during the shutdown period. 57 Fed. Reg. 10517.

[54] In his report, Mangine describes this process as follows: "If the resistance value is proper for that specific vehicle, the engine functions are released by the control module.  If the resistance value is incorrect or non-existent, the engine will not start."  Mangine Report at 6.

removed from the ignition, thus making its use by the driver virtually automatic."[55]

A shorter description of Pass-Key appears in GM's owner's manuals.  For example, the owner's manual for GM's 1997 Cadillac Eldorado, a vehicle owned by plaintiff Mecadon, states:

> Your vehicle is equipped with the PASS-KEY II theft-deterrent system. PASS-Key II is a passive system.  The system is armed when the key is removed from the ignition.  PASS-KEY II uses a resistor pellet in the ignition key that is read by the system in your vehicle. If the key resistor matches the code stored in the vehicle system, the vehicle's fuel and starting systems will be enabled. If an incorrect key is used, the vehicle's fuel and starting systems are disabled for three minutes.  Additional attempts during this lockout period will not start the car, even with the correct key.[56]

### 2. Transponder-Based Systems (SecuriLock, Sentry Key, Pass-Key III, Pass-Key III+, Mercedes FBS III, Nissan VIS)

SecuriLock

In 1996, Ford introduced the first transponder-based antitheft device with its SecuriLock engine immobilizer system.[57]  In its petition to NHTSA for exemption from parts-marking requirements, Ford describes its SecuriLock transponder-based electronic immobilizer system as follows.  When the ignition key is turned to the start position, the transponder located in the key head transmits a code to the powertrain's electronic control module (ECM).  Each transponder is hard-coded with a unique code at the time of manufacture.  The engine functions are enabled only if the transponder code matches the

---

[55] NHTSA Notice, 51 Fed. Reg. 21823, 1986 WL 103035 (June 16, 1986) (describing Pass-Key I, then known as VATS); NHTSA Notice, 57 Fed. Reg. 10517 (describing Pass-Key II).

[56] Pls.' Ex. 327 at 7525, 7537.

[57] NHTSA Notice, 70 Fed. Reg. 12780-81, 2005 WL 585152 (Mar. 15, 2005); (Mangine, supra, Anti-Theft Systems, at 214-15); Pls.' Ex. 222 (Ford Spreadsheet).  The complete name of Ford's antitheft system is the SecuriLock Passive Anti-Theft Electronic Engine Immobilizer System.  70 Fed. Reg. 12780.

code previously programmed into the ECM.  Ford explains that the "device is activated when the driver/operator turns off the engine by using the properly coded ignition key."[58]

In Ford's owners' manuals, the SecuriLock system is described more succinctly.  For example, the owner's manual for Ford's 2001 Ford Taurus LX, a vehicle owned by plaintiff Boyle, describes the system as follows:

> SecuriLock passive anti-theft system is an engine immobilization system. This system prevents the engine from being started unless a coded key programmed to your vehicle is used.
>
> *                 *                 *
>
> **Automatic arming**
> The vehicle is armed immediately after switching the ignition to the 3 (OFF) position. The THEFT light in the instrument cluster will flash every two seconds when the vehicle is armed.
>
> **Automatic disarming**
> Switching the ignition to the 4 (ON) position with a **coded key** disarms the vehicle. . . .

Other plaintiffs who also own Ford vehicles equipped with the SecuriLock antitheft system are the Willisches, who own a 2004 Ford Explorer and a 2008 Ford Expedition; and Justice, who owns a 2000 Lincoln Town Car.  The description of the SecuriLock system in these vehicles' owners' manuals is the same as the one in the 2001 Ford Taurus owner's manual – that the vehicle's antitheft system is armed immediately after switching the ignition to the "off" position.

---

[58] NHTSA Notice, 64 Fed. Reg. 7949, 1999 WL 71191 (Feb. 17, 1999) (describing SecuriLock).  In 2000, there were seventy-two quadrillion different codes; and in Model Year 2006, there were 18 quintillion. *Id.*  Additionally, the communication between all system parts is encrypted.  *Id.*

Pass-Key III and Pass-Key III+

GM began installing its transponder-based system in 1997 with Pass-Key III.  As described by GM in its NHTSA filing, Pass-Key III works as follows.  The transponder, embedded in the head of the key, is stimulated by a coil surrounding the key cylinder.  The identity of the key[59] is an integral and unique code within a modulated signal that the transponder emits at a specified radiofrequency. When a properly cut ignition key is inserted into the lock keyway and rotated, the key cylinder coil receives and sends the modulated signal to a decoder module, located in the steering column or behind the instrument panel.  When the decoder module recognizes a valid code, it sends an encoded message to the Powertrain Control Module (PCM), enabling fuel flow and starter operation.[60] If an invalid key is used, the decoder module will transmit a different password to the PCM to prevent fuel flow and starter operation.[61]  GM describes the Pass-Key III system as "fully functional once the ignition is turned off and the key has been removed" from the ignition.[62]

Pass-Key III+ operates similarly to Pass-Key III, except that when the transponder receives energy and data from the control module, it calculates a response to the data using secret information and an internal encryption algorithm before transmitting the

---

[59] Unlike Pass-Key I and II, which only have fifteen different resistance values available for use, the PASS-Key III device has the potential for four trillion or more unique electrical key codes.  NHTSA Notice, 61 Fed. Reg. 25734-35, 1996 WL 267862 (May 22, 1996).

[60] Mangine describes it similarly: "If the signal is recognized as being correct and accepted, the engine functions are enabled."  Mangine, *supra*, *Anti-Theft Systems* at 216.

[61] Unlike PASS-Key II, which shuts down for three minutes if an invalid key is detected, with the PASS-Key III device, a shut-down period occurs only if someone is attempting to program a new electronically coded key.  NHTSA Notice, 61 Fed. Reg. 25734-35, 1996 WL 267862.

[62] NHTSA Notice, 61 Fed. Reg. 25734-35 (describing Pass-Key III).

response back to the decoder and then to the PCM.  The PASS-Key III+ device has the capability for producing billions of codes, making it virtually impossible to to steal a vehicle by scanning the code.[63]

In its owner's manuals, GM provides a less technical description of Pass-Key III. The owner's manual for GM's 2002 Buick Rendezvous, a vehicle owned by the Beseckers, states:

> Pass-Key III is a passive theft-deterrent system.  This means you don't have to do anything different to arm or disarm the system.  It works when you insert or remove the key from the ignition. . . . Pass-Key III uses a radio frequency transponder in the key that matches a decoder in your vehicle. When the Pass-Key III system senses that someone is using the wrong key, it shuts down the vehicle's starter and fuel systems.  The starter will not work and fuel will stop being delivered to the engine.

Pls.' Ex. 323 at 7326, 7355.


Sentry Key Immobilizer System (SKIS)

DaimlerChrysler had been installing the Sentry Key Immobilizer System ("SKIS") in its vehicles as standard equipment since 1999.[64]  The immobilizer feature of the SKIS is activated when the key is removed from the ignition switch.  The SKIS prevents the engine from running for more than two seconds unless a valid key is in the ignition switch.  Once activated, only a valid key inserted into the ignition switch will cancel immobilization and allow the vehicle to start and continue to run.  Specifically, when the ignition switch is turned to the "ON" position, the Sentry Key Remote Entry Module (SKREEM) transmits a

---

[63] NHTSA Notice, 70 Fed. Reg. 12779-80, 2005 WL 585151 (Mar. 15, 2005) (describing Pass-Key III+).

[64] NHTSA Notice, 67 Fed. Reg. 79687-88, 2002 WL 31881899 (Dec. 30, 2002).

radio frequency (RF) signal to the transponder in the ignition key.  If the response received identifies the key as valid, the SKREEM sends a valid key message to the Powertrain Control Module (PCM) over the Programmable Communications Interface data connector, and the PCM allows the engine to continue to run.  If the response identifies the key as invalid or no response is received, the SKREEM sends an invalid key message to the PCM, which will disable engine operation after an initial two-second run.[65]

The owner's manual for the 2004 Chrysler Pacifica, which the Beseckers also own, describes the Sentry Key system:

> The Sentry Key Immobilizer System prevents unauthorized operation of the vehicle by disabling the engine.  The system will shut the engine off after 2 seconds of running if an invalid key is used to start the vehicle.  This system utilizes ignition keys which have an electronic chip (transponder) embedded into them.  Only keys that have been programmed to the vehicle can be used to start and operate the vehicle.

> *The Sentry Key Immobilizer System does not need to be armed or activated. Operation of the system is automatic regardless of whether or not the vehicle is locked or unlocked.*  During normal operation, the Theft Alarm/Immobilizer Light will come on for 3 seconds immediately after the ignition switch is turned on for a bulb check. . . . If the bulb begins to flash after the bulb check, this indicates that an invalid key has been used to start the vehicle. Both of these conditions will result in the engine being shut off after two seconds of running.   Keep in mind that a key which has not been programmed is also considered an invalid key even if it is cut to fit the ignition lock cylinder for that vehicle.

(emphasis added).[66]  *See* Pls.' Ex. 321 at 7263, 7271.

The Sentry Key Immobilizer System is also standard equipment installed in the 2005

---

[65] NHTSA Notice, 70 Fed. Reg. 70656, 2005 WL 3107184 (Nov. 22, 2005).  Each new key is programmed with a unique transponder identification code by the manufacturer and must be recognized by the SKREES as a valid key.  The SKIS allows for over one trillion combinations.  NHTSA Notice, 70 Fed. Reg. 40103, 2005 WL 1609839 (Jul. 12, 2005).

[66] Unlike the language used in the manufacturer's petition for exemption, the owner's manual does not state that the immobilizer feature of the SKIS is activated when the key is removed from the ignition switch.

Jeep Liberty Renegade, owned by the Bucaris; and Warrick's 2003 Dodge Neon.[67]  Each of these vehicle's owner's manual describes the Sentry Key system identically.

Mercedes FBS III

In its petition to NHTSA, Mercedes described its transponder-based electronic immobilizer device as including an electronic key, electronic ignition starter switch control unit and an engine control unit, which prevents the engine from running unless a valid key is used in the ignition switch.  The vehicle is immobilized when the key is removed from the ignition switch, whether the doors are open or closed.  Once activated, a valid, coded-key must be inserted into the ignition switch to permit the vehicle to start.[68]

The owner's manuals for Baldoni's 2006 Mercedes CLK 350 and 2007 Mercedes GL 450 describe the system even more simply.  They advise that to "activate" the immobilizer, you must "remove the SmartKey from the starter switch," and to "deactivate" the immobilizer, you must "insert the SmartKey in the starter switch."

Nissan Vehicle Immobilizer System

According to Nissan North America's NHTSA filing, Nissan vehicles have a transponder-based, electronic engine immobilizer device installed as standard equipment.  Nissan's device, which includes an engine electronic control module, immobilizer control, antenna and transponder key, is "automatically activated" by turning the ignition switch to

---

[67] The Sentry Key system may have been installed in Boyle's 1999 Jeep Cherokee as optional equipment.  As explained later, we cannot determine whether it was factory installed in Boyle's Jeep.

[68] NHTSA Notices, 72 Fed. Reg. 39890, 2007 WL 2064665 (July 20, 2007) (describing FBS III); 75 Fed. Reg. 31837, 2010 WL 2212910 (June 4, 2010) (same).

the "OFF" position using the proper ignition key.  When the ignition key is turned to the "OFF" position, a security indicator light begins flashing to notify the operator that the immobilizer device is activated.[69]

The owner's manual for the 2007 Nissan Murano, the vehicle owned by plaintiff Waterman, similarly describes the Nissan Vehicle Immobilizer System ("NVIS").  It states that the antitheft system "will not allow the engine to start without the use of the registered Nissan Vehicle Immobilizer System key," which has "a transponder chip in the key head." The security indicator light blinks when the valid NVIS key "is removed or turned to the OFF, ACC or LOCK position," indicating that the immobilizer system is operating.[70]

### 3.  *Magnetic Rotation Devices (PassLock):*

In 1996, GM began phasing out its use of its Pass-Key systems, replacing them with the magnetic-rotation system device PassLock I.  The following year, it began installing its PassLock II, a magnetic-rotation system device.[71]  The system uses a coded magnet embedded in the ignition lock cylinder (not in the key shank as in Pass-Key systems), and an electronic sensor mounted on the column assembly housing surrounding the ignition lock.  When the ignition lock core is rotated within the housing using the correctly cut key, the magnet passes over the housing-mounted sensor, generating a signal that is sent to

---

[69] NHTSA Notices, 74 Fed. Reg. 28768, 2009 WL 1677406 (June 17, 2009) (describing Nissan's antitheft device);  66 Fed. Reg. 53830, 2001 WL 1267021 (Oct. 24, 2001) (same).

[70] Pl.'s Add'l Ex. 41 at 1069, 1158-60, 1193.

[71] NHTSA Notice, 61 Fed. Reg. 12132, 1996 WL 128609 (Mar. 25, 1996); Mangine, *supra*, *Anti-Theft Systems* at 211.  From 1996 to 2004, only the Corvette retained the Pass-Key II system, and the 2005 Corvette had a keyless electronic ignition system installed.  *Id.*; NHTSA Notice, 69 Fed. Reg. 12734, 2004 WL 506549 (Mar. 17, 2004).

the decoder module, which measures the voltage.  If the value of the sensor's voltage matches the value stored in the memory of the decoder, the decoder sends an encoded signal to the power control module to start the flow of fuel and enable engine functions. If an invalid key is used, an improper voltage value is measured, which sends a signal to the power control module to prevent the flow of fuel for ten minutes.[72]  GM explains that the PassLock system is "designed to be active at all times without direct intervention by the vehicle operator," and "activated by turning off the ignition and removing the key."[73]

PassLock is also described, though in much less detail, in GM's owners' manuals. The owner's manual for the 2000 Chevrolet Blazer, a vehicle owned by plaintiff Kolesar, states:

> Your vehicle is equipped with the PassLock theft-deterrent system. Passlock is a passive theft-deterrent system.  PassLock enables fuel if the ignition lock cylinder is turned with a valid key. If a correct key is not used or the ignition lock cylinder is tampered with, fuel is disabled.[74]

### The Three Major Types of Engine Immobilizer Devices Installed as Original Equipment Qualify as Passive Under the Antitheft Device Discount Statute

The legislature defined a qualifying passive antitheft device in the statute as "an item or system" which is "designed to prevent unauthorized use" and is "activated automatically when the operator turns the ignition key to the off position."  75 Pa. Cons. Stat. Ann. § 1799.1(b).  This means that the system is armed when the vehicle is turned off.

---

[72] NHTSA Notice, 65 Fed. Reg. 17333-34, 2000 WL 331321 (Mar. 31, 2000); NHTSA Notice, 64 Fed. Reg. 14963-64, 1999 WL 165592 (Mar. 29, 1999); Mangine, *supra*, *Anti-Theft Systems* at 212-13.

[73] NHTSA Notice, 64 Fed. Reg. 14963-64; NHTSA Notice, 61 Fed. Reg. 12132, 1996 WL 128609 (Mar. 25, 1996).

[74] Pls.' Ex. 325 at 7486, 7496.

The Pass-Key I, Pass-Key II, Pass-Key III, Pass-Key III+, SecuriLock, Sentry Key, Mercedes FBS III, Nissan Vehicle Immobilizer, and PassLock systems all qualify as passive antitheft devices under the statute.  Designed to prevent unauthorized use, they immobilize the vehicle when they are activated by turning the key to the "off" position.

Removing the ignition key after turning it to the off position is not a step that disqualifies the device.  Leaving the key in the ignition allows anyone, authorized and unauthorized, to start the engine regardless of the presence of any antitheft device.  That the driver must remove the key before the system activates does not mean the system is not passive under § 1799.1.  All passive antitheft devices are designed with the assumption that the driver will remove the key.  Otherwise, the car could easily be stolen simply by turning the key back into the "on" position.  To conclude otherwise would be absurd and nonsensical.

When the owner's manual or NHTSA filing advises that the key must be removed, the advice is nothing more than an explication of the obvious.  Leaving the valid key in the ignition, even in the off position, does not prevent theft.  Merely turning it from the "off" position to the "on" position will deactivate or disarm the device.  Thus, for the system to be effective, the key must be removed.

In the descriptions in their NHTSA filings and owners' manuals, manufacturers explain how these immobilizers are activated or armed in one of two ways: (1) when the ignition switch is turned to the "off" position with a valid key (SecuriLock, Nissan VIS); or (2) when the ignition switch is turned to the "off" position with a valid key and the key is removed from the ignition. (Pass-Key, PassLock, Sentry Key, Mercedes FBS III).  These descriptions demonstrate that each of these immobilizers is activated automatically when

the operator turns the valid ignition key to the "off" position.

In its NHTSA filings, Ford states that its SecuriLock transponder-based electronic immobilizer system "is activated when the driver/operator turns off the engine by using the properly coded ignition key."[75]  Ford reiterates this in its owners' manuals, where it states that "[w]hen the ignition is in the 1 (OFF/LOCK) position . . .  the SecuriLock system is functioning as a theft deterrent.").  As defined in § 1799.1(b), a passive antitheft device is an "item or system installed in an automobile which is activated automatically when the operator turns the ignition key to the off position."  Because this is how Ford describes the SecuriLock system, any vehicle equipped with SecuriLock qualifies as having a passive antitheft device under the literal reading of the statute.

The Willisches, Boyle and Justice each have one or more vehicles equipped with SecuriLock.  Therefore, their vehicles qualify for the statutory passive antitheft device discount.

Nissan describes its Vehicle Immobilizer System ("NVIS") as "automatically activated" by turning the ignition switch to the "OFF" position using the proper ignition key.  This is virtually identical to the statutory language describing a passive antitheft device.  Thus, because Waterman's 2007 Nissan Murano is equipped with an NVIS, his vehicle qualifies for the statutory discount.

With respect to the manufacturers that describe their antitheft device systems as activating or being fully functional when the ignition switch is turned to the "off" position and the key is removed from the ignition, the requirement that the key be removed from the

---

[75] 64 Fed. Reg. 7949, 1999 WL 71191 (Feb. 17, 1999).

ignition does not disqualify the devices from the discount.

Leaving the key in the ignition allows anyone, authorized and unauthorized, to start and run the engine functions.  Merely turning the key from the "off" position to the "on" position will deactivate or disarm the device.  In this situation, the system is activated and armed when the valid ignition key is in the "off" position.  Removing the valid key from the ignition prevents an unauthorized user from using the valid key to disarm the device.

Even though the manufacturers who equip their vehicles with Pass-Key, PassLock, Sentry Key and FBSIII describe these immobilizers as activating when the ignition switch is turned to the "off" position with a valid key and the key is removed from the ignition, the passive antitheft device discount mandated by § 1799.1 must be applied to any vehicle equipped with those devices.  As we have noted, removing the key after the ignition is turned off is not an additional step that goes beyond the statutory definition of a passive antitheft device.  Therefore, the vehicles insured by Mecadon, Besecker, Bucari, Warrick, Baldoni and Kolesar, which are equipped with one of these devices, qualified for the statutory passive antitheft device discount.

Progressive argues that Boyle is not entitled to relief based on his Jeep Grand Cherokee because the owner's manual states that the Sentry Key theft deterrent system is *optional* equipment, and plaintiff alleges his car was equipped with this device as *standard* equipment.  *See* Am. Compl. ¶¶ 2-4, 9.  Boyle claims that the Sentry Key system is standard on all Jeep Grand Cherokee Limited models, which Boyle claims he has, and the statement in the owner's manual that it is optional applies to another sub-model, the 1999 Grand Cherokee Laredo, which does not come with the Sentry Key System as standard equipment.

37

Plaintiff provides insufficient evidentiary support for his statement that the "optional" language in the owner's manual applied to the Laredo sub-model, or that it did not apply to the Limited submodel. Therefore, because it is a question of fact as to whether Boyle's Jeep was equipped with a Sentry Key immobilizer as original standard manufacturer's equipment, Boyle is not entitled to summary judgment as to his claim based on his Jeep.

The Bucaris' 2008 Honda Accord does not qualify for the discount because there is insufficient evidence to determine how the immobilizer works or at what point it is armed or activated. Accordingly, the Bucari plaintiffs' motion for summary cannot be granted.

The Bucaris produced the affidavit of a senior technical specialist at Honda North America stating that since 2003, all Honda vehicles sold in America "were equipped with antitheft immobilizer devices as standard equipment."[76] There is no information about this antitheft device in NHTSA filings. The only description of how the device works offered by the plaintiffs is in owners' manuals for the 2007 and 2008 Honda Accord.

The Honda Accord owners' manuals state that "[t]he immobilizer system protects your vehicle from theft. If an improperly-coded key (or other device) is used, the engine's fuel system is disabled." It further states:

> When you turn the ignition switch to the ON (II) position, the immobilizer system indicator should come on briefly, then go off. If the indicator starts to blink, it means the system does not recognize the coding of the key. Turn the ignition switch to the LOCK (0) position, remove the key, reinsert it, and turn the ignition switch to the ON (II) position again.[77]

This description does not address when the immobilizer is armed or engaged. Thus, without any evidence that shows when it is activated, it is not possible to determine

_____

[76] Pls.' Ex. 243 at 4975.

[77] Pls.' Ex. 315 at 7077, 7086.

whether this device qualifies as "passive" under the terms of the statute.

Lowe-Fennick's vehicle, a 2006 Hyundai Sonata, contains an alarm system but does not have an engine immobilizer.  The owner's manual states that the system is armed by removing the key from the ignition switch, and closing and locking the doors.  Because locking a door to activate the alarm system does not qualify as "passive" under the statutory definition, Lowe-Fenick's vehicle does not qualify for the statutory discount.

### Claim for Breach of Implied Terms of the Contract

The claim for breach of implied terms of the contract is based on the insurers' alleged violation of both the antitheft device discount statute, 75 Pa. Cons. Stat. Ann. § 1799.1, and the rate filing statute, 40 P.S. § 1184(h).  Plaintiffs contend that these statutes are, by operation of law, incorporated into and are implied terms of the insurance contract.  Thus, according to the plaintiffs, a violation of either of these statutes amounts to a breach of the insurance contract.[78]

Statutes that pertain to the subject matter of a contract "form a part of the contractual obligation as if actually incorporated into the contract."  *Stroback v. Camaioni*, 674 A.2d 257, 261 (Pa. Super. 1996) (citations omitted).  Specifically, applicable statutory provisions of insurance law are deemed incorporated into insurance contracts.  *Coolspring Stone Supply, Inc. v. American States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993) (citing *Santos v. Ins. Placement Facility*, 626 A.2d 1177, 1179 (Pa. Super. 1993) ("pertinent statutory provisions of Pennsylvania insurance law are deemed incorporated into insurance

---

[78] In the first eight *Willisch* actions, plaintiffs misnamed their cause of action based on the implied terms of the MVFRL and the rate filing statute a "breach of implied contract" claim.  But, they correctly alleged that the insurers breached the implied terms of the contracts with the plaintiffs.  In the last two actions *Waterman* and *Justice*, they correctly labeled the claim as "breach of contract."

policies")).   Because "[i]nsurance contracts are presumed to have been made with reference to substantive law, including applicable statutes in force," pertinent statutory provisions are deemed incorporated into the insurance contract.  *Clairton City Sch. Dist. v. Mary*, 541 A.2d 849, 851 (Pa. Cmwlth. 1988) (citing *First Nat'l Bank of Pa. v. Flanagan*, 528 A.2d 134, 137 (Pa. 1987); *Neel v. Williams*, 45 A.2d 375 (Pa. Super. 1946)).  *See also Santos*, 626 A.2d at 1179 (citing *Flanagan*, 528 A.2d at 137) ("The substantive laws in effect when the parties enter into a contract are implicitly incorporated into it.").[79]  The defendants do not dispute this legal principle.[80]

The antitheft device discount provision of the MVFRL pertains to the subject matter of the insurance contract between the insureds and the insurers.  The antitheft device discount statute expressly states that private passenger automobile insurance companies are required to provide an antitheft discount for vehicles with "passive antitheft devices." § 1799.1(a).  Accordingly, because the terms of § 1799.1 are incorporated into every automobile insurance policy contract issued in the Commonwealth of Pennsylvania, the failure to give the antitheft device discount to an insured whose vehicle is equipped with a qualifying device constitutes a breach of the implied terms of the contract.

---

[79] *See also Skiff re Bus., Inc. v. Buckingham Ridgeview, LP*, 991 A.2d 956, 970 n.16 (Pa. Super. 2010) (describing *Liss & Marion, P.C. v. Recordex Acquisition*, 983 A.2d 652 (Pa. 2009), where the Pennsylvania Supreme Court held the pricing caps of the Medical Records Act, 42 Pa. Cons. Stat. Ann. §§ 6151–6160, were implied terms of the private contract between a hospital's third-party record-copying service company and a law firm procuring medical records from the company).

[80] *See* Answer to Compl. filed by Peerless (Doc. No. 18 in 09-5513) ¶ 37 (conceding that ". . . insurance contracts must be read with reference to applicable statutes"); Nationwide Ins. Co. (Doc. 20 in 09-5267) ¶ 37 (same); Nationwide Affinity Ins. Co. (Doc. No. 13 in 10-5469) ¶ 40 (same); Progressive Specialty Ins. Co. (Doc. No. 41 in 09-5515) ¶ 38 (same; *see also* Allstate Indem. Ins. Co. (Doc No. 20 in 09-5511) ¶ 37 (conceding ". . . where a statute or law pertain to a given area of contract, courts may imply the statutory provisions into the contract"); Allstate Prop. & Cas. Ins. Co. (Doc. No. 20 in 09-5512) ¶ 37 (same); Allstate Ins. Co. (Doc No. 15 in 09-6077) ¶ 37 (same); Encompass Indem. Co. (Doc. 20 in 09-5510) ¶ 37 (same).

Likewise, 40 P.S. § 1184(h), which provides that "no insurer shall make or issue a contract or policy except in accordance with filings or rates which are in effect for said insurer," is an implied term of every automobile insurance policy issued in Pennsylvania. It also operates to incorporate the insurer's rate filing into the insurance contract.

Rate filings have the force of law and insurers are bound by their terms.  40 P.S. § 1184; *Brockway Glass Co. v. Pa. Pub. Util. Comm'n*, 437 A.2d 1067, 1070 (Pa. Cmwlth. 1981) (tariffs have the force of law and bind the regulated industry to their terms); *Escher v. Decision One Mortg. Co.*, 417 B.R. 245, 257 n.8 (E.D. Pa. 2009) (citations omitted) (same).  The insurers agree.[81]  In each of these cases, by the terms of § 1184(h), the insurer's rate filings are incorporated into the insurance policy contract between the insured and the insurer.  Therefore, any insurer who fails to apply the antitheft discount to an insured whose vehicle contains an antitheft device that qualifies for a discount under the insurer's rate filing definition breaches the insurance contract between that insured and the insurer.[82]

---

[81] No insurer disputes plaintiffs' assertion that its "rate filing has the force and effect of law and [it] is bound by and must comply with its rate and rule filings."  *See* Defs.' Joint Statement of Disputed Facts in Opp'n to Pls.' Corrected Statement of Uncontested Material Facts (Doc. No. 67 in *Willisch*, Civ. A. No. 09-5276), ¶ 7; Defs.' Joint Statement of Material Facts (Doc. No. 50 in *Justice v. NAIC*) at 1 (NAIC adopting Defs.' Response to Pls.' Statement of Undisputed Facts); USAA's Statement of Undisputed Material Facts (Doc. No. 50 in *Waterman v. USAA*) at 2, n.1 ("USAA hereby adopts and incorporates the filings, arguments, and evidence submitted by the insurer defendants in the previously argued cases.").

[82] Early on in the *Willisch* cases, the plaintiffs expected defendants to argue in their summary judgment motions that the plaintiffs did not have a private right of action under § 1799.1.  For that reason, plaintiffs argued in their summary judgment motions that although § 1799.1 does not expressly provide for a private remedy, plaintiffs could bring an action under that statute because the statute was enacted for their benefit; it is consistent with the underlying purpose of the MVFRL's legislative scheme to imply such a remedy for the plaintiffs; and there is no indication that the legislature intended to deny plaintiffs a remedy.  In fact, none of the *Willisch* defendants raised the issue in their joint or individual motions.  Later, the defendant in *Waterman*, USAA, raised this issue in its motion for summary judgment, arguing in the last two pages of its forty-page brief that the legislature has not provided any enforcement mechanism in the MVFRL to recover for an insurer's failure to properly apply an antitheft device discount.  Even if USAA is correct, which we do not believe it is, the plaintiffs can still proceed on their contractual causes of action.

By approving the rate filings, which included each insurer's own definition of a "passive antitheft device," the Commissioner has effectively determined that the insurer's definition conformed to the statutory definition.  Had the Commissioner determined that the definition in a given rate filing did not satisfy the statutory requirement, the rate filing would not have been approved.  Thus, we conclude that each automobile insurer was mandated to give the passive antitheft discount to each insured whose vehicle was equipped with a device meeting the definition in the insurer's approved rate filing.

The three elements of a breach of contract cause of action are: (1) there was a contract; (2) the defendant breached it; and, (3) the plaintiff suffered damages as a result of the breach.  *McShea v. City of Phila.*, 995 A.2d 334, 340 (Pa. 2010).  In each case, there was a contract – the insurance policy – which impliedly incorporated the terms of the antitheft device statute and the insurer's rate filing.  If the antitheft discount was not given to insureds whose vehicles had antitheft devices that qualify under either or both the statutory definition and the insurers' rate filing definition, the insurers violated the antitheft device and/or the rate filing statutes.

*Breach of Contract for Violating the Antitheft Device Discount Statute*

Any insurer who failed to apply the antitheft device discount to an insured's vehicle that was equipped with a device that qualified as "passive" under the statute violated the statute's terms.  Because the terms of § 1799.1 are implied in the insurance contracts between each plaintiff and his or her insurer, the violation of the antitheft device statute constitutes a breach of the implied terms of the contract.

As explained earlier, the Pass-Key I, the Pass-Key II, the Pass-Key III, the Pass-Key

42

III+, the SecuriLock, the Sentry Key, the Mercedes FBS III, the Nissan Vehicle Immobilizer, and the PassLock systems all qualify as "passive" antitheft devices under the statute. Willisch, Justice, Mecadon, Besecker, Bucari, Warrick, Baldoni, Kolesar and Waterman each insured one or more vehicles equipped with one of these devices as standard. Because the insurers of those vehicles[83] failed to give the insureds the antitheft device discount, they violated the terms of the statute, breaching the implied terms of the insurance contracts.

*Breach of Contract for Violating the Rate-Filing Statute*

Similarly, because the terms of 40 P.S. § 1184(h) are implied in the insurance contracts between each plaintiff and his or her insurer, any insurer who failed to apply the antitheft device discount to an insured's vehicle that was equipped with a device that qualified as "passive" under its rate filing violated the terms of the rate-filing statute. The violation of the rate-filing statute also constitutes a breach of the implied terms of the contract.

The insurers' definitions of devices that qualify for a passive antitheft device discount in their rate filings fall into four groups:  (1) those that are identical to the statutory definition, stating that a passive antitheft device "activates automatically when the operator turns the ignition key to the off position" (State Farm, Progressive); (2) those that define

---

[83] Nationwide insured the Willisches' 2004 Ford Explorer and 2008 Ford Expedition; Progressive insured Boyle's 2001 Ford Taurus; NAIC insured Justice's 2000 Lincoln Town Car; Allstate Indemnity insured Mecadon's 1997 Cadillac Eldorado; Peerless insured the Beseckers' 2002 Buick Rendezvous and 2004 Chrysler Pacifica; Allstate P&C insured the Bucaris' 2005 Jeep Liberty Renegade; Allstate Insurance Co. insured Warrick's 2003 Dodge Neon; State Farm insured Baldoni's 2006 Mercedes CLK 350 and 2007 Mercedes GL 450; USAA insured Waterman's 2007 Nissan Murano; and Encompass insured Kolesar's 2000 Chevy Blazer.

"passive" as "engaged automatically when the operator turns the ignition switch of the vehicle to the off position" *and* "a separate manual step is not required to engage the device" (Nationwide, NAIC); (3) those that define a "passive" device as where a "separate manual step is not required to engage the device" (Peerless; Encompass; USAA); and (4) those that define "passive" as "activated automatically when the driver turns the ignition key to the off position and the key is removed" (Allstate Insurance Co., Allstate Indemnity, Allstate P&C).

With respect to the first group's rate filings, which define "passive" almost exactly as the statute defines it, each plaintiff whose vehicle qualified for the statutory antitheft discount and was insured by an insurer in this group will have a device that qualifies for the passive antitheft device discount under the insurer's rate filing.

State Farm and Progressive are the insurers in the first group, whose rate filings define a qualifying antitheft device nearly identically to the statute.  State Farm's rate filing states as follows:

> ANTI-THEFT DEVICE DISCOUNT
> The base premium for comprehensive coverage  . . . shall be reduced 10% on vehicles equipped with passive disabling devices which disable the vehicle by making inoperative the fuel, ignition or starting system. A passive disabling device shall be defined as any item or system installed in an automobile which is activated automatically when the operator turns the ignition key to the off position.
>
> EXCEPTION: The discount does not apply to an ignition interlock provided as a standard anti-theft device by the original automobile manufacturer.

Progressive's rate filing states as follows:

Rule Description: Vehicle Equipment Discounts

A 10 % discount applies to Comprehensive coverage for each vehicle

equipped with a passive antitheft device. A passive anti-theft device is defined as any item or system, designed to prevent unauthorized use, which is installed in an automobile and activates automatically when the operator turns the ignition key to the off position.  The term does not include an ignition interlock provided as a standard antitheft device by the original automobile manufacturer.

State Farm insured the Baldonis' 2006 and 2007 Mercedes vehicles, which were equipped with the Mercedes FBS III antitheft system.  Because these vehicles contain devices that qualified for the statutory antitheft discount, they likewise qualify for the passive antitheft device discount under State Farm's rate filing.

Progressive insured two of Boyle's vehicles – a 1999 Jeep Grand Cherokee, which may have been equipped with a Sentry Key device, and a 2001 Ford Taurus, which was equipped with the SecuriLock system as standard equipment.  Progressive also insured Lowe-Fenick's 2006 Hyundai Sonata, which was equipped with an alarm system but had no engine immobilizer.  Because Boyle's Ford Taurus contain a device that qualified for the statutory antitheft discount, this vehicle likewise qualifies for the passive antitheft device discount under Progressive's rate filing. Because there is a factual dispute whether Boyle's Jeep Cherokee was equipped with a  Sentry Key system as standard equipment, he is not entitled to summary judgment as to the Jeep.  Because Lowe-Fenick's 2006 Hyundai Sonata does not have an antitheft device that qualifies as "passive" under the statute, it does not qualify as "passive" under Progressive's rate filing.  Therefore, Progressive is entitled to summary judgment on Lowe-Fenick's statutory and contract causes of action.

The second group of insurers includes Nationwide and NAIC, whose rate filings define "passive" as "engaged automatically when the operator turns the ignition switch of the vehicle to the off position" *and* "a separate manual step is not required to engage the

device."  Specifically, Nationwide and NAIC's rate filings state as follows:

> A 10 percent discount (multiply by .90) in Comprehensive premium is applicable for vehicles equipped with the following anti-theft device:

> A passive anti-theft device is one that is engaged automatically when the operator turns the ignition switch of the vehicle to the off position.  (A separate manual step is not required to engage the device).  The device must disable the vehicle by making the fuel, ignition, or starting system inoperative.

> Ignition interlock systems (mechanism that locks the steering column when the key is removed) do not qualify for the discount.

Nationwide insured the Willisches's 2004 Ford Explorer and 2008 Ford Expedition. NAIC insured Justice's 2000 Lincoln Town Car.  Each of these vehicles is equipped with the SecuriLock antitheft system.

As described earlier, because the SecuriLock system is activated when the operator turns the ignition to "off" using a properly coded key, it qualifies for the statutory antitheft discount.  The definition of "passive" antitheft device in Nationwide and NAIC's rate filings is almost identical to the statute's definition, with the only difference being that they add that a "separate manual step is not required to engage the device."  Because no separate manual step is required to engage the SecuriLock device, these vehicles qualify as "passive" under Nationwide and NAIC's rate filings.

The rate filings of the third group of insurers, comprised of Peerless, Encompass and USAA, define "passive" as where a "separate manual step is not required to activate the device."  They do not explicitly state that the device is activated when the ignition key is turned off.  Consequently, these descriptions are broader than the statutory definition. They simply describe a qualifying antitheft device as one that disables the fuel, ignition or starting system – one that immobilizes the vehicle.

Peerless's rate filing states as follows:

    1. Anti-Theft Devices

    a. The following discounts apply to [Comprehensive coverage]. To qualify, the vehicle must be equipped with:

    (1) a hood lock which can be released only from inside the vehicle; and

\*                        \*                      \*

    e. Passive Disabling Devices

    A 15% discount shall be afforded on vehicles equipped with passive disabling devices which disable the vehicle by making the fuel, ignition or starting system inoperative.  A disabling device is categorized as passive if a separate manual step is not required to engage the device.

Encompass's and USAA's rate filing are almost identical to Peerless's, except USAA does not require the vehicle to be equipped with a hood lock.[84]

As defined in the rate filings of these three insurers, an antitheft device is "passive" when a "separate manual step is not required to engage" it.  This definition is similar to the statutory definition; but, unlike the statute, it does not require a specific point in time when the antitheft system must be activated.  The statute states that the system must be automatically activated by the time the ignition is turned to "off."  The rate filings do not place any time restriction on when it must be activated.  In this way, the rate filing definition of "passive" is broader than the statute's, including devices that may not qualify under § 1799.1.

---

[84] Encompass's rate filing states: "To qualify for a discount on Comprehensive Coverage only, the auto must be equipped with (1) a hood lock which can only be released from inside the auto; *and* (2) . . . a passive disabling device which disables the vehicle by making the fuel, ignition or starting system inoperative.  A disabling device is categorized as passive if a separate manual step is NOT required to engage the device. . . ." (emphasis added).  USAA's rate filing defines a passive disabling device as one that "disable[s] the vehicle by making the fuel, ignition, or starting system inoperative . . . [and] a separate, manual step is not required to engage the device."

Peerless insured the Beseckers' 2004 Chrysler Pacifica and 2002 Buick Rendezvous, which are equipped with the Sentry Key and Pass-Key II antitheft systems, respectively. Encompass insured Kolesar's 2000 Chevy Blazer, which is equipped with the PassLock system. USAA insured Waterman's 2007 Nissan Murano, which was equipped with the Nissan immobilizer system.

As explained earlier, the antitheft systems on the plaintiffs' vehicles – Pass-Key III, Sentry Key, Nissan Vehicle Immobilizer, and PassLock systems – all qualify as "passive" under the antitheft device discount statute. They also qualify under these insurers' rate filings because they immobilize the vehicle by disabling at least one of the vehicle's fuel, ignition or starting systems.

The rate filings of the fourth group of insurers, comprised of Allstate Insurance Company, Allstate Indemnity and Allstate P&C, define "passive" as an anti-theft device or system which is "activated automatically when the driver turns the ignition key to the off position and the key is removed."[85] This definition includes language that is not in the statutory definition – "and the key is removed."

Allstate Insurance Company insured Warrick's 2003 Dodge Neon, which is equipped

---

[85] Specifically, Allstate Insurance Company's rate filing states: "Rule 40 - Anti-Theft Discount - Coverages HF, HG & HH: This rule applies to all private passenger motor vehicles . . . equipped with a passive anti-theft device or system which is activated automatically when the driver turns the ignition key to the off position, and the key is removed. . . ."

Allstate Indemnity's rate filing states: "Rule 29 - Anti-Theft Device Discount - Coverage HH: The Anti-Theft Device Discount applies to all insurable vehicles equipped with a passive anti-theft device or system which is activated automatically when the driver turns the ignition key to the off position and the key is removed."

Allstate P&C's rate filing states: "Rule 40 - Anti-Theft Discount - Coverages HF, HG & HH: This rule applies to all private passenger motor vehicles . . . equipped with a passive anti-theft device or system which is activated automatically when the driver turns the ignition key to the off position, and the key is removed. . . ."

with the Sentry Key system.  Allstate Indemnity insured Mecadon's 1997 Cadillac Eldorado, which is equipped with Pass-Key II.  Allstate P&C insured the Bucaris' 2005 Jeep Liberty Renegade, which is equipped with Sentry Key, and a 2008 Honda Accord, which is equipped with the Honda Immobilizer System.

Except for the Bucaris' Honda Accord, the vehicles insured by the Allstate defendants had either Sentry Key or Pass-Key II systems, which qualify as "passive" under the antitheft device discount statute.  Therefore, because the additional language "and the key is removed" in the insurers' rate filings defining "passive" does not disqualify these devices,[86] these devices necessarily also qualify as "passive" under Allstate Insurance, Allstate Indemnity and Allstate P&C's rate filing.

As we have concluded, one cannot determine, from the evidence presented, how the immobilizer in the Bucaris' Honda Accord works or how or when it is armed or activated.  Thus, it is not possible to determine whether this device qualifies as "passive" under the insurer's rate filing.

As explained earlier, some manufacturers instruct that the valid key must be removed from the ignition to arm the antitheft system.  Even if one, construing the statutory meaning of "passive" in a hyper-technical manner, concluded that the system is not activated until the key is removed once it is placed in the "off" position, the devices would still qualify under the rate filings of insurers in the third and fourth groups.

The rate filings of the third group of insurers, comprised of Peerless, Encompass and USAA, define "passive" as where a "separate manual step is not required to activate

---

[86] *See* our discussion, *supra*, explaining that the requirement to remove the valid key from the ignition is to prevent an unauthorized user from using a valid key to start and run the engine, which would defeat any antitheft protection and effectively disarm the device.

the device." Removing a key from the ignition switch is not a separate, manual step.  An operator removes the key from the ignition as part of the routine operation of the vehicle.  In the words of Mangine, it does not "require action on the part of the driver to arm the system (active system) as opposed to OEM [original equipment manufacturer] immobilizer systems, which require no action on the part of the driver (passive system)."

The rate filings of the fourth group of insurers, comprised of Allstate Insurance, Allstate Indemnity and Allstate P&C, define "passive" as an anti-theft device or system which is "activated automatically when the driver turns the ignition key to the off position and the key is removed."   The manufacturers of Pass-Key, PassLock, Sentry Key and Mercedes FBS III describe their devices as armed or activated when the ignition switch is turned to the "off" position with a valid key and the key is removed from the ignition.  These manufacturers' description of the antitheft device qualifying for the discount is almost identical to the rate-filing language.  Thus, failure to give the discount to an insured whose vehicle was equipped with one of these devices breached the implied terms of its contract with the plaintiff.

### *Claim for Breach of Express Terms of the Contract*

In two actions, *Waterman* and *Justice,* plaintiffs assert in their complaints an additional claim for breach of contract based on the express terms of the contract.  The plaintiffs in *Willisch*, *Mecadon, Bucari, Warrick* and *Lowe-Fenick/Boyle* also assert that the insurers breached the express terms of the insurance contracts, but allege these claims for the first time in their summary judgment motions.  The defendants argue that the plaintiffs who failed to allege this cause of action in their complaints cannot assert it now

in a summary judgment motion.  We agree.

At no time did the plaintiffs who raised this cause of action at the summary judgment stage move under Fed. R. Civ. P. 15 to amend the complaints to add this claim.  This additional cause of action has not been asserted timely in those cases other than *Waterman* and *Justice*.  Therefore, we shall not consider the claims of these other insureds for breach of contract based on the language in the insurance policies.

The express terms of the contract on which Waterman's breach of contract claim is based appear in the policy as follows:

> Provision 1:
>
> "We will make any calculations or adjustments of [the insured's] premium using the applicable rules, rates, and forms."

> Provision 2:
>
> "The premium is based on information we have received from [the insured] and other sources."

With respect to the first provision, Waterman alleges that USAA expressly incorporated its rate filing into the insurance contract, which it breached when it did not apply the rate filing in calculating plaintiff's premium.  Because the insurer's rate filings are incorporated into the insurance contract, and we already determined that USAA breached its contract with Waterman for violating its rate filing, this claim for breach of an express term of the contract is a redundant cause of action.

With respect to the second provision in which USAA represents that the premium USAA charges is based on information it has "received from [the insured] and other sources," Waterman alleges that USAA failed to take into account information it had in its

possession from Insurance Services Office, Inc. ("ISO") showing that plaintiff's vehicle had a qualifying device.[87]  He then asserts that USAA's failure to apply the antitheft discount to plaintiff's vehicle, which was equipped with a qualifying passive device, violated this express term of the insurance contract.

USAA's rate filing is similar to ISO's definition.  ISO defines a "passive disabling antitheft device"[88] as:

> any fuel, ignition or starting system cutoff that is automatically activated (does not require manual intervention).  One example is an electronic immobilizer system that prevents a car from starting unless a properly coded key is used in the vehicle's ignition.

USAA's rate filing defines a passive disabling device as one that "disable[s] the vehicle by making the fuel, ignition, or starting system inoperative . . . [and] a separate, manual step is not required to engage the device."

The information ISO supplied USAA identified Waterman's vehicle as equipped with a qualifying device.  There was a code with a "P" for "passive disabling" device.

Because the ISO information that USAA possessed showed that Waterman's vehicle was equipped with a passive disabling device (an ISO "P"), and USAA's definition of "passive" antitheft device in its rate filing is not unlike ISO's definition, USAA possessed information that Waterman's vehicle had an antitheft device that qualified for the "passive" discount under its rate filing.  Because USAA failed to base its premium on information it had "received from . . . other sources," USAA breached this express term of the contract.

---

[87] USAA and NAIC subscribe to a service provided by ISO that identifies which vehicles are equipped with certain types of passive antitheft devices.

[88] ISO codes antitheft devices as "A" = alarm; "D" = active disabling; "P" = passive disabling; and "-" = ATD info. not available.

In effect, this claim is no different than the implied contract one based on the rate-filing statute.

Justice relies on the following language in NAIC's insurance contract to support his claim for breach of the express terms of the contract:

> Provision 1:
>
> "Any terms of this policy which may be in conflict with statutes of [Pennsylvania] are hereby amended to conform."
>
> Provision 2:
>
> "The premium for each coverage is based on information in our possession."

The first provision is nothing more than a statement of the law.  It means that the terms of the antitheft device discount statute and the insurer's rate filings are incorporated into the insurance contract.  In any event, this claim for breach of an express term of the contract based on this contract provision is redundant of the claim for breach of the implied terms of the contract based on violation of the antitheft device statute.

The second policy provision on which Justice relies represents that the premium "is based on information in our possession."  NAIC's rate filing defines a  passive antitheft device as one that is "engaged automatically when the operator turns the ignition switch of the vehicle to the off position. . . [and a] separate manual step is not required to engage the device."  ISO defines a "passive disabling antitheft device"[89] as:

> any fuel, ignition or starting system cutoff that is automatically activated (does not require manual intervention).  One example is an electronic immobilizer system that prevents a car from starting unless a properly coded

---

[89] ISO codes antitheft devices as "A" = alarm; "D" = active disabling; "P" = passive disabling; and "-" = ATD info. not available.

key is used in the vehicle's ignition.

ISO's definition of a passive antitheft device differs from NAIC's definition in its rate filing.  It does not include NAIC's requirement that the device "engage automatically when the operator turns the ignition switch to the off position."  Consequently, the passive device information in NAIC's possession from ISO would not have aided in determining which vehicles were equipped with qualifying devices.   In other words, NAIC's and ISO's definitions of antitheft devices are dissimilar.  Therefore, Justice has not proven that NAIC had information in its possession from third-party vendors showing that plaintiffs' vehicles had antitheft devices qualifying for the discount under the statute or the rate filing.[90]

However, NAIC had another source of information that would have shown whether the vehicles had qualifying devices.  Standard NAIC company practice required agents to obtain "trailing documentation" -- preferably the owner's manual – to support an antitheft discount.[91]  Consequently, NAIC's agent had or should have had the owner's manual describing the antitheft system on Justice's vehicle.   That information would have demonstrated that the device qualified for the "passive" discount under the antitheft discount statute and/or its rate filing.   Thus, NAIC failed to base the premium on information in its possession, violating this express term of the contract.

---

[90] Notably, this does not excuse NAIC from liability for breach of the *implied* contract terms if it failed to determine that the Justice vehicles were equipped with antitheft devices that qualified for the discount under the statute or rate filings.

[91] *See* Nationwide MSJ (Doc. No. 43-2) at 5-6.

**Conclusion**

Based on the clear and unambiguous language of the passive antitheft device discount provision, § 1799.1, read in the context of the structure and the purpose of the MVFRL, we hold that insurers must give a ten percent discount on the premium for comprehensive coverage to all of its insureds whose vehicles are equipped with a passive antitheft device that meets the statutory definition, whether or not the insureds request the discount. We also hold that the failure to give the discount to those insureds whose vehicles contain passive antitheft devices as defined in the insurers' rate filings constitutes a breach of the implied terms of the insurance contracts.

Therefore, we shall grant the motions for summary judgment on plaintiffs' statutory and contract causes of action in their entirety of plaintiffs Willisch, Justice, Mecadon, Besecker, Warrick, Baldoni, Kolesar and Waterman; grant the motions for summary judgment of plaintiff Bucari as to only the 2005 Jeep Liberty Renegade and of plaintiff Boyle as to only the 2001 Ford Taurus; deny the motions of plaintiff Bucaris as to the 2008 Honda and of plaintiff Boyle as to the 1999 Jeep Grand Cherokee; and deny the motion of Lowe-Fenick in its entirety. With respect to the defendants' motions for summary judgment, we shall deny the summary judgment motions of all defendants except for Progressive, who is entitled to summary judgment on Lowe-Fenick's statutory and contract causes of action.